## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re                                         :        **Chapter 11**
                                              :
**OSCIENT PHARMACEUTICALS**                   :        **Case No. 09-16576**
**CORPORATION, *et al.*,**[1]                 :
                                              :        **(Jointly Administered)**
            **Debtors.**                      :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTOR'S MOTION FOR AN ORDER (A) AUTHORIZING AND APPROVING
BIDDING PROCEDURES AND FEES IN CONNECTION WITH
PROPOSED SALE OF FACTIVE AND RELATED ASSETS OF THE DEBTOR
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS AND PROPOSED ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS; (B) SCHEDULING A HEARING TO
CONSIDER APPROVAL OF THE SALE; (C) PRESCRIBING THE MANNER OF
NOTICE FOR SUCH HEARING; (D) AUTHORIZING AND APPROVING
ASSET PURCHASE AGREEMENT WITH CORNERSTONE BIOPHARMA
INC. OR ANOTHER BIDDER PROVIDING A HIGHER OR BETTER OFFER;
(E) AUTHORIZING THE SALE OF FACTIVE AND RELATED ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS;
(F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS; AND (G) GRANTING OTHER RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE

Oscient Pharmaceuticals Corporation, the debtor and debtor in possession herein (the

"Debtor"), hereby submits this motion (the "Motion") for an order (i) (a) authorizing bidding

procedures to be employed in connection with the proposed sale (the "Asset Sale") of FACTIVE

and related assets of the Debtor (collectively, the "Purchased Assets") to Cornerstone BioPharma

Inc., a Delaware corporation (together with any designees, the "Buyer") or another bidder

---

[1] The Debtors in these cases are Oscient Pharmaceuticals Corporation (Case No. 09-16576) and Guardian II
Acquisition Corporation (Case No. 09-16579).

submitting a higher or better offer at a proposed auction (the "Auction"); (b) authorizing a breakup fee and expense reimbursement in connection therewith; (c) scheduling an Auction and hearing to consider approval of the Asset Sale; (d) and approving the form and manner of notice of this Motion and the Sale Hearing (as defined below); and (ii) (a) approving that certain Asset Purchase Agreement dated July 13, 2009, between the Debtor and Buyer (the "Stalking Horse Purchase Agreement"), a true and correct copy of which is attached hereto and made a part hereof as Exhibit A; or an asset purchase agreement similar to the Stalking Horse Purchase Agreement submitted in connection with a higher or better offer at the Auction; (b) authorizing and approving sale of the Purchased Assets free and clear of liens, claims, encumbrances and interests; (c) authorizing assumption and assignment of certain executory contracts, and (d) granting related relief.[2]  In support of this Motion, the Debtor submits the Declaration of Philippe Maitre in Support of Chapter 11 Petitions and First Day Motions and Applications, sworn to on July 13, 2009 (the "Maitre Declaration"), and the Debtor respectfully states as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

---

[2] Capitalized terms used, but not defined, herein are used herein with the meanings assigned to them in the Stalking Horse Purchase Agreement.

## Background

2.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary

petition with this Court for relief under chapter 11 of the Bankruptcy Code.  Sections 1107(a)

and 1108 of the Bankruptcy Code authorize the Debtor to continue to operate its business and

manage its properties as debtor in possession.  No trustee or examiner has been appointed in the

Debtor's chapter 11 case.

## The Debtor's Businesses

3.      The Debtors are a commercial-stage pharmaceutical business that sells

United States Food and Drug Administration (FDA) approved pharmaceutical products in the

United States.  The Debtors have two products in the market: ANTARA (fenofibrate) capsules, a

cardiovascular product ("ANTARA"), and FACTIVE (gemifloxacin mesylate) tablets, a

fluoroquinolone antibiotic ("FACTIVE").  ANTARA is approved by the FDA to treat

hypercholesterolemia (high blood cholesterol) and hypertriglyceridemia.  FACTIVE is approved

by the FDA to treat community-acquired pneumonia and acute bacterial exacerbations of chronic

bronchitis.  ANTARA is the Debtors' primary product, accounting for over 80% of the Debtors'

2008 revenues (as compared to less than 20% for FACTIVE).  The Debtors also have a late-stage

antibiotic candidate, Ramoplanin, for the treatment of *Clostridium difficile*-associated disease

("Ramoplanin").

4.      Oscient Pharmaceuticals Corporation ("Oscient") licenses the active

pharmaceutical ingredient of FACTIVE from LG Life Sciences, Ltd., and owns all assets related

to FACTIVE.  Oscient's wholly owned subsidiary Guardian II Acquisition Corporation

("Guardian") licenses the active pharmaceutical ingredient of ANTARA from Ethypharm S.A.

and owns all assets related to ANTARA.  Oscient provides all sales, distribution, quality control,

and other operational services on behalf of Guardian, which has no personnel of its own.

11962495_7.DOC

5.      As of December 31, 2008, the Debtors' audited consolidated financial statements reflected total assets of approximately $174 million and total liabilities of approximately $255 million.  Until recently, the Debtors employed a sales and marketing staff of approximately 180 employees, including approximately 150 field sales representatives, and employed approximately 30 other personnel.  On June 19, 2009, however, the Debtors ceased their sales force and marketing operations, vacated their offices in Skillman, New Jersey, and terminated all but nine employees, including the entire sales and marketing staff.  The Debtors are headquartered in Waltham, Massachusetts.

### Capital Structure

6.      The Debtors' capital structure consists of various secured and unsecured notes as well as financing for the acquisition of ANTARA pursuant to a Revenue Interests Assignment Agreement (the "RIAA") with Paul Royalty Fund Holdings II, LP ("Paul Capital"). Oscient, the parent-level entity, has no secured debt but substantial unsecured obligations. Oscient's subsidiary Guardian, on the other hand, has substantial secured obligations, but limited unsecured debt.

7.      Oscient and Guardian are joint obligors under the RIAA to Paul Capital. Guardian (but not Oscient) is also obligated to Paul Capital under a secured note for a principal amount of $20 million.  Under the RIAA, Paul Capital transferred $40 million to the Debtors in 2006 in connection with the Debtors' acquisition of ANTARA.  In exchange, the Debtors are obligated to pay to Paul Capital a portion of revenues from sales of ANTARA and FACTIVE through 2016.  The RIAA also provides that, upon certain occurrences, including a bankruptcy filing by Oscient or Guardian, Paul Capital has a "Put" right to require the Debtors to make a lump sum payment to Paul Capital (the "Put Amount"), after which the RIAA terminates.  The

Debtors estimate the current Put Amount at approximately $65 million.  Both Guardian's secured

note and the obligations under the RIAA are secured by a first lien on substantially all of

Guardian's assets.

8.      In November 2008, Oscient issued convertible notes due 2011 (the

"Second Lien Notes") in exchange for retiring $212,979,000 in aggregate principal amount of

unsecured notes due 2011.  In May 2009, Oscient issued additional Second Lien Notes in

exchange for retiring $15,363,372 in aggregate principal and interest of unsecured notes due

2009.  As of July 13, 2009, $47,944,000 in principal amount of Second Lien Notes are

outstanding.  Guardian has guaranteed the Second Lien Notes, and this guarantee is secured by a

second lien on substantially all of Guardian's assets.

9.      Oscient also has outstanding approximately $14,816,000 in various

convertible unsecured notes issued prior to 2008 (the "Unsecured Notes").  The Unsecured Notes

are not obligations of Guardian and are not secured.

### Events Leading to these Chapter 11 Cases

10.      Two principal factors have caused the Debtors to seek protection under

Chapter 11 of the Bankruptcy Code: (i) a highly leveraged balance sheet with significant near

term debt maturities; and (ii) the potential advent of generic competition for the Debtors' primary

commercial product.

11.      The Debtors have substantial amounts of secured and unsecured debt

maturing in the next twelve to twenty-four months.  The unprecedented contraction of the equity

and credit markets in the United States and the general downturn in the domestic and global

economy have prevented the Debtors from raising funds necessary to repay or to refinance this

debt.  The Debtors have taken action to address the excess debt on their balance sheet, including

a successful reduction of their indebtedness by nearly $125 million through a debt exchange in
November 2008.  Nevertheless, the Debtors' leveraged balance sheet and the imminent
maturities of their debt obligations have hindered the acquisition of new products and entry into
new licensing and co-promotion agreements that would have maximized the value of the
Debtors' then-existing primary care sales force and commercial infrastructure.

12.      Second, starting in 2008 generic drug makers have challenged the
Debtors' ability to exclusively sell ANTARA under the patents licensed to the Debtors.  The
Debtors learned of the first of these challenges days after consummating the aforementioned debt
exchange in November of 2008.  If successful, these challenges would introduce generic versions
of ANTARA to the market, substantially reducing the value of the Debtors' rights in ANTARA.
Because ANTARA sales comprise the majority of the Debtors' revenue, these challenges have
generated substantial uncertainty concerning the Debtors' long term profitability and limited the
Debtors' options for raising capital, acquiring products, and entering into new strategic
partnerships.

13.      In response to the Debtors' financial difficulties, the Debtors' management
team has taken significant steps to adapt the Debtors' operations and capital structure to the
increasingly competitive pharmaceutical and biotechnology industry and to reduce their overall
cost structure, including the exchange offerings and reduction in force noted above.  As part of
this process, in February 2009, the Debtors retained Broadpoint Capital, Inc. ("Broadpoint") as
their financial advisor to pursue strategic alternatives.  Through Broadpoint, the Debtors
approached approximately 130 potentially interested parties, including both strategic and
financial entities, to investigate opportunities for a sale or reorganization of the Debtors'

business.  In addition, the Debtors engaged in a dialogue with Paul Capital and other creditor constituencies regarding debt restructuring.

14.    As a result of Broadpoint's marketing efforts, the Debtors received various offers for their rights and assets with respect to ANTARA, FACTIVE, and Ramoplanin.  The Debtors, after reviewing these offers to determine which were the highest and best, have entered into negotiations regarding asset purchase agreements with various stalking horse bidders for the sale of ANTARA, FACTIVE, and Ramoplanin, respectively, in auction sales pursuant to section 363 of the Bankruptcy Code.

## Purchase and Sale of FACTIVE

15.    To preserve the value of FACTIVE to a prospective purchaser, it is imperative that the Debtor sell its interests in FACTIVE in the near term.  FACTIVE is primarily prescribed during winter months and so, at the present time, the Debtor's current customer base of FACTIVE users is relatively small.  Further, FACTIVE competes in the heavily populated antibiotics market.  The Debtor cannot promote FACTIVE and generate new prescriptions in coming months due to the Debtor's recent elimination of its sales force.  This greatly reduces the Debtor's expected sales and thus the value of FACTIVE.  Accordingly, to preserve and maximize FACTIVE's value, the Debtor must sell its interests in FACTIVE with all reasonable speed to a buyer that can promote the drug.

16.    As discussed above, the Debtor retained Broadpoint in February 2009 to, among other things, locate potential purchasers of FACTIVE.  Broadpoint contacted more than 130 potential purchasers.  Of these, numerous expressions of interest and offers were received.  The Debtor ultimately considered Buyer's offer to be the highest and best offer, accepted

Buyer's offer to serve as the "stalking horse" at an auction of the Purchased Assets, and entered

into the Stalking Horse Purchase Agreement on July 13, 2009.

### Relief Requested

17.     By this Motion, the Debtor requests an order, substantially in the form of

the order attached hereto as <u>Exhibit B</u> (the "<u>Bidding Procedures Order</u>"), authorizing and

approving (i) the bidding procedures to be employed in connection with the proposed Asset Sale;

(ii) (a) an expense reimbursement fee equal to the lesser of (x) $75,000 and (y) Buyer's actual

expenses incurred in connection with the Asset Sale, including expenses of counsel and other

consultants (the "<u>Expense Reimbursement Fee</u>") and (b) a break-up fee equal to the lesser of

(x) $100,000 and (y) 35% of the excess of the amount of the Counteroffer over (1) the Purchase

Price plus (2) $175,000 (the "<u>Break-Up Fee</u>"), each such fee payable in the event that the Court

fails to approve a sale to Buyer and instead approves a sale of the Purchased Assets to an entity

that has submitted a counteroffer and such sale closes; (iii) scheduling an auction and hearing to

approve the Asset Sale; and (iv) approving the form and manner of notice of the Motion and the

Sale Hearing.

18.     The Debtor further requests that, at the Sale Hearing, the Court enter an

order substantially in the form of <u>Exhibit C</u> hereto (the "<u>Sale Order</u>") (i) approving a sale to

Buyer pursuant to the Stalking Horse Purchase Agreement or to another bidder submitting a

higher or better offer (the "<u>Purchaser</u>") (ii) approving the Stalking Horse Purchase Agreement or

a substantially similar asset purchase agreement applicable the Purchaser, and (iii) authorizing

the Debtor (a) to sell the Purchased Assets, free and clear of all liens, claims, encumbrances, and

interests (other than certain specified assumed liabilities), and (b) to assume and assign to the

Purchaser certain executory contracts associated with the Debtor's business (the "<u>Assigned Contracts</u>").

### A.  <u>The Proposed Sale to Buyer</u>

19.     On July 13, 2009, the Debtor and Buyer entered into the Stalking Horse Purchase Agreement, subject to higher and better offers and the approval of this Court.  Pursuant to the Stalking Horse Purchase Agreement, Buyer has offered to purchase the Purchased Assets for a purchase price of $5,000,000 (the "<u>Purchase Price</u>"), plus additional amounts for inventory on hand, plus a portion of the Buyer's revenues from future adjusted net sales of FACTIVE.

20.     Below is a summary of material provisions of the Stalking Horse Purchase Agreement.  The summary is intended solely to give the Court and interested parties an overview of the material terms of the Stalking Horse Purchase Agreement.  Interested parties should refer to the Stalking Horse Purchase Agreement for the complete terms thereof.  To the extent that any inconsistency exists between this Motion and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall control.

a)  <u>Purchase Price</u>.  $5,000,000, plus additional amounts for inventory on hand, plus fifteen percent of the Buyer's revenues from adjusted net sales of FACTIVE.

b)  <u>Deposit</u>.  $500,000 cash deposit (currently held by Ropes & Gray LLP in an escrow account).

c)  <u>Purchased Assets</u>.  Assets related to FACTIVE, including trademarks, customer records and contracts, the Debtors' license to the FACTIVE intellectual property, certain assigned contracts, and including certain assigned causes of action related to trademarks and patents related solely to FACTIVE ("<u>Assigned Causes of Action</u>")

d)  <u>Excluded Assets</u>.  The Purchased Assets do not include any asset not specifically listed as a Purchased Asset.  Assets excluded from Purchased Assets include (a) cash and cash equivalents on hand as of the Closing, (b) tax refunds, (c) claims or causes of action (including avoidance and other causes of action under the Bankruptcy Code), other than Assigned Causes of Action, (d) contracts other than the Assigned Contracts, (e) accounts receivable, and (f) Ramoplanin and all assets related to Ramoplanin.

e) <u>Assumed Liabilities</u>.  Buyer assumes (a) cure obligations and post-closing obligations with respect to Assigned Contracts and (b) obligations with respect to FACTIVE product returned after the Closing Date.

f) <u>Bankruptcy Court Approval</u>.  The sale is conditioned upon entry an order of the Bankruptcy Court authorizing the Asset Sale free and clear of liens, claims, encumbrances, and interests in form and substance reasonably satisfactory to Debtor and Buyer, including a determination that Buyer is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

g) <u>Termination</u>.  Buyer may terminate the Stalking Horse Purchase Agreement (i) after thirty days following the Petition Date if the Bidding Procedures Order is not entered, (ii) after fifty-five days following the Petition Date hereof, if the Sale Order is not entered, and (iii) after three days following the entry of the Sale Order if the Closing has not occurred other than as a result of Buyer's material breach.

**B.     The Bidding Procedures**

21.     The Stalking Horse Purchase Agreement requires entry of a bidding procedures order in the form of the Bidding Procedures Order, or otherwise reasonably satisfactory to Debtor and Buyer.  The Bidding Procedures Order must contain the following <u>non-waivable requirements</u> for qualified counteroffers and other bidding protections:

a) Any counteroffer shall provide for:

(i) a purchase price with a minimum cash component payable at closing of $5,275,000 plus the Inventory Purchase Price;

(ii) other consideration that Debtor in its discretion acting in good faith determines constitutes a higher and better offer;

(iii) a cash deposit of $500,000; and

(iv) such bid to be irrevocable until the closing of the Sale.

b) Any bidder submitting a counteroffer shall demonstrate to Debtor's satisfaction in Debtor's reasonable discretion that it is (a) financially able to consummate the transaction contemplated by such bid, which ability may be demonstrated by submission of current audited or unaudited financial statements or other reasonable evidence, or, if the bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited or

unaudited financial statements or other reasonable evidence of the equity holders of the

bidder, and (b) able to consummate the transaction on the date and on the terms

contemplated by the asset purchase agreement submitted the counteroffer (the

"Counteroffer Asset Purchase Agreement").

c) The terms and conditions of the counteroffer must be, in aggregate, not materially more

burdensome to Debtor than provisions contained in the Stalking Horse Purchase

Agreement as determined by Debtor in its sole discretion exercised in good faith.

22.    The Bidding Procedures Order must contain the following additional

requirements for counteroffers provided that the Debtor, in its sole discretion, may waive any of

these requirements:

a) Any counteroffer shall:

> (i) contain a case caption as set forth above and be filed with the Bankruptcy Court, 1101 Thomas P. O'Neill, Jr. Federal Building, 10 Causeway Street, Boston, MA 02222-1074 on or before 12:00 noon on the third business day prior to the scheduled date of the Sale Hearing (the "Bidding Deadline"), with a copy delivered so that it is actually received by (i) bankruptcy counsel for the Debtor, Charles A. Dale III, K&L GATES, LLP, State Street Financial Center, One Lincoln Street, Boston, MA 02111-2950, Telecopy: 617-261-3175; (ii) corporate counsel for the Debtor, James M. Wilton, Ropes & Gray LLP, One International Place, Boston, MA 02110-2624, Telecopy: 617-951-7050, (iii) counsel to Buyer, David B. Clement, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., 2500 Wachovia Capitol Center, Post Office Box 2611, Raleigh, NC 27602-2611, Telecopy: 919-821-6800; (iv) counsel to the Creditors' Committee, _____ _____, (v) counsel to Paul Royalty Fund Holdings II, LP, John Sigel, Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, MA 02100, and James Millar, Wilmer Cutler Pickering Hale and Dorr LLP, 399 Park Avenue, New York, NY 10022, and (vi) counsel to the Office of the United States Trustee, Eric K. Bradford, 10 Causeway Street, Room 1184, Boston, MA 02222-1043 before the Bidding Deadline; and

> (ii) be accompanied by (a) a cash deposit with counsel to the Debtor (to be received on or before the last business day prior to the scheduled date of the Sale Hearing) equal to $500,000, (b) a duly executed, signed,

detailed asset purchase agreement on terms in aggregate not materially more burdensome to the Debtor than provisions contained herein as determined by the Debtor in its sole discretion exercised in good faith, *provided* that (x) the bidder shall be substituted for Buyer and (y) the purchase price shall have a cash component payable at closing in an amount not less than $5,275,000 plus the Inventory Purchase Price, and (c) evidence of such bidder's financial ability to consummate the transaction on the date and on the terms contemplated by the asset purchase agreement to the Seller's satisfaction in its reasonable discretion, which ability may be demonstrated by submission of current audited or unaudited financial statements or other reasonable evidence, or, if the bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited or unaudited financial statements or other reasonable evidence of the equity holders of the bidder.

b)   The entity submitting a counteroffer shall enter into joint escrow instructions with the Debtor and its corporate counsel Ropes & Gray LLP regarding the deposit delivered in connection with such counteroffer.

**C.**   **Sale Hearing Date; Objection and Counteroffer Deadline**

23.   Buyer has a right to terminate the Stalking Horse Purchase Agreement unless the Court enters a sale order approving the sale to Buyer in the form of the Sale Order or otherwise reasonably satisfactory to Buyer.  Although the Debtor has the ability to waive the requirement, the sale procedures contemplated in the Stalking Horse Purchase Agreement require that the deadline for objections and counteroffers be the Bidding Deadline.

**D.**   **Assumption and Assignment of License and Additional Assigned Contracts**

24.   Under the Stalking Horse Purchase Agreement, the Buyer shall pay any cure costs associated with the Assigned Contracts, which are to be assumed and assigned as a condition to the closing.

**E.**   **Notice**

25.   To ensure that adequate notice of the Asset Sale is provided, the Debtor seeks approval of a form of Notice of Sale attached hereto as Exhibit D (the "Notice of Sale").

11962495_7.DOC

26.     Within two business days following entry of the Bidding Procedures Order, the Debtor will serve copies of the Bidding Procedures Order and the Notice of Sale upon: (a) the Office of the United States Trustee for the District of Massachusetts, Eastern Division (the "US Trustee"); (b) counsel to Paul Capital; (c)  the Indenture Trustees for the Debtor's Second Lien and Unsecured Notes, or their counsel; (d) the creditors holding the 30 largest unsecured claims against the Debtor's estate; (e) all parties known to have asserted liens against the Purchased Assets; (f) federal and state taxing authorities' offices which have a reasonably known interest in the relief requested in the Motion; (g) counsel to the Buyer; and (h) all parties who have filed notices of appearance requesting service of notices and pleadings in this case and any party that has expressed an interest in a transaction with respect to the Purchased Assets within the last twelve months.  In addition, within two business days of the entry of the Bidding Procedures Order, the Debtor will serve a copy of the Notice of Sale upon all other creditors and other persons entitled to notice under Bankruptcy Rule 2002(a).

27.     Within two business days of entry of the Bidding Procedures Order, the Debtor will serve copies of the Bidding Procedures Order and the notice of the assumption and assignment of the Assigned Contracts substantially in the form attached hereto as Exhibit E upon all non-debtor parties to Assigned Contracts.

28.     As soon as practicable after entry of the Bidding Procedures Order, the Debtor shall give notice of the proposed sale by publishing the Notice of Sale in the *Boston Globe*.

29.     The Debtor submits that each of the foregoing notices provides the recipient with ample notice of the relief requested, the relative impact that such relief may have on the recipient and the procedures that a recipient must follow in the event that such recipient

wishes to respond, participate in the Auction, or otherwise object to the relief requested, as the case may be, and that that the foregoing notices therefore constitute good and sufficient notice of the Bidding Procedures, the Sale Hearing, the assumption and assignment of the Assigned Contracts, this Motion, and all relief contemplated thereby.

**Basis for Relief**

**A.    The Asset Sale is Within the Debtor's Sound Business Judgment**

30.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor in possession is given these rights by section 1107(a) of the Bankruptcy Code. See 11 U.S.C. § 1107(a). Moreover, section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

31.    A sale of a debtor's assets should be authorized pursuant to Bankruptcy Code section 363 if a sound business purpose exists for doing so. In re Aerovox, 269 B.R. 74, 80 (Bankr. D. Mass. 2001); see also In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Lionel Corp., 722 F.2d 1063, 1071-72 (2d Cir. 1983).

32.    A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice. In re Cadkey Corp., 317 B.R. 19, 22 (D. Mass. 2004); In re Aerovox, Inc., 269 B.R. at 80 (citing In re Logical Software, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)). A debtor-in-possession or a trustee is often obliged to make difficult business decisions that may later be open to serious criticism by obstreperous creditors.

DiStefano v. Stern (In re J.F.D. Enters., Inc.), 223 B.R. 610, 625 (Bankr. D. Mass. 1998) (citing

Mosser v. Darrow, 341 U.S. 267, 273-74 (1951)).  Nevertheless, such decisions are entitled to

"great judicial deference."  In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991), vacated on

other grounds, 165 B.R. 1 (D.P.R. 1992); see also In re Thinking Machs. Corp., 182 B.R. 365,

368 (D. Mass. 1995) (emphasizing "the high degree of deference usually afforded purely

economic decisions of trustees"), rev'd on other grounds, 67 F.3d 1021 (1st Cir. 1995).  In

considering approval of a debtor's business decision, the court does not act as an arbiter of

disputes between creditors and the estate but as an "overseer of the wisdom with which the

bankruptcy estate's property is being managed by the trustee or debtor-in-possession."  In re

Aerovox, Inc., 269 B.R. at 80 (quoting In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir.

1993)).

       33.     Courts have applied various factors in determining whether a sound

business justification exists, including: (i) whether a sound business reason exists for the

proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the

transaction has been proposed and negotiated in good faith; and (iv) whether adequate and

reasonable notice is provided.  See Fulton State Bank v. Schipper (In re Schipper), 933 F.2d.

513, 515 (7th Cir. 1991); see also In re Lionel Corp., 722 F.2d at 1071 (setting forth the "sound

business purpose" test); accord In re Montgomery Ward Holding Corp., 242 B.R. 147, 153-54

(D. Del. 1999).  While the Bankruptcy Code does not define "good faith," the First Circuit has

used the traditional equitable definition of good faith in the context of a good faith purchaser,

requiring that such purchaser provide value in good faith and without knowledge of adverse

claims.  Jeremiah v. Richardson, 148 F.3d 17, 23 (1st Cir. 1998).

34. The proposed Asset Sale pursuant to the Stalking Horse Purchase Agreement (as may be modified at the Auction) is supported by sound business justifications. The Debtor firmly believes that creditors will receive more value through a prompt sale of the Purchased Assets than through continued operations and that a prompt sale is necessary to maximize the value of the Purchased Assets for the estate.

(i)    Sound Business Reasons Exist for the Asset Sale

35. There is more than adequate business justification to sell the Purchased Assets to a successful bidder. Based upon the Debtor's limited ongoing operations and business prospects, the Debtor's Board of Directors, after a meeting and after consultation with the Debtor's financial advisor and other professionals, believes that a sale of the Purchased Assets is in the best interests of the Debtor's estate. The Debtor cannot promote FACTIVE and generate new prescriptions in coming months due to the Debtor's recent elimination of its sales force, which greatly reduces the Debtor's expected sales and thus the value of FACTIVE. Accordingly, to preserve and maximize FACTIVE's value, the Debtor must sell its interests in FACTIVE with all reasonable speed to a buyer that can promote the drug.

(ii)   The Consideration Offered is Fair and Reasonable

36. The Debtor has determined that the Asset Sale according to the sale procedures described herein and in the Stalking Horse Purchase Agreement will enable the Debtor to obtain the highest and best offers for the Purchased Assets and maximize the value of the Purchased Assets for the estate. The Debtor retained Broadpoint in February 2009 to locate potential purchasers of FACTIVE. Broadpoint contacted more than 130 potential purchasers. Of these, numerous expressions of interest and offers were received. The Debtor ultimate considered Buyer's offer to be the highest and best offer, accepted Buyer's offer to serve as the

"stalking horse" at an auction of the Purchased Assets and entered into the Stalking Horse
Purchase Agreement on July 13, 2009. Accordingly, the Debtor submits that the Asset Sale will
provide fair and reasonable consideration.

(iii)    The Debtor has Presented the Proposed Asset Sale in Good Faith

37.    The Stalking Horse Purchase Agreement provides that a Sale Order will
require a finding of the Court that the successful bidder is a good faith purchaser within the
meaning of section 363(m) of the Bankruptcy Code. The Debtor has fully disclosed and
requested the Court's approval of all of the terms and conditions of the proposed sale and intends
to provide notice as directed by the Court. Furthermore, the Debtor will be prepared to introduce
evidence at the Sale Hearing regarding the conduct of the Auction and the negotiation of the
Stalking Horse Purchase Agreement. Accordingly, the Asset Sale pursuant to the Stalking Horse
Purchase Agreement has been proposed, and is, in good faith.

(iv)    Adequate Notice of the Asset Sale is Being Provided

38.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside
of the ordinary course of business may be by private sale or by public auction. Further, pursuant
to Bankruptcy Rule 2002, twenty day notice by mail is sufficient notice of the proposed use, sale,
or lease of property of the estate other than in the ordinary course of business. Subject to
Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under
Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and
conditions of any private sale, and the time fixed for filing objections. See Fed. R. Bankr. P.
2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it
generally describes the property. Id.

39.    The Debtor respectfully submits that the notice, procedures, and rules set forth in the Motion satisfy the notice requirements of the Bankruptcy Rules and section 363(b) of the Bankruptcy Code, constitute good and sufficient notice, and that no other or further notice is required.

**B.    The Break-up Fee and Expense Reimbursement are Warranted**

40.    To compensate Buyer for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Debtor and Buyer seek authority for the Debtor to pay Buyer the Expense Reimbursement Fee and the Break-up Fee in the event Buyer is not the successful bidder, the Court approves a sale of the Purchased Assets to an entity that has submitted a counteroffer, and such sale closes.  The Expense Reimbursement Fee and the Break-up Fee shall be payable at the closing of the sale in connection with such counteroffer from the first proceeds of such sale without further order of the Court.  The Expense Reimbursement Fee and the Break-up Fee, when earned, shall constitute administrative claims under Bankruptcy Code Sections 503(b)(1) and 507(a)(1).

41.    The Debtor and Buyer believe that the Expense Reimbursement Fee and the Break-up Fee are reasonable, given the benefits to the estates of having the Stalking Horse Purchase Agreement as a definitive agreement and the risk to Buyer that a third-party offer ultimately may be accepted, and that the Break-up Fee and Expense Reimbursement are necessary to preserve and enhance the value of the Debtor's estates.

42.    Bidding incentives such as a breakup fee encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts have approved

bidding incentives similar to the Break-up Fee and Expense Reimbursement under the "business

judgment rule," which prescribes against judicial second-guessing of the actions of a

corporation's board of directors taken in good faith and in the exercise of honest judgment.  See,

e.g., In re 995 Fifth Avenue Assocs. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding

incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by

providing some form of compensation for the risks it is undertaking") (citation omitted); Official

Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147

B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (establishing three

basic factors for determining whether to permit such fees in bankruptcy: whether (1) relationship

of parties who negotiated break-up fee is tainted by self-dealing or manipulation; (2) fee

hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to

purchase price).

43.     The United States Court of Appeals for the Third Circuit also established

standards for determining the appropriateness of bidding incentives in the bankruptcy context.  In

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527

(3d Cir. 1999), the Court found that even though bidding incentives are measured against a

business judgment standard in nonbankruptcy transactions, the administrative expense provisions

of Bankruptcy Code section 503(b) govern in the bankruptcy context.  Accordingly, to be

approved, bidding incentives must provide some benefit to the debtor's estate.  See id. at 533.

44.     The O'Brien court identified at least two instances in which bidding

incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a

breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would

not have been made and without which bidding would have been limited."  Id. at 537.  Second,

where the availability of bidding incentives induce a bidder to research the value of the debtor

and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the

bidder may have provided a benefit to the estate by increasing the likelihood that the price at

which the debtor is sold will reflect its true worth." Id.

45.    The Expense Reimbursement Fee and the Break-up Fee satisfy both the

"business judgment rule" and the O'Brien court's more restrictive "administrative expense"

standard.  The Stalking Horse Purchase Agreement and the Expense Reimbursement Fee and the

Break-up Fee are the product of good faith, arm's-length negotiations between the Debtor and

Buyer.  The Break-up Fee and Expense Reimbursement are fair and reasonable in amount,

particularly in view of Buyer's efforts to date and the risk to Buyer of not acquiring the

Purchased Assets.  Further, the Break-up Fee and Expense Reimbursement already have

encouraged competitive bidding, in that Buyer would not have entered into the Stalking Horse

Purchase Agreement without this provision.  The Break-up Fee and Expense Reimbursement

thus have "induc[ed] a bid that otherwise would not have been made and without which bidding

would [be] limited." Id.  Similarly, Buyer's offer, which was formulated only after substantial

due diligence review of the Purchased Assets and their value, provides a minimum bid on which

other bidders can rely, thereby "increasing the likelihood that the price at which the [Purchased

Assets will be] sold will reflect [their] true worth." Id.

46.    Finally, the mere existence of the Break-up Fee and Expense

Reimbursement permits the Debtor to insist that competing bids for the Assets be materially

higher or otherwise better than Buyer's bid, a clear benefit to the Debtor's estates.

47.    In sum, the Debtor's ability to offer the Break-up Fee and Expense

Reimbursement enable it to ensure that the sale of the Purchased Assets will be to a

contractually-committed bidder at a price it believes to be fair.  At the same time, the Break-up

Fee and Expense Reimbursement provide the Debtor with the potential of even greater benefit to

the estate.  Accordingly, the Break-up Fee and Expense Reimbursement should be approved.

**C.**     **Assumption and Assignment of Executory Contracts**

48.     As required by the Stalking Horse Purchase Agreement, the Debtor also

seeks by this Motion authority to assume and assign to Buyer the Assigned Contracts.  In

assuming and assigning the Assigned Contracts, the Debtor and Buyer shall comply with the

provisions of Bankruptcy Code Section 365(f)(2).

49.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of
> the debtor only if –
>
>> (A)     the trustee assumes such contract or lease in
>> accordance with the provisions of this section; and
>
>> (B)     adequate assurance of future performance by the
>> assignee of such contract or lease is provided, whether or
>> not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under Bankruptcy Code section 365(a), a debtor, "subject to the court's

approval, may assume or reject any executory contract or unexpired lease of the debtor."  11

U.S.C. § 365(a).

50.     Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for

assuming an unexpired lease or executory contract of a debtor.  This subsection provides:

> (b) (1) If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee may not assume such
> contract or lease unless, at the time of assumption of such contract
> or lease, the trustee –
>
>> (A)     cures, or provides adequate assurance that the
>> trustee will promptly cure, such default . . . ;

11962495_7.DOC

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

51.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("the degree of assurance necessary falls considerably short of an absolute guaranty"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

52.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

53.    The Debtor will adduce facts at the Sale Hearing to show the financial wherewithal of Buyer's or the successful bidder's experience in the industry and willingness and ability to perform under the contracts to be assumed and assigned to it.  The Sale Hearing will therefore provide the Court and the other interested parties the opportunity to evaluate and, if necessary, challenge the ability of Buyer or the successful bidder to provide adequate assurance of future performance under the contracts to be assumed, as required under Bankruptcy Code

section 365(b)(1)(C).  The Court should therefore authorize the Debtor to assume and assign contracts as set forth herein.

54.    The Debtor also requests that the Court include in its order relating to this Motion provisions barring non-debtor parties to executory contracts, assumed and assigned under such order, from: (i) asserting any default, loss, or liability against the assignee of such contract based on any event or circumstance arising prior to the date of assignment; or (ii) objecting to the assumption and assignment of its contract, unless the non-debtor party timely objects to this Motion.

**D.    Authorization for Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**

55.    Bankruptcy Code § 363(f) provides that a debtor may sell property "free and clear of any interest in such property of an entity other than the estate, only if –

a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b)    such entity consents;

c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d)    such interest is in bona fide dispute; or

e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Accordingly, a sale free and clear of liens, claims, and interests is permitted under Bankruptcy Code § 363(f)(3).

**F.    Compliance with MLBR 6004-1(a)(1)(A)**

56.    MLBR 6004-1(a)(1)(A) provides that "if all or substantially all of a chapter 11 debtor's assets are to be sold, the motion shall state why the sale is proposed under 11

U.S.C. § 363 rather than through a chapter 11 plan and shall contain a practical and abbreviated equivalent of the adequate information required in a disclosure statement to a chapter 11 plan." The Purchased Assets constitute the Debtor's primary asset but, arguably, not all or substantially all of the Debtor's assets.  Further, the information presented in the Maitre Declaration, as well as the information presented herein and in other motions filed in this case, have provided a practical and abbreviated equivalent of the adequate information required in a disclosure statement to a chapter 11 plan.  Accordingly, the Debtor has satisfied MLBR 6004-1(a)(1)(A).

### Conclusion

57.     For all of the foregoing reasons, the Debtor respectfully requests that the Court enter an order in the form attached hereto as Exhibit B (i) (a) authorizing bidding procedures to be employed in connection with the Asset Sale of the Purchased Assets to Buyer or another bidder submitting a higher or better offer at the Auction; (b) authorizing a breakup fee in connection therewith; (c) scheduling an Auction and hearing to consider approval of the Asset Sale; and (d) approving the form and manner of notice of the Motion and the Sale Hearing; and (ii) (a) approving the Stalking Horse Purchase Agreement, a true and correct copy of which is attached hereto and made a part hereof as Exhibit A; or an asset purchase agreement similar to the Stalking Horse Purchase Agreement submitted in connection with a higher or better offer at the Auction; (b) authorizing and approving a sale of the Purchased Assets free and clear of liens, claims, encumbrances and interests; (c) authorizing assumption and assignment of certain executory contracts, and (d) granting related relief.

Dated: Boston, Massachusetts
        July 14, 2009

Respectfully submitted,

OSCIENT PHARMACEUTICALS CORP.

By its proposed counsel,

*/s/ Charles A. Dale III*
Charles A. Dale III (BBO No. 558839)
Mackenzie L. Shea (BBO No. 666241)
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Tel:  (617) 261-3100
Fax: (617) 261-3175

E-mail:
        chad.dale@klgates.com
        mackenzie.shea@klgates.com

11962495_7.DOC