UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re                      :       Chapter 11
                        :

OSCIENT PHARMACEUTICALS    :       Case No. 09-16576 (HJB)
CORPORATION, *et al.*,[1]       :
                        :       (Jointly Administered)
        Debtors.        :
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION FOR AN ORDER (A) AUTHORIZING AND APPROVING BIDDING
PROCEDURES AND BREAK-UP FEE IN CONNECTION WITH
PROPOSED SALE OF ANTARA AND RELATED ASSETS OF THE DEBTORS
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS AND PROPOSED ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS; (B) SCHEDULING A HEARING TO
CONSIDER APPROVAL OF THE SALE; (C) PRESCRIBING THE MANNER OF
NOTICE FOR SUCH HEARING; (D) AUTHORIZING AND APPROVING
ASSET PURCHASE AGREEMENT WITH AKRIMAX PHARMACEUTICALS,
LLC OR ANOTHER BIDDER PROVIDING A HIGHER OR BETTER OFFER;
(E) AUTHORIZING THE SALE OF ANTARA AND RELATED ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS;
(F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS; AND (G) GRANTING OTHER RELATED RELIEF**

TO THE HONORABLE HENRY J. BOROFF
CHIEF UNITED STATES BANKRUPTCY JUDGE

       Guardian II Acquisition Corporation, on behalf of itself and its affiliated debtor and

debtor in possession, Oscient Pharmaceuticals Corporation (collectively, the "Debtors"), hereby

submits this motion (the "Motion") for an order (the "Order") (i) (a) authorizing bidding

procedures to be employed in connection with the proposed sale (the "Asset Sale") of ANTARA

and related assets of the Debtors (collectively, the "Purchased Assets") to Akrimax

---

[1] The Debtors in these cases are Oscient Pharmaceuticals Corporation (Case No. 09-16576) and Guardian II Acquisition Corporation (Case No. 09-16579).

Pharmaceuticals, LLC, a Delaware limited liability company (together with any designees, the "<u>Buyer</u>") or another bidder submitting a higher or better offer at a proposed auction (the "<u>Auction</u>"); (b) authorizing a breakup fee in connection therewith; (c) scheduling an Auction and hearing to consider approval of the Asset Sale; (d) and approving the form and manner of notice of this Motion and the Sale Hearing (as defined below); and (ii) (a) approving that certain Asset Purchase Agreement dated August 7, 2009, between the Debtors and Buyer (the "<u>Stalking Horse Purchase Agreement</u>"), a true and correct copy of which, except for the schedules thereto, is attached hereto and made a part hereof as <u>Exhibit A</u>; or an asset purchase agreement similar to the Stalking Horse Purchase Agreement or other offer submitted in connection with a higher or better offer at the Auction; (b) authorizing and approving sale of the Purchased Assets free and clear of liens, claims, encumbrances and interests; (c) authorizing assumption and assignment of certain executory contracts, and (d) granting related relief.[2]

### Jurisdiction and Venue

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "<u>Bankruptcy Code</u>").

### Background

2.      On July 13, 2009 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions with this Court for relief under chapter 11 of the Bankruptcy Code.  Sections 1107(a)

---

[2] Capitalized terms used, but not defined, herein are used herein with the meanings assigned to them in the Stalking Horse Purchase Agreement.

and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their business and manage their properties as debtors in possession.  No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

### The Debtors' Businesses

3.      The Debtors are a commercial-stage pharmaceutical business that sells United States Food and Drug Administration (FDA) approved pharmaceutical products in the United States.  The Debtors have two products in the market: ANTARA (fenofibrate) capsules, a cardiovascular product ("ANTARA"), and FACTIVE (gemifloxacin mesylate) tablets, a fluoroquinolone antibiotic ("FACTIVE").  ANTARA is approved by the FDA to treat hypercholesterolemia (high blood cholesterol) and hypertriglyceridemia.  FACTIVE is approved by the FDA to treat community-acquired pneumonia and acute bacterial exacerbations of chronic bronchitis.  ANTARA is the Debtors' primary product, accounting for over 80% of the Debtors' 2008 revenues (as compared to less than 20% for FACTIVE).  The Debtors also have a late-stage antibiotic candidate, Ramoplanin, for the treatment of *Clostridium difficile*-associated disease ("Ramoplanin").

4.      Oscient Pharmaceuticals Corporation ("Oscient") licenses the active pharmaceutical ingredient of FACTIVE from LG Life Sciences, Ltd., and owns all assets related to FACTIVE.  Oscient's wholly owned subsidiary Guardian II Acquisition Corporation ("Guardian") licenses the active pharmaceutical ingredient of ANTARA from Ethypharm S.A. and owns all assets related to ANTARA.  Oscient provides all sales, distribution, quality control, and other operational services on behalf of Guardian, which has no personnel of its own.

5.      As of December 31, 2008, the Debtors' audited consolidated financial statements reflected total assets of approximately $174 million and total liabilities of approximately $255 million.  Until recently, the Debtors employed a sales and marketing staff of

approximately 180 employees, including approximately 150 field sales representatives, and

employed approximately 30 other personnel.  On June 19, 2009, however, the Debtors ceased

their sales force and marketing operations, vacated their offices in Skillman, New Jersey, and

terminated all but nine employees, including the entire sales and marketing staff.  The Debtors

are headquartered in Waltham, Massachusetts.

### Capital Structure

6.     The Debtors' capital structure consists of various secured and unsecured

notes as well as financing for the acquisition of ANTARA pursuant to a Revenue Interests

Assignment Agreement (the "RIAA") with Paul Royalty Fund Holdings II, LP ("Paul Capital").

Oscient, the parent-level entity, has no secured debt but substantial unsecured obligations.

Oscient's subsidiary Guardian, on the other hand, has substantial secured obligations, but limited

unsecured debt.

7.     Oscient and Guardian are joint obligors under the RIAA to Paul Capital.

Guardian (but not Oscient) is also obligated to Paul Capital under a secured note for a principal

amount of $20 million.  Under the RIAA, Paul Capital transferred $40 million to the Debtors in

2006 in connection with the Debtors' acquisition of ANTARA.  In exchange, the Debtors are

obligated to pay to Paul Capital a portion of revenues from sales of ANTARA and FACTIVE

through 2016.  The RIAA also provides that, upon certain occurrences, including a bankruptcy

filing by Oscient or Guardian, Paul Capital has a "Put" right to require the Debtors to make a

lump sum payment to Paul Capital (the "Put Amount"), after which the RIAA terminates.  The

Debtors estimate the current Put Amount at approximately $65 million.  Both Guardian's secured

note and the obligations under the RIAA are secured by a first lien on substantially all of

Guardian's assets.

8.      In November 2008, Oscient issued convertible notes due 2011 (the

"Second Lien Notes") in exchange for retiring $212,979,000 in aggregate principal amount of

unsecured notes due 2011.  In May 2009, Oscient issued additional Second Lien Notes in

exchange for retiring $15,363,372 in aggregate principal and interest of unsecured notes due

2009.   As of July 13, 2009, $47,944,000 in principal amount of Second Lien Notes are

outstanding.  Guardian has guaranteed the Second Lien Notes, and this guarantee is secured by a

second lien on substantially all of Guardian's assets.

9.      Oscient also has outstanding approximately $14,816,000 in various

convertible unsecured notes issued prior to 2008 (the "Unsecured Notes").  The Unsecured Notes

are not obligations of Guardian and are not secured.

### Events Leading to these Chapter 11 Cases

10.      Two principal factors have contributed to the weakening of the Debtors'

financial situation, which ultimately led the Debtors to seek protection under Chapter 11 of the

Bankruptcy Code: (i) an excess of debt on the balance sheet and significant near term debt

maturities; and (ii) the potential advent of generic competition for the Debtors' two commercial

products.

11.      The Debtors have substantial amounts of secured and unsecured debt

maturing in the next twelve to twenty-four months.  The unprecedented contraction of the equity

and credit markets in the United States and the general downturn in the domestic and global

economy have prevented the Debtors from raising funds necessary to repay or to refinance this

debt.  The Debtors have taken action to address the excess debt on their balance sheet, including

a successful reduction of their indebtedness by nearly $125 million through a debt exchange in

November 2008.  Nevertheless, the Debtors' leveraged balance sheet and the imminent

maturities of their debt obligations have hindered the acquisition of new products and entry into new licensing and co-promotion agreements that would have maximized the value of the Debtors' then-existing primary care sales force and commercial infrastructure.

12.     Second, starting in 2008 generic drug makers have challenged the Debtors' ability to exclusively sell ANTARA under the patents licensed to the Debtors.  The Debtors learned of the first of these challenges days after consummating the aforementioned debt exchange in November of 2008.  If successful, these challenges would introduce generic versions of ANTARA to the market, substantially reducing the value of the Debtors' rights in ANTARA.  Because ANTARA sales comprise the majority of the Debtors' revenue, these challenges have generated substantial uncertainty concerning the Debtors' long term profitability and limited the Debtors' options for raising capital, acquiring products, and entering into new strategic partnerships.

13.     In response to the Debtors' financial difficulties, the Debtors' management team has taken significant steps to adapt the Debtors' operations and capital structure to the increasingly competitive pharmaceutical and biotechnology industry and to reduce their overall cost structure, including the exchange offerings and reduction in force noted above.  As part of this process, in February 2009, the Debtors retained Broadpoint Capital, Inc. ("Broadpoint") as their financial advisor to pursue strategic alternatives.  Through Broadpoint, the Debtors approached approximately 130 potentially interested parties, including both strategic and financial entities, to investigate opportunities for a sale or reorganization of the Debtors' business.

12018818_4.DOC

**Purchase and Sale of ANTARA**

14.     To preserve the value of ANTARA to a prospective purchaser, it is imperative that the Debtors sell their interests in ANTARA in the near term.  ANTARA is an important but nevertheless small competitor in the heavily populated cholesterol treatment market.  The Debtors cannot promote ANTARA and generate new prescriptions in coming months due to the Debtors' recent elimination of their sales force.  In addition, the Debtors cannot cost effectively maintain operations for the length of the anticipated revenue stream from continuing sales of ANTARA.  Accordingly, to preserve and maximize ANTARA's value, the Debtors must sell their interests in ANTARA with all reasonable speed.

15.     As discussed above, the Debtors retained Broadpoint in February 2009 to, among other things, locate potential purchasers of ANTARA.  Broadpoint contacted more than 130 potential purchasers.  Of the numerous expressions of interest and offers received, the Debtors ultimately considered Buyer's offer to be the highest and best offer, accepted Buyer's offer to serve as the "stalking horse" at an auction of the Purchased Assets, and entered into the Stalking Horse Purchase Agreement on August 7, 2009.

**Relief Requested**

16.     By this Motion, the Debtors request an order, substantially in the form of the order attached hereto as Exhibit B (the "Bidding Procedures Order"), authorizing and approving (i) the bidding procedures to be employed in connection with the proposed Asset Sale; (ii) (a) a fee of $300,000 as reimbursement of Buyer's costs and expenses and as a break-up fee (the "Break-Up Fee"), payable in the event that the Court fails to approve a sale to Buyer and several other contingencies occur; (iii) scheduling an auction and hearing to approve the Asset Sale; and (iv) approving the form and manner of notice of the Motion and the Sale Hearing.

17.    The Debtors further request that, at the Sale Hearing, the Court enter an order substantially in the form of Exhibit C hereto (the "Sale Order") (i) approving a sale to Buyer pursuant to the Stalking Horse Purchase Agreement or to another bidder submitting a higher or better offer (the "Successful Purchaser") (ii) approving the Stalking Horse Purchase Agreement or a substantially similar asset purchase agreement applicable the Successful Purchaser, and (iii) authorizing the Debtors (a) to sell the Purchased Assets, free and clear of all liens, claims, encumbrances, and interests (other than certain specified assumed liabilities), and (b) to assume and assign to the Successful Purchaser certain executory contracts associated with the Debtors' business (the "Assigned Contracts").

## A.    The Proposed Sale to Buyer

18.    On August 7, 2009, the Debtors and Buyer entered into the Stalking Horse Purchase Agreement, subject to higher and better offers and the approval of this Court. Pursuant to the Stalking Horse Purchase Agreement, Buyer has offered to purchase the Purchased Assets for a purchase price of $20,000,000, plus assumed liabilities.

19.    Below is a summary of material provisions of the Stalking Horse Purchase Agreement. The summary is intended solely to give the Court and interested parties an overview of the material terms of the Stalking Horse Purchase Agreement. Interested parties should refer to the Stalking Horse Purchase Agreement for the complete terms thereof. To the extent that any inconsistency exists between this Motion and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement shall control.

a) Purchase Price. $20,000,000 plus assumed liabilities.

b) Deposit. $1,200,000 cash deposit (currently held by Ropes & Gray LLP in an escrow account).

12018818_4.DOC

c) <u>Purchased Assets</u>.  Assets related to ANTARA, including trademarks and patents, customer records and contracts, the Debtors' license to the ANTARA intellectual property, certain assigned contracts, and including certain assigned causes of action related to trademarks and patents related solely to ANTARA ("<u>Assigned Causes of Action</u>")

d) <u>Excluded Assets</u>.  The Purchased Assets do not include any asset not specifically listed as a Purchased Asset.  Assets excluded from Purchased Assets include (a) cash and cash equivalents on hand as of the Closing, (b) tax refunds, (c) claims or causes of action (including avoidance and other causes of action under the Bankruptcy Code), other than Assigned Causes of Action, (d) contracts other than the Assigned Contracts, (e) accounts receivable, (f) certain trademarks, (g) FACTIVE and all assets related to FACTIVE, and (h) Ramoplanin and all assets related to Ramoplanin.

e) <u>Assumed Liabilities</u>.  Buyer assumes, among other things, (a) certain cure obligations and post-closing obligations with respect to Assigned Contracts and (b) certain obligations with respect to ANTARA product returned after the Closing Date.

f) <u>Bankruptcy Court Approval</u>.  The sale is conditioned upon entry an order of the Bankruptcy Court authorizing the Asset Sale free and clear of liens, claims, encumbrances, and interests in form and substance reasonably satisfactory to Debtors and Buyer, including determinations that the Debtors may assume and assign certain contracts to Buyer and that Buyer is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

g) <u>Termination</u>.  Buyer may terminate the Stalking Horse Purchase Agreement (i) if the Bidding Procedures Order is not entered by certain deadlines set forth in the Stalking Horse Purchase Agreement, (ii) if the Sale Order is not entered by certain deadlines set forth in the Stalking Horse Purchase Agreement, (iii) after three days following the entry of the Sale Order, if the Closing has not occurred other than as a result of Buyer's material breach, (iv) if there is an uncured breach by the Debtors, or (v) if either Debtor's chapter 11 case is converted to a chapter 7 case or if a trustee is appointed in either Debtor's chapter 11 case.

20.     The Stalking Horse Purchase Agreement does not include a separate purchase price adjustment for the Debtor's inventory.  In addition, the agreement requires the Debtors to pay up to $2,900,000 in respect of potential cure costs associated with assumption and assignment of the Ethypharm Contract.

21.     The Debtors have omitted Schedule 1.1.3 from the copy of Stalking Horse Purchase Agreement attached hereto as <u>Exhibit A</u> due to confidentiality agreements with certain

parties disclosed in that schedule.  The Debtors respectfully request that the Court order

disclosure of the schedule, so as to provide more complete information of the Stalking Horse

Purchase Agreement to potential bidders for the Purchased Assets without violating the Debtors'

confidentiality obligations.

**B.      The Bidding Procedures**

22.     The Stalking Horse Purchase Agreement requires entry of a bidding

procedures order in the form of the Bidding Procedures Order, or otherwise reasonably

satisfactory to the Debtors and Buyer.

23.     The proposed Bidding Procedures Order provides that the Debtors will

pay a Break-up Fee, as described above, in various circumstances in which the Buyer is not the

successful bidder, including circumstances in which a sale to another bidder may not have been

approved or where a credit bid may have been made by the Debtors' secured lender, Paul

Royalty, which does not result in a cash payment to the Debtors' estates.

24.     Pursuant to the Bidding Procedures Order, any counteroffer must contain

the following non-waivable requirements:

a)  Any Counteroffer shall provide for:

(i) a purchase price with a minimum cash component payable at closing of
$20,600,000;

(ii) other consideration that the Debtors in their discretion acting in good
faith determine constitutes a higher and better offer than that of the Buyer
pursuant to the Stalking Horse Purchase Agreement; and

(iii) a cash deposit of $1,200,000.

b)  Notwithstanding the foregoing, a creditor holding a valid secured claim against the
Purchased Assets may, in accordance with the Bankruptcy Code, credit bid all or a
portion of its secured claim and, if its secured claim exceeds $1,200,000, need not deliver
a cash deposit.

12018818_4.DOC

25.    The Bidding Procedures Order must contain the following additional

requirements for counteroffers <u>provided that the Debtors, in their sole discretion, may waive any</u>

<u>of these requirements</u>:

a)  Any Counteroffer shall:

    i)   contain a case caption as set forth above and be filed[3] with the United States Bankruptcy Court for the District of Massachusetts, 1101 Thomas P. O'Neill, Jr. Federal Building, 10 Causeway Street, Boston, MA 02222-1074 on or before 12:00 noon on _____, 2009, the fourth business day prior to the first scheduled date of the Sale Hearing (the "<u>Bidding Deadline</u>"), with a copy delivered so that it is actually received by  (i) counsel for the Debtors, K&L Gates LLP, State Street Financial Center, One Lincoln Street, Boston, MA 02111, Attn: Charles A. Dale III, and Ropes & Gray LLP, One International Place, Boston, MA 02110-2624, Attn: James M. Wilton, Esq., Telecopy: 617-951-7050; (ii) counsel to Buyer, Lowenstein Sandler LLP, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Michael J. Lerner, Telecopy: 973-597-2400; (iii) counsel to Paul Royalty Fund Holdings II, LP, Wilmer Cutler Pickering Hale and Dorr LLP, 60 State Street, Boston, MA 02100, Attn: John Sigel, and Wilmer Cutler Pickering Hale and Dorr LLP, 399 Park Avenue, New York, NY 10022 Attn: James Millar, Telecopy: 212-230-8888; (iv) counsel to the Official Committee of Unsecured Creditors, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111, Attn: Richard E. Mikels; and (v) counsel to the Office of the United States Trustee, 10 Causeway Street, Room 1184, Boston, MA 02222-1043, Attn:  Eric K. Bradford before the Bidding Deadline;

    ii)  be accompanied by an executed asset purchase agreement in the form of the Asset Purchase Agreement with such changes as are acceptable to the entity submitting the Counteroffer, including a purchase price expressed in U.S. Dollars and accompanied by all exhibits and schedules thereto (a "<u>Counteroffer Asset Purchase Agreement</u>"); and

    iii) be accompanied by a marked copy of the Counteroffer Asset Purchase Agreement showing changes from the Asset Purchase Agreement.

b)  In lieu of a Counteroffer Asset Purchase Agreement, an entity submitting a Counteroffer may submit a detailed and binding term sheet for the acquisition of stock of the reorganized Debtors through a plan of reorganization.

---

[3] Please note that Counteroffers filed by facsimile will not be accepted pursuant to Rule 5005-4(a)(4) of the Local Rules of the U.S. Bankruptcy Court for the District of Massachusetts.

c) The cash deposit delivered in connection with the Counteroffer shall be delivered to Ropes & Gray LLP, by certified check or wire transfer, so as to be received on or before _____, 2009, the last business day prior to the first scheduled date of the Sale Hearing.

d) The entity submitting a Counteroffer shall enter into joint escrow instructions with the Debtors and Ropes & Gray LLP regarding the deposit delivered in connection with such Counteroffer.

e) The terms and conditions of the Counteroffer must be, in aggregate, not materially more burdensome to the Debtors than provisions contained in the Asset Purchase Agreement.

f) Any bidder submitting a Counteroffer shall demonstrate to the Debtors' satisfaction in the Debtors' sole discretion that it is (a) financially able to consummate the transactions contemplated by the Counteroffer, which ability may be demonstrated by submission of bank statements, current audited or unaudited financial statements, or other reasonable evidence, or, if the bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited or unaudited financial statements or other reasonable evidence of the financial capability of the equity holders of the bidder, and (b) able to consummate the transaction on the date and on the terms contemplated by the Counteroffer Asset Purchase Agreement.

## C.      Sale Hearing Date; Objection and Counteroffer Deadline

26.      Buyer has a right to terminate the Stalking Horse Purchase Agreement unless the Court enters a sale order approving the sale to Buyer in the form of the Sale Order or otherwise reasonably satisfactory to Buyer.  Although the Debtors have the ability to waive the requirement, the sale procedures contemplated in the Stalking Horse Purchase Agreement require that the deadline for objections and counteroffers be the Bidding Deadline.

## D.      Assumption and Assignment of License and Additional Assigned Contracts

27.      Under the Stalking Horse Purchase Agreement, and except as described above in connection with the Ethypharm Contract, the Buyer shall pay any cure costs associated with the Assigned Contracts, which are to be assumed and assigned as a condition to the closing.

## E.      Notice

28.      To ensure that adequate notice of the Asset Sale is provided, the Debtors seek approval of a form of Notice of Sale attached hereto as Exhibit D (the "Notice of Sale").

12018818_4.DOC

29.     Within two business days following entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures Order and the Notice of Sale upon: (a) the Office of the United States Trustee for the District of Massachusetts, Eastern Division (the "US Trustee"); (b) counsel to Paul Capital; (c)  the Indenture Trustees for the Debtors' Second Lien and Unsecured Notes, or their counsel; (d) the creditors holding the 30 largest unsecured claims against the Debtors' estates on a consolidated basis; (e) all parties known to have asserted liens against the Purchased Assets; (f) federal and state taxing authorities' offices which have a reasonably known interest in the relief requested in the Motion; (g) counsel to the Buyer; (h) counsel to the Official Committee of Unsecured Creditors; and (i) all parties who have filed notices of appearance requesting service of notices and pleadings in this case and any party that has expressed an interest in a transaction with respect to the Purchased Assets within the last twelve months.  In addition, within two business days of the entry of the Bidding Procedures Order, the Debtors will serve a copy of the Notice of Sale upon all other creditors and other persons entitled to notice under Bankruptcy Rule 2002(a).

30.     Within two business days of entry of the Bidding Procedures Order, the Debtors will serve copies of the Bidding Procedures Order and the notice of the assumption and assignment of the Assigned Contracts substantially in the form attached hereto as Exhibit E upon all non-debtor parties to Assigned Contracts.

31.     As soon as practicable after entry of the Bidding Procedures Order, the Debtors shall give notice of the proposed sale by publishing the Notice of Sale in the *Boston Globe*.

32.     The Debtors submit that each of the foregoing notices provides the recipient with ample notice of the relief requested, the relative impact that such relief may have

12018818_4.DOC

on the recipient and the procedures that a recipient must follow in the event that such recipient

wishes to respond, participate in the Auction, or otherwise object to the relief requested, as the

case may be, and that that the foregoing notices therefore constitute good and sufficient notice of

the Bidding Procedures, the Sale Hearing, the assumption and assignment of the Assigned

Contracts, this Motion, and all relief contemplated thereby.

**Basis for Relief**

**A.      The Asset Sale is Within the Debtors' Sound Business Judgment**

33.      Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  A debtor in possession is given these rights by

section 1107(a) of the Bankruptcy Code.  See 11 U.S.C. § 1107(a).  Moreover, section 105(a) of

the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C.

§ 105(a).

34.      A sale of a debtor's assets should be authorized pursuant to Bankruptcy

Code section 363 if a sound business purpose exists for doing so.  In re Aerovox, 269 B.R. 74, 80

(Bankr. D. Mass. 2001); see also In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Lionel

Corp., 722 F.2d 1063, 1071-72 (2d Cir. 1983).

35.      A debtor's business decision should be approved by the court unless it is

shown to be so manifestly unreasonable that it could not be based upon sound business

judgment, but only on bad faith, or whim or caprice.  In re Cadkey Corp., 317 B.R. 19, 22

(D. Mass. 2004); In re Aerovox, Inc., 269 B.R. at 80 (citing In re Logical Software, 66 B.R. 683,

686 (Bankr. D. Mass. 1986)).  A debtor-in-possession or a trustee is often obliged to make

difficult business decisions that may later be open to serious criticism by obstreperous creditors. DiStefano v. Stern (In re J.F.D. Enters., Inc.), 223 B.R. 610, 625 (Bankr. D. Mass. 1998) (citing Mosser v. Darrow, 341 U.S. 267, 273-74 (1951)).  Nevertheless, such decisions are entitled to "great judicial deference."  In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992); see also In re Thinking Machs. Corp., 182 B.R. 365, 368 (D. Mass. 1995) (emphasizing "the high degree of deference usually afforded purely economic decisions of trustees"), rev'd on other grounds, 67 F.3d 1021 (1st Cir. 1995).  In considering approval of a debtor's business decision, the court does not act as an arbiter of disputes between creditors and the estate but as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession."  In re Aerovox, Inc., 269 B.R. at 80 (quoting In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993)).

36.     Courts have applied various factors in determining whether a sound business justification exists, including: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided.  See Fulton State Bank v. Schipper (In re Schipper), 933 F.2d. 513, 515 (7th Cir. 1991); see also In re Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business purpose" test); accord In re Montgomery Ward Holding Corp., 242 B.R. 147, 153-54 (D. Del. 1999).  While the Bankruptcy Code does not define "good faith," the First Circuit has used the traditional equitable definition of good faith in the context of a good faith purchaser, requiring that such purchaser provide value in good faith and without knowledge of adverse claims.  Jeremiah v. Richardson, 148 F.3d 17, 23 (1st Cir. 1998).

37.     The proposed Asset Sale pursuant to the Stalking Horse Purchase Agreement (as may be modified at the Auction) is supported by sound business justifications. The Debtors firmly believe that creditors will receive more value through a prompt sale of the Purchased Assets than through continued operations and that a prompt sale is necessary to maximize the value of the Purchased Assets for the estate.

(i)      Sound Business Reasons Exist for the Asset Sale

38.     There is more than adequate business justification to sell the Purchased Assets to a successful bidder.  Based upon the Debtors' limited ongoing operations and business prospects, the Debtors' Board of Directors, after a meeting and after consultation with the Debtors' financial advisor and other professionals, believes that a sale of the Purchased Assets is in the best interests of the Debtors' estates.  The Debtors cannot promote ANTARA and generate new prescriptions due to the Debtors' recent elimination of their sales force.  In addition, the Debtors are winding down their business and cannot maintain operations for the length of time necessary to collect anticipated sales revenues from continuing sales of ANTARA.  Accordingly, to preserve and maximize ANTARA's value, the Debtors must sell their interests in ANTARA with all reasonable speed.

(ii)     The Consideration Offered is Fair and Reasonable

39.     The Debtors have determined that the Asset Sale according to the sale procedures described herein and in the Stalking Horse Purchase Agreement will enable the Debtors to obtain the highest and best offers for the Purchased Assets and maximize the value of the Purchased Assets for the estate.  The Debtors retained Broadpoint in February 2009 to locate potential purchasers of ANTARA.  Broadpoint contacted more than 130 potential purchasers.  Of these, numerous expressions of interest and offers were received.  The Debtors ultimately

12018818_4.DOC

considered Buyer's offer to be the highest and best offer, accepted Buyer's offer to serve as the "stalking horse" at an auction of the Purchased Assets and entered into the Stalking Horse Purchase Agreement on August 7, 2009. Accordingly, the Debtors submit that the Asset Sale will provide fair and reasonable consideration.

(iii)    The Debtors Have Presented the Proposed Asset Sale in Good Faith

40.    The Stalking Horse Purchase Agreement provides that a Sale Order will require a finding of the Court that the successful bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors have fully disclosed and requested the Court's approval of all of the terms and conditions of the proposed sale and intend to provide notice as directed by the Court. Furthermore, the Debtors will be prepared to introduce evidence at the Sale Hearing regarding the conduct of the Auction and the negotiation of the Stalking Horse Purchase Agreement. Accordingly, the Asset Sale pursuant to the Stalking Horse Purchase Agreement has been proposed, and is, in good faith.

(iv)    Adequate Notice of the Asset Sale is Being Provided

41.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction. Further, pursuant to Bankruptcy Rule 2002, twenty day notice by mail is sufficient notice of the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. See Fed. R. Bankr. P. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. Id.

42.    The Debtors respectfully submit that the notice, procedures, and rules set forth in the Motion satisfy the notice requirements of the Bankruptcy Rules and section 363(b) of the Bankruptcy Code, constitute good and sufficient notice, and that no other or further notice is required.

**B.    The Break-Up Fee is Warranted**

43.    To compensate Buyer for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Debtors and Buyer seek authority for the Debtors to pay Buyer the Break-up Fee in various circumstances in which the Buyer is not the successful bidder, including circumstances in which a sale to another bidder may not have been approved or where a credit bid may have been made by the Debtors' secured lender, Paul Royalty, which does not result in a cash payment to the Debtors' estates.  The Break-up Fee, when earned, shall constitute an administrative claim under Bankruptcy Code Sections 503(b) and 507(a)(2).  However, pursuant to the Final Order with Respect to Guardian II Acquisition Corporation (i) Authorizing Use of Cash Collateral, (ii) Granting Adequate Protection, and (iii) Modifying the Automatic Stay entered in the Case (the "Final Cash Collateral Order"), the Debtors will pay the Break-up Fee using cash collateral that would otherwise be entirely subject to a lien in favor of Paul Royalty.  Accordingly, payment of the Break-up Fee is an expense that will be borne by Paul Royalty and the payment will not adversely affect the Debtors' estates even if a sale at a higher price is not immediately consummated.

44.    The Debtors and Buyer believe that the Break-up Fee is reasonable, given the benefits to the estates of having the Stalking Horse Purchase Agreement as a definitive agreement and the risk to Buyer that a third-party offer ultimately may be accepted, and that the Break-up Fee is necessary to preserve and enhance the value of the Debtors' estates.

12018818_4.DOC

45.     Bidding incentives such as a break-up fee encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Break-up Fee under the "business judgment rule," which prescribes against judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth Avenue Assocs. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (establishing three basic factors for determining whether to permit such fees in bankruptcy: whether (1) relationship of parties who negotiated break-up fee is tainted by self-dealing or manipulation; (2) fee hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to purchase price).

46.     The United States Court of Appeals for the Third Circuit also established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Court found that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate.  See id. at 533.

47.     The O'Brien court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

48.     The Break-up Fee satisfies both the "business judgment rule" and the O'Brien court's more restrictive "administrative expense" standard.  The Stalking Horse Purchase Agreement and the Break-up Fee are the product of good faith, arm's-length negotiations between the Debtors and Buyer.  The Break-up Fee is fair and reasonable in amount, particularly in view of Buyer's efforts to date and the risk to Buyer of not acquiring the Purchased Assets.  Further, the Break-up Fee already has encouraged competitive bidding, in that Buyer would not have entered into the Stalking Horse Purchase Agreement without this provision.  The Break-up Fee thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." Id.  Similarly, Buyer's offer, which was formulated only after substantial due diligence review of the Purchased Assets and their value, provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Purchased Assets will be] sold will reflect [their] true worth." Id.

49.     Finally, the mere existence of the Break-up Fee permits the Debtors to insist that competing bids for the Assets be materially higher or otherwise better than Buyer's bid, a clear benefit to the Debtors' estates.

50.     In sum, the Debtors' ability to offer the Break-up Fee enables them to ensure that the sale of the Purchased Assets will be to a contractually-committed bidder at a price they believe to be fair.  At the same time, the Break-up Fee provides the Debtors with the potential of even greater benefit to the estate.  Accordingly, the Break-up Fee should be approved.

## C.     Assumption and Assignment of Executory Contracts

51.     As required by the Stalking Horse Purchase Agreement, the Debtors also seek by this Motion authority to assume and assign to Buyer the Assigned Contracts.  In assuming and assigning the Assigned Contracts, the Debtors and Buyer shall comply with the provisions of Bankruptcy Code Section 365(f)(2).

52.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> > (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
> >
> > (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

53.     Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –

(A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

54.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("the degree of assurance necessary falls considerably short of an absolute guaranty"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

55.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

56.     The Debtors will adduce facts at the Sale Hearing to show the financial wherewithal of Buyer's or the successful bidder's experience in the industry and its willingness and ability to perform under the contracts to be assumed and assigned to it.  The Sale Hearing will therefore provide the Court and the other interested parties the opportunity to evaluate and,

if necessary, challenge the ability of Buyer or the successful bidder to provide adequate assurance of future performance under the contracts to be assumed, as required under Bankruptcy Code section 365(b)(1)(C). The Court should therefore authorize the Debtors to assume and assign contracts as set forth herein.

57.    The Debtors also request that the Court include in its order relating to this Motion provisions barring non-debtor parties to executory contracts, assumed and assigned under such order, from: (i) asserting any default, loss, or liability against the assignee of such contract based on any event or circumstance arising prior to the date of assignment; or (ii) objecting to the assumption and assignment of its contract, unless the non-debtor party timely objects to this Motion.

**D.    Authorization for Sale Free and Clear of Liens, Claims, Encumbrances, and Interests**

58.    Bankruptcy Code § 363(f) provides that a debtor may sell property "free and clear of any interest in such property of an entity other than the estate, only if –

a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b)    such entity consents;

c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d)    such interest is in bona fide dispute; or

e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Accordingly, a sale free and clear of liens, claims, and interests is permitted under Bankruptcy Code § 363(f)(3).

**F.    Compliance with MLBR 6004-1(a)(1)(A)**

12018818_4.DOC

59.     MLBR 6004-1(a)(1)(A) provides that "if all or substantially all of a chapter 11 debtor's assets are to be sold, the motion shall state why the sale is proposed under 11 U.S.C. § 363 rather than through a chapter 11 plan and shall contain a practical and abbreviated equivalent of the adequate information required in a disclosure statement to a chapter 11 plan." The Purchased Assets constitute the Debtors' primary asset but, arguably, not all or substantially all of the Debtors' assets.  Further, the information presented in the Maitre Declaration, as well as the information presented herein and in other motions filed in this case, have provided a practical and abbreviated equivalent of the adequate information required in a disclosure statement to a chapter 11 plan.  Accordingly, the Debtors have satisfied MLBR 6004-1(a)(1)(A).

### Conclusion

60.     For all of the foregoing reasons, the Debtors respectfully request that the Court enter an order in the form attached hereto as Exhibit B (i) (a) authorizing bidding procedures to be employed in connection with the Asset Sale of the Purchased Assets to Buyer or another bidder submitting a higher or better offer at the Auction; (b) authorizing a breakup fee in connection therewith; (c) scheduling an Auction and hearing to consider approval of the Asset Sale; and (d) approving the form and manner of notice of the Motion and the Sale Hearing; and (ii) (a) approving the Stalking Horse Purchase Agreement, a true and correct copy of which, except for the schedules thereto, is attached hereto and made a part hereof as Exhibit A; or an asset purchase agreement similar to the Stalking Horse Purchase Agreement submitted in connection with a higher or better offer at the Auction; (b) authorizing and approving a sale of the Purchased Assets free and clear of liens, claims, encumbrances and interests; (c) authorizing assumption and assignment of certain executory contracts, and (d) granting related relief.

12018818_4.DOC

Dated: Boston, Massachusetts
        August 7, 2009

Respectfully submitted,

OSCIENT PHARMACEUTICALS CORP. and
GUARDIAN II ACQUISITION CORP.

By their counsel,

*/s/ Charles A. Dale III*
Charles A. Dale III (BBO No. 558839)
Mackenzie L. Shea (BBO No. 666241)
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Tel:  (617) 261-3100
Fax: (617) 261-3175

E-mail:
        chad.dale@klgates.com
        mackenzie.shea@klgates.com