<u>EXECUTION VERSION</u>

ASSET PURCHASE AGREEMENT

dated as of August 7, 2009,

by and among

GUARDIAN II ACQUISITION CORPORATION

and

OSCIENT PHARMACEUTICALS CORPORATION

collectively, as Sellers,

AKRIMAX PHARMACEUTICALS, LLC

as Buyer

11977205_16.DOC

# TABLE OF CONTENTS

Page

1.    Purchase and Sale of the Purchased Assets........................................................1

2.    Closing; Deliveries at Closing...........................................................................8

3.    Representations of Sellers .................................................................................9

4.    Representations of Buyer .................................................................................12

5.    Conditions Precedent to the Obligations of Buyer ..........................................13

6.    Conditions Precedent to Obligations of Sellers...............................................15

7.    Covenants of the Parties..................................................................................16

8.    Conduct of Auction and Closing of Sale..........................................................24

9.    Notices............................................................................................................25

10.   Termination.....................................................................................................26

11.   Certain Definitions. ........................................................................................27

12.   Waiver .............................................................................................................29

13.   Entire Agreement ............................................................................................30

14.   Assignment......................................................................................................30

15.   Governing Law; Bankruptcy Court Jurisdiction ..............................................30

16.   No Third Party Beneficiaries...........................................................................30

17.   No Liability of Officers and Directors .............................................................30

18.   Survival of Representations and Warranties ....................................................30

19.   Counterparts ...................................................................................................30

20.   Severability......................................................................................................31

21.   Headings..........................................................................................................31

List of Schedules
Schedule 1.1.1          Trademarks
Schedule 1.1.3          Assigned Contract and Additional Assigned Contracts
Schedule 1.1.4          Patents
Schedule 1.2.8          Excluded Trademarks
Schedule 3.7            Licenses to the Product
Schedule 3.9            References
Schedule 3.11           Inventory
Schedule 3.12           Product Distribution Practices

List of Exhibits
Exhibit 1.5.1           Joint Escrow Instructions
Exhibit 5.2(a)          Bill of Sale
Exhibit 5.2(b)          Assumption and Assignment Agreement
Exhibit 5.3             Assignment of Trademarks
Exhibit 5.4             Assignment of Patents

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of August 7, 2009, by and among Guardian II Acquisition Corporation, a Delaware corporation ("Guardian"), Oscient Pharmaceuticals Corporation, a Massachusetts corporation ("Parent" and, collectively with Guardian, "Sellers"), and Akrimax Pharmaceuticals, LLC, a Delaware limited liability company ("Akrimax," and collectively with its permitted assigns, "Buyer").

WHEREAS, on July 13, 2009 (the "Petition Date"), each of Parent and Guardian have filed a voluntary petition for relief under Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") commencing a case under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases");

WHEREAS, pursuant to that certain Amended and Restated Development, License and Supply Agreement, dated July 31, 2006, by and between Ethypharm S.A. ("Ethypharm") and Guardian, as assignee of Reliant Pharmaceuticals Inc. (the "Ethypharm Contract"), Ethypharm has granted Guardian, among other things, a license to develop, purchase, and market micronized fenofibrate (the "Active Ingredient"), a compound marketed by Sellers under the trademark ANTARA (the "Current Product") as described in New Drug Application No. 021695 (the "NDA"), and other assets related to the Active Ingredient, including all approved dosage forms and strengths of ANTARA and any line extensions in development (the Active Ingredient and the Current Product are collectively referred to as the "Product");

WHEREAS, Parent provides services to Guardian pursuant to a Servicing Agreement dated August 18, 2006, including analysis and compliance with laws regulating the development, sale and marketing of ANTARA and sales, marketing and promotional services for the ANTARA product line and, in that capacity, holds the NDA and various contracts related to the marketing and sale of ANTARA on behalf of Guardian; and

WHEREAS, Buyer desires to purchase from Sellers all of the assets of Sellers related to the Product free and clear of liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code as provided in an order of the Bankruptcy Court approving such sale under section 363 of the Bankruptcy Code to be entered in the Bankruptcy Cases, and to assume only certain specified liabilities of Sellers related thereto, all on the terms and subject to the conditions set forth in this Agreement and in accordance with Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code;

NOW, THEREFORE, in consideration of these premises, the respective covenants of Buyer and Sellers set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

     1.     Purchase and Sale of the Purchased Assets.

     1.1.     *Assets Being Sold.*  Sellers agree to sell and assign to Akrimax (or in the event of the Opal Assignment, Opal (as such terms are defined in Section 14 hereof)), and Akrimax (or in the event of the Opal Assignment, Opal) agrees to purchase, at the Closing (as hereinafter defined) and thereafter as provided herein, all of Sellers' right, title and interest in, to and under

the following assets other than Excluded Assets (collectively, the "Purchased Assets"), in accordance with the Sale Order (as hereinafter defined) and pursuant to Sections 363 and 365 of the Bankruptcy Code:

    1.1.1.  All rights to the name "ANTARA," and any other registered and unregistered United States and foreign trademarks, service marks, service names, trade names, internet domain names, brand marks, brand, trade dress, package designs, product inserts, labels, slogans, logos and associated artwork, and all related applications or registrations for any of the foregoing, and any extensions, renewals, continuations, or re-issues thereof, or amendments or modifications thereto, together with all goodwill associated therewith, used in the sale, promotion, or marketing of the Product (collectively, "Trademarks"), including, without limitation, those trademarks listed on Schedule 1.1.1 hereto, *provided* that the Trademarks will not include the Excluded Trademarks;

    1.1.2.  To the extent assignable, all copyrights (including software and software systems) related to the Product and registrations thereof (collectively, "Copyrights");

    1.1.3.  All rights of Sellers under (a) the Ethypharm Contract and (b) licenses, contracts, and agreements related to the Product listed on Schedule 1.1.3 hereto (the "Schedule 1.1.3 Contracts") that Buyer shall elect to have Sellers assume and assign to Buyer by notice to Sellers in writing before the date of the Sale Hearing, it being agreed that Sellers will make all necessary motions and take any other appropriate actions in the Bankruptcy Cases to cause any such contract or agreement to be assigned to Buyer (such Schedule 1.1.3 Contracts that Buyer elects to assume, the "Additional Assigned Contracts"), *provided* that Buyer may withdraw such notice and direct Sellers to reject any Additional Assigned Contract at any time prior to the date of entry of an order of the Bankruptcy Court authorizing assumption and assignment of such Additional Assigned Contract and upon the occurrence of any such withdrawal, the Schedule 1.1.3 Contract that is the subject thereof shall no longer constitute an Additional Assigned Contract;

    1.1.4.  The patents and patent applications (including design patents, industrial designs and utility models) owned or controlled by, or licensed to Sellers relating to or that cover, in whole or in part, the manufacture, use, distribution, marketing, promotion, sale, administration or formulation of the Product, and any unfiled patent disclosures, substitutions, extensions, additions, reissues, reexaminations, renewals, divisions, continuations, continuations-in-part or supplementary protection certificates thereof, and all foreign counterparts of any of the foregoing (collectively, "Patents"), including, without limitation, those Patents listed on Schedule 1.1.4, *provided* that Patents shall not include any patents or other rights licensed to Sellers (as assignees of Reliant Pharmaceuticals, Inc.) under the binding settlement term sheet dated April 3, 2006 in respect of *Reliant Pharmaceuticals, Inc. v. Abbott Laboratories, et al.* in the United States District Court for the District of Delaware (Civil Action No. 04-350) (the "Abbott Agreement");

    1.1.5.  All claims, judgments, choses in action or rights related to the Product, including but not limited to, for past, present or future (a) infringement of Patents

licensed pursuant to the Ethypharm Contract or infringement or dilution of any Trademarks related to the Product and including, but not limited to, infringement of Patents by Lupin Limited or Paddock Laboratories, Inc. ("Paddock"), or (b) injury to the goodwill associated with any Trademarks or trademark registration related to the Product (collectively, "Assigned Causes of Action"), other than Excluded Causes of Action;

1.1.6. To the extent assignable, all know-how, show-how, technical and non-technical information, trade secrets, formulae, techniques, sketches, drawings, discoveries, materials, models, inventions, improvements, designs, specifications, processes, apparatus, equipment, databases and database systems, research, experimental work, development, pharmacology and clinical data, software programs and applications, software source documents, third-party licenses, confidential and technical information, confidential business information and any related type of proprietary Intellectual Property right other than the Patents, in each case related to the  Product or used in the manufacture, composition, use, distribution, marketing, promotion, sale, administration, or formulation of the Product (collectively, "Product Know How");

1.1.7. The data and other information related to the Product that has been used for the registration of the Product, that is owned by or licensed to Sellers or otherwise in the possession of, developed by or on behalf of, or otherwise controlled by Sellers, that is used in the development or commercialization of the Product or that otherwise has been used in the manufacture, composition, use, distribution, marketing, promotion, sale, administration, or formulation of the Product, including, without limitation, all clinical data, adverse event data, pharmaceutical development reports, and other medical information related to the Product (collectively, the "Technical Information").

1.1.8.        All registrations related to the Product including all filings with any governmental authorities (including the United States Food and Drug Administration ("FDA") or a similar agency) for the purpose of obtaining consent to conduct clinical trials for the Product or approval from such governmental authority to commence making, using, or selling the Product or any line extensions thereof, including without limitation New Drug Applications (including the NDA), Investigational New Drug Applications ("INDs") and, subject to the rights described on Schedule 3.9 hereto, exclusive rights to reference all FDA filings and correspondence;

1.1.9. All uniform resource locators, e-mail and other internet addresses and domain names, rights in website content and applications and registrations thereof ("URLs") related to the Product, including but not limited to the domain name http://www.antararx.com and any Intellectual Property related thereto;

1.1.10. Safety information and adverse event reports related to the Product;

1.1.11. Any inventory of Sellers (whether supplies, raw materials, work-in-process, or finished goods) related to the Product, together with related promotional materials, product samples, documentation, and all rights to acquire such inventory in the possession or control of third parties (collectively, the "Inventory");

1.1.12. Copies of all other books and records of the Sellers relating to the Product and the Purchased Assets, *provided* that Sellers may retain a copy of any such books and records and may use such books and records in connection with winding up its operations and affairs following the Closing; and

1.1.13. To the extent assignable, all representations, warranties, guarantees, indemnities, undertakings, covenants not to compete benefitting the Purchased Assets, certificates, covenants, agreements and all security therefore received by the Sellers on the purchase, license or other acquisition of any part of the Purchased Assets.

1.2. *Excluded Assets.* The Purchased Assets shall not include any other assets of Sellers, including, but not limited to, the following (collectively, the "Excluded Assets"):

1.2.1. All cash, cash equivalents, and securities on hand as of the Closing, wherever located, including, without limitation, in accounts, lock boxes, and other similar accounts (whether maintained at a bank, savings and loan, or other financial institution);

1.2.2. All income tax refunds or other tax refunds;

1.2.3. All contracts not assumed by Buyer pursuant to Section 1.1.3, including the Abbott Agreement;

1.2.4. All accounts receivable existing immediately prior to the Closing (including accounts receivable related to the Product), intercompany claims, general intangibles not related to the Purchased Assets, prepaid expenses, deposits, and other current assets of Sellers;

1.2.5. All employee benefit plans, programs, or arrangements and all contracts of insurance, collective bargaining agreements and union contracts of Sellers;

1.2.6. All insurance policies and related claims and all proceeds of insurance policies or related claims;

1.2.7. All fixtures, furniture, and equipment, including office equipment, telephone systems and computers, furniture, fixtures and leasehold improvements, office supplies, all personal property not related to the Product, and all other physical assets of Sellers not related to the Product;

1.2.8. The name "Oscient" and the marks set forth on Schedule 1.2.8 and any registered and unregistered United States and foreign trademarks, service marks, service names, trade names, internet domain names, brand marks, brand, trade dress, package designs, product inserts, labels, slogans, logos and associated artwork, and all related applications or registrations for any of the foregoing, and any extensions, renewals, continuations, or re-issues thereof, or amendments or modifications thereto, together with all goodwill associated therewith, not used in the sale, promotion, or marketing of the Product (collectively, "Excluded Trademarks"), including, without limitation, those trademarks listed on Schedule 1.2.8 hereto;

1.2.9. All general business software used in keeping the books and records of Sellers or the operation of Sellers' business;

1.2.10. All (i) claims and causes of action pursuant to sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code and (ii) claims, judgments, choses in action, or rights related to collection of accounts receivable arising from sales of the Product prior to the Closing Date ("Excluded Causes of Action");

1.2.11. FACTIVE and all assets related to FACTIVE;

1.2.12. Ramoplanin and all assets related to Ramoplanin; and

1.2.13. Any economic interest in drug discovery or genomics alliances of Sellers.

1.3. *Assumption of Certain Liabilities.*  At the Closing, or on the date of assumption and assignment in the case of contracts designated for assumption and assignment pursuant to Section 1.1.3 for which Bankruptcy Court approval has not been obtained prior to the Closing Date, Buyer will assume only the following liabilities of Sellers set forth in Section 1.3.1 relating to the Purchased Assets (the "Assumed Liabilities").  Except as specifically described in Section 1.3.1, Buyer shall not assume any liability or obligation of Sellers whatsoever, whether or not any such liability or obligation pertains to the Purchased Assets (provided that this sentence shall in no way limit Buyer's other obligations under this Agreement).

1.3.1. Buyer shall assume, under section 365(b)(1)(A) of the Bankruptcy Code, all payment or performance obligations and related liabilities that arise (i) after the Closing under the Ethypharm Contract and (ii) in the case of each Additional Assigned Contract, after the date of assumption and assignment of such Contract pursuant to the terms of this Agreement; provided that Buyer, in its sole discretion, may as provided herein elect to delete any contract from the designated list of Additional Assigned Contracts to be assigned to Buyer and, in that event, shall not assume any obligations in respect of such contract (the Ethypharm Contract and any Additional Assigned Contract that Buyer does not elect to delete from the list of Additional Assigned Contracts in accordance with this Agreement are sometimes referred to herein, collectively, as the "Assumed Contracts").

1.4. *Excluded Liabilities.*  Sellers shall remain liable for all liabilities other than the Assumed Liabilities (such liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities").  Without limiting the foregoing, (i) Sellers shall remain liable for all of Sellers' liabilities related to any Excluded Assets and (ii) in no event shall Buyer assume any of the following liabilities or obligations:

1.4.1. any liabilities arising from the ownership, operation or sale of the Purchased Assets prior to Closing (other than in respect of Buyer's obligation to pay Other Cure Amounts); and

1.4.2. any liabilities arising under the Worker Adjustment and Retraining Notification Act (the "WARN Act"), or any analogous provisions of the law of any State, in connection with either Seller's termination of any employees.

1.5.   *Purchase Price.*   The consideration to be paid by Buyer for the Purchased Assets (the "Purchase Price") shall be (a) a cash payment of Twenty Million Dollars ($20,000,000) (the "Closing Date Payment") and (b) the assumption of Assumed Liabilities.   In accordance with Section 2.2, at the Closing, the Buyer shall (x) deliver the Assumption and Assignment Agreement (as hereinafter defined) and (y) make the Closing Date Payment by (i) the delivery of an amount equal to Twenty Million Dollars ($20,000,000) *minus* the amount of the Deposit (as hereinafter defined) (and any interest and income earned thereon) by wire transfer of immediately available funds to an account designated in writing by Guardian, or in such manner or form as may be mutually satisfactory; and (ii) the delivery by the Escrow Agent (as hereinafter defined) of the Deposit (and any interest and income earned thereon) to an account designated in writing by Guardian.

1.5.1.   *Deposit.*

1.5.1.1.   On the date hereof, Buyer shall make a cash deposit of One Million Two Hundred Thousand Dollars ($1,200,000) (the "Deposit") by wire transfer to Ropes & Gray LLP ("Escrow Agent") to be held in an interest bearing escrow account in accordance with the joint escrow instructions attached hereto as Exhibit 1.5.1.1 and to be applied to the Closing Date Payment.   Buyer and Sellers consent to the terms of these joint escrow instructions and agree to be bound thereby.

1.5.1.2.   The Deposit (but excluding any interest or other income earned thereon) shall be nonrefundable upon the termination of this Agreement by Sellers pursuant to Section 10.1.5 or 10.1.8 (any such termination, a "Seller Deposit Event").   The Deposit (together with any interest or other income earned thereon) shall be refunded to Buyer following the termination of this Agreement for any other reason, including under Sections 10.1.1, 10.1.2, 10.1.3, 10.1.4, 10.1.6, 10.1.7 or 10.1.9 (any such termination, a "Buyer Refund Event").   At the Closing, the Deposit (and any interest or income accrued thereon) shall be paid over to Sellers and upon such payment, credited and applied toward payment of the Purchase Price.

1.5.1.3.   In the event of a Buyer Refund Event, (a) Buyer and Sellers (to the extent Sellers do not dispute the existence of a Buyer Refund Event) shall deliver a joint instruction (a "Deposit Release Joint Instruction") to the Escrow Agent, or (b) in the event that Sellers fail to execute such joint instruction, Buyer shall deliver an instruction to the Escrow Agent (with a copy to the Sellers), in each case directing Escrow Agent to release the Deposit (together with any interest or other income earned thereon) to Buyer (a "Buyer Deposit Release Instruction").   If within seven Business Days immediately following delivery of a Buyer Deposit Release Instruction, Sellers do not deliver an objection thereto to Buyer and Escrow Agent, the Buyer Deposit Release Instruction shall be deemed to be authorized by Buyer and Sellers.   Escrow Agent shall, by not later than the second Business Day immediately following (i) its receipt of a Deposit Release Joint Instruction, or (ii) the expiration of seven Business Days immediately following Escrow Agent's receipt of a Buyer Deposit Release Instruction if

Escrow Agent has received no written objection of Sellers thereto, deliver the Deposit (together with any interest or other income earned thereon) to Buyer. In the event Sellers deliver a written objection in accordance with clause (ii) of the immediately preceding sentence, the parties shall submit such dispute to the Bankruptcy Court. In such event, the Escrow Agent shall release the Deposit (together with any interest or other income earned thereon) in accordance with an order of the Bankruptcy Court.

1.5.1.4.    In the event of a Seller Deposit Event, (a) Sellers and Buyer (to the extent Buyer does not dispute the existence of a Seller Deposit Event) shall deliver a joint instruction (a "Deposit Forfeiture Joint Instruction") to the Escrow Agent, or (b) in the event that Buyer fails to execute such joint instruction, Sellers shall deliver an instruction to the Escrow Agent (with a copy to Buyer), in each case directing the Escrow Agent to disburse the Deposit to the Sellers and deliver any interest or other income earned on the Deposit to Buyer (a "Sellers Deposit Forfeiture Instruction"). If within seven Business Days immediately following delivery of a Sellers Deposit Forfeiture Instruction, Buyer does not deliver a written objection thereto to Sellers and Escrow Agent, the Sellers Deposit Forfeiture Instruction shall be deemed to be authorized by Sellers and Buyer. Escrow Agent shall, by not later than the second Business Day immediately following (i) its receipt of a Deposit Forfeiture Joint Instruction, or (ii) the expiration of seven Business Days following Escrow Agent's receipt of a Seller Deposit Forfeiture Instruction if Escrow Agent has received no written objection of Buyer thereto, deliver the Deposit to Seller and deliver any interest or other income earned on the Deposit to Buyer. In the event Buyer delivers a written objection in accordance with clause (ii) of the second immediately preceding sentence, the parties shall submit such dispute to the Bankruptcy Court. In such event, the Escrow Agent shall release the Deposit (together with any interest or other income earned thereon) in accordance with an order of the Bankruptcy Court.

1.5.1.5.    In the event that the Closing has not occurred on or prior to September 30, 2009 and each of Buyer, on the one hand, and Sellers, on the other hand, allege that the other is in material breach of this Agreement, and not otherwise able to terminate this Agreement in accordance with its terms, the parties shall submit such dispute to the Bankruptcy Court. If the Bankruptcy Court shall determine that both Buyer and either Seller is in material breach and not otherwise able to terminate this Agreement as a result of such material breach, then the Deposit (together with any interest or other income earned thereon) shall be refunded to Buyer and Seller shall have no obligation to pay the Break-Up Fee to Buyer. In such event, the Escrow Agent shall release the Deposit (together with any interest or other income earned thereon) in accordance with an order of the Bankruptcy Court.

1.5.2.    *Allocation of Purchase Price.*  The Purchase Price will be allocated to the Purchased Assets as reasonably agreed by Buyer and Guardian within 30 days immediately following the Closing Date. Buyer and Sellers agree that such allocation

shall be binding for tax reporting purposes.  If Buyer and Guardian are in good faith unable to reasonably agree on an allocation of the Purchase Price to the Purchased Assets, each of Buyer and Sellers may file tax returns based on allocations determined by each to be reasonable and shall notify the other of the allocation that will be reported in its tax reporting 30 days prior to filing of such returns.

1.6.   *Further Assurances.*  Each of Buyer and Sellers, before, at, and after the Closing, upon the request from time to time of the other party hereto and without further consideration, will do each and every reasonable act and thing as may be necessary or reasonably desirable to consummate the transactions contemplated hereby and to effect an orderly transfer to Buyer of the Purchased Assets, including, without limitation:  executing, acknowledging, and delivering assurances, assignments, powers of attorney, and other documents and instruments; obtaining the approval of the Bankruptcy Court as promptly as practicable for the consummation of the transactions contemplated hereby; furnishing information and copies of documents, books, and records; filing reports, returns, applications, filings, and other documents and instruments with governmental authorities; in the case of Sellers, transferring to Buyer trademark registrations, trademark applications, patents, patent applications and the like held by Sellers that relate to the Patents and the Trademarks; turning over to Buyer all mail and communications in Sellers' possession or control related to the Purchased Assets; and cooperating with the other party hereto (at such other party's expense) in exercising any right or pursuing any claim, whether by litigation or otherwise, other than rights and claims running against the party from whom or which such cooperation is requested.  If any party shall receive any payment that pursuant to this Agreement is the property of another party, then the party receiving such payment shall promptly turn such payment over to such other party and until such time shall hold it in trust for such other party.

2.     Closing; Deliveries at Closing.

2.1.   *Closing.*  The closing of the transactions (the "Transaction") contemplated hereby (the "Closing") shall be held at the offices of Ropes & Gray LLP, counsel to Sellers, One International Place, Boston, Massachusetts at 10:00 a.m. on the third Business Day after the date of entry of the Sale Order or such other date or place as may be mutually satisfactory to the parties, subject to satisfaction or waiver of the conditions set forth in Sections 5 and 6 hereof (the date of the Closing being the "Closing Date").

2.2.   *Deliveries at Closing.*  At the Closing, (i) Buyer shall make the Closing Date Payment and shall execute and deliver to Sellers the Assumption and Assignment Agreement; and (ii) Sellers shall (a) execute and deliver to Buyer the instruments of conveyance specified in Sections 5.2, 5.3 and 5.4, (b) deliver to Buyer the various certificates, instruments and documents referred to in Section 5, (c) deliver to Buyer, or otherwise put Buyer in possession and control of, all of the Purchased Assets of a tangible nature, (d) deliver to Buyer true and complete files for the Ethypharm Contract and all Additional Assigned Contracts that constitute Assumed Contracts as of the Closing, including originally signed copies of each such Assumed Contract (to the extent in either Seller's possession) and all correspondence, amendments, modifications and waivers with respect thereto, and (e) deliver to Buyer copies of the NDA, IND and the annual reports, supplements and amendments with respect to each of the foregoing.

3.    <u>Representations of Sellers</u>.  Parent represents and warrants to Buyer as set forth in Sections 3.1 and 3.2 and Guardian represents and warrants to Buyer as set forth in Sections 3.1 through 3.14 below:

3.1.    *Due Incorporation, Authorization, and Good Standing.*  Parent is a corporation duly incorporated, validly existing, and in good standing under the laws of the Commonwealth of Massachusetts and Guardian is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware, and, subject to the approval of the Bankruptcy Court, each of Parent and Guardian has the requisite corporate power and authority to enter into, execute, deliver, and perform this Agreement, any other agreements relating to the transactions contemplated hereby, and any instruments of transfer and conveyance (collectively, with this Agreement, the "<u>Transaction Documents</u>") to which either Parent or Guardian is party, and to consummate all transactions contemplated hereby and thereby and has taken all corporate action required by law and its Articles of Organization or Certificate of Incorporation, as applicable, and bylaws to authorize such execution, delivery, and performance.  This Agreement has been duly executed and delivered by Parent and Guardian, and each of the other Transaction Documents to which each of Parent or Guardian is a party shall be duly executed by a duly authorized officer of Parent or Guardian, as appropriate, and delivered by such party at the Closing.  This Agreement is, and each of the other Transaction Documents to which each of Parent or Guardian is a party will be, subject to the approval of the Bankruptcy Court and upon execution by a duly authorized officer of Parent or Guardian, as appropriate, at the Closing, the legal, valid and binding obligation of Parent or Guardian, as appropriate, enforceable against Parent or Guardian, as appropriate, in accordance with its terms, in each case subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability relating to or affecting the rights and remedies or creditors and to general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.

3.2.    *No Violation or Approval.*  The execution, delivery, and performance of this Agreement and the other Transaction Documents to which each of Parent or Guardian will be party, in accordance with their respective terms, and the consummation of the transactions contemplated hereby and thereby, will not (with or without notice or lapse of time or both) (i) result in a breach or violation of, or a default under, Parent's Articles of Organization or Guardian's Certificate of Incorporation, as applicable, or Parent's or Guardian's bylaws (or other comparable instruments), or (ii) result in a breach of violation of any law (including the common law), statute, ordinance, order, judgment, decree, rule, or regulation of any court or any Governmental Body applicable to Parent, Guardian and/or their respective properties.  Subject only to the approval of the Bankruptcy Court and filings to be made with the Bankruptcy Court on or after the Closing Date in connection with the Closing, no consent, approval, order, or authorization of, or declaration or filing with any Governmental Body or other Person is required of, and has not been obtained or made by, Sellers in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

3.3.    *Title to Assets.*  Sellers have good title to all Purchased Assets and at the Closing will transfer the Purchased Assets to Buyer free and clear of all liens, claims, and encumbrances ("<u>Liens</u>").  Subject to Bankruptcy Court approval, Sellers have the complete and unrestricted power and right to transfer the Purchased Assets to Buyer as contemplated by this Agreement.

3.4.   *Brokers, Finders, Etc.*   Other than professionals engaged by any Creditors' Committee or by Paul Royalty Fund Holdings II ("Paul Royalty") and except for agreements with Broadpoint Capital, Inc., Sellers have not entered into any brokerage or other agreement that has not been terminated contemplating commissions or other payments payable upon sale of the Purchased Assets and the Creditors' Committee, Paul Royalty, or the Sellers are solely responsible for the payment of the fees and expenses of any such professionals and brokers.  All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Sellers in such manner as to give rise to any valid claim against Buyer for any brokerage or finder's commission, fee, or similar compensation.

3.5.   *Trade Names and Trademarks.*   Listed on Schedule 1.1.1 are all Trademarks owned or licensed by Sellers related to the Product that are registered or as to which registrations are pending with the U.S. Patent and Trademark Office or any counterpart foreign trademark office.

3.6.   *Patents.*   There are no patents or patent applications that would be infringed by the making, using or selling of the Product, owned, licensed to, or otherwise controlled by Sellers or, to Sellers' knowledge, any of their current or former employees or independent contractors other than the patents and patent applications licensed to Guardian pursuant to the Ethypharm Contract or listed on Schedule 1.1.4.

3.7.   *Intellectual Property.*   With respect to the Purchased Assets and except as set forth on Schedule 3.7, (i) Sellers have not received a written notice or written claim of infringement from any third party; (ii) Sellers have no knowledge of, and have not received written inquiry or written notice from, any third party directing Sellers to review or consider the applicability of a third parties' intellectual property; (iii) to their knowledge, Sellers own or have acquired the necessary licenses to the patents to manufacture, import, use, and sell the Product; (iv) to the knowledge of Sellers, no third party, other than Lupin Limited and Paddock, is infringing any Intellectual Property Rights; (v) Sellers are not aware of any past or current unauthorized re-importation or importation of the Product or any corresponding infringing or gray market goods; and (vi) Sellers have taken commercially reasonable steps to protect their rights in transferred trade secrets and confidential information related to the Product, except where the failure to take such steps would not have a Material Adverse Effect.

3.8.   *Regulatory Compliance.*   Sellers are in compliance with all applicable laws, regulatory or warning letters, notices of adverse findings, and any other letters or notices issued or administered by the FDA with respect to the Product except where the failure to comply would not have a Material Adverse Effect.  There are no pending, or, to Seller's knowledge threatened, regulatory actions (other than non-material routine or periodic inspections or reviews) by the FDA with respect to the Product against Sellers or, to Seller's knowledge, Ethypharm.  Sellers have received no written notices from the FDA alleging or asserting noncompliance with any applicable law in connection with the Product.  To the knowledge of Sellers, all reports, documents, claims and notices required to be filed, maintained, or furnished to the FDA with respect to the Product by Sellers have been so filed, maintained or furnished and were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing).

3.9.    *Drug Authorizations*.  (i) The NDA is in full force and effect, (ii) Parent on behalf of Guardian is the sole and exclusive owner of the NDA and, except as set forth on <u>Schedule 3.9</u>, the Sellers have not granted any right of reference with respect to the NDA, (iii) the manufacturing, marketing, sale and distribution of the Product at all times has been conducted in compliance with the NDA except where failure to so conduct the manufacturing, marketing, sale, and distribution would not have a Material Adverse Effect, and Sellers are (and have been at all times during the past three (3) years) in material compliance with the NDA, (iv) there is no proceeding pending or, to Sellers' knowledge, threatened, to revoke, suspend, or modify the NDA and (v)  Sellers have not committed fraud in relation to the filing or acquisition of the NDA.

3.10.    *Compliance with Law; Permits*.  Except where failure to do so would not have a Material Adverse Effect, Sellers have obtained all material licenses, franchises, permits, approvals and other authorizations from a Governmental Body that are necessary to entitle Sellers to own or lease, and operate and use the Purchased Assets and to market, sell and distribute the Product as currently conducted.  Seller is not in violation, and has not been in violation in the preceding three years, in any material respects of any law (including the common law), statute, ordinance, order, judgment, decree, rule, or regulation of any court of competent jurisdiction or any Governmental Body with respect to Purchased Assets or the manufacturing, marketing, sale and distribution of the Product, except where such violation would not have a Material Adverse Effect.

3.11.    *Inventory*.  At least eighty percent (80%) of the inventory of Sellers (whether raw materials, work-in-process, or finished goods) related solely to the Product is in compliance with all applicable specifications in all material respects and is free from damage which would prevent such Inventory from being sold in the ordinary course of business.  The Inventory existing as of July 13, 2009 is as set forth on <u>Schedule 3.11</u> hereto.

3.12.    *Product Distribution Practices*.  Except as set forth on <u>Schedule 3.12</u>, each of the Sellers have shipped and sold the Product, at all times since January 1, 2009, in quantities and at prices consistent with past shipment and sales practices in all material respects (and not in quantities in excess of the historical demand for the Product) and, in particular, Sellers have not engaged in (i) stop or slow shipping of the Product; (ii) "load" selling of the Product; (iii) encouraging or requiring customers to "buy in" the Product, or (iv) taking any similar actions inconsistent with past practice that would reasonably be expected to materially adversely impact sales of the Product following the Closing Date.

3.13.    *Contracts; Default; Cure Costs*.

3.13.1.    Sellers have furnished or made available to Buyer a true and complete copy of the Ethypharm Contract and each of the Schedule 1.1.3 Contracts.

3.13.2.  Except as set forth in <u>Schedule 3.13.2</u>, neither Sellers nor, to Sellers' knowledge, Ethypharm, is in default in complying with any provisions of the Ethypharm Contract, and no condition or set of facts exists which, with notice, lapse of time or both would constitute a default thereunder on the part of Sellers or, to Sellers' knowledge, Ethypharm.  The Ethypharm Contract is in full force and effect.

- 11 -

3.13.3.  Schedule 1.1.3 sets forth as of the date hereof a list of estimated Cure Costs for the Ethypharm Contract and each Schedule 1.1.3 Contract.

3.14.  *Litigation.* There are no material judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court of competent jurisdiction or Governmental Body to which Parent or Guardian is a party or is subject with respect to the Product or the other Purchased Assets.

3.15.  *Disclaimer.*  Buyer acknowledges and agrees that, except as expressly provided herein, the sale of the Purchased Assets shall be "as is and where is" and Sellers make no, and hereby disclaim any, representation or warranty to Buyer with respect to the Purchased Assets or the transactions contemplated hereby, including, without limitation, any warranty of merchantability or fitness for a particular purpose.  Without limiting the generality of the foregoing, except as expressly provided herein, Sellers make no representation or warranty, express or implied, as to the validity or utility of the Purchased Assets, the status of any issued patents or registered trademarks or any applications for patents or trademarks, whether transfer documentation executed by Sellers is sufficient to transfer title to the Trademarks or Patents registered in foreign jurisdictions, whether any license agreements or other contracts are assignable, or whether any registrations in connection with clinical trials related to the Product are effective.

4.  Representations of Buyer.  Buyer represents and warrants to Sellers as follows:

4.1.  *Due Incorporation, Authorization, and Good Standing.*  Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has the requisite corporate power and authority to enter into, execute, deliver, and perform this Agreement and the other Transaction Documents to which each is a party and to consummate all transactions contemplated hereby and thereby and has taken all action required by law and its Certificate of Formation and Operating Agreement to authorize such execution, delivery, and performance.  This Agreement is, and each of the other Transaction Documents to which Buyer is a party, will, upon execution thereof by a duly authorized officer of Buyer respectively at the Closing, be the valid and legally binding obligation of Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization, and similar laws of general applicability affecting the rights and remedies of creditors and to general principles of equity, regardless of whether enforcement is sought in proceedings in equity or at law.  Opal Pharmaceuticals Acquisition, LLC, a Delaware limited liability company ("Opal"), is under common control with Buyer and is an "Affiliate" of Buyer, as such term is defined in the Ethypharm Contract.

4.2.  *No Violation or Approval.*  The execution, delivery, and performance of this Agreement and the other Transaction Documents to which Buyer will be a party and the consummation of the transactions contemplated hereby and thereby will not result in a breach or violation of, or a default under, as applicable, Buyer's Certificate of Formation, Operating Agreement, any statute applicable to it, any agreement to which it is a party or by which it or any of its properties are bound, or any order, judgment, decree, rule, or regulation of any court or any Governmental Body having jurisdiction over it or its properties.  No consent, approval, order, or authorization of, or declaration or filing with, any Governmental Body or other entity is required

of, and has not been obtained or made by, Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

4.3.   *Brokers, Finders, etc.*   All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the intervention of any person acting on behalf of Buyer in such manner as to give rise to any valid claim against Sellers or Buyer for any brokerage or finder's commission, fee, or similar compensation.

4.4.   *Financial Statements; Solvency; Status of Buyer.*   Immediately after giving effect to the consummation of the transactions contemplated by this Agreement, (a) the fair saleable value (determined on a going concern basis) of the assets of Buyer shall be greater than the total amount of Buyer's liabilities (including all liabilities, whether or not reflected in a balance sheet prepared in accordance with GAAP); and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed); (b) Buyer shall be able to pay its debts and obligations in the ordinary course of business as they become due and (c) Buyer shall have adequate capital to carry on its businesses and all businesses in which it is about to engage.   Buyer is a reputable company engaged in the pharmaceutical business with a history of regulatory compliance.

5.   Conditions Precedent to the Obligations of Buyer.   The obligations of Buyer to purchase the Purchased Assets and to consummate the other transactions contemplated hereby and by the other Transaction Documents are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, unless expressly waived by Buyer, in its sole discretion, at the Closing:

5.1.   *Representations and Warranties; Covenants.*   The representations and warranties made by Sellers in this Agreement (including the Exhibits and Schedules hereto) (without regard to any qualifications contained therein with respect to materiality or Material Adverse Effect) shall be true and correct in all respects as of the Closing Date as if made on and as of the Closing Date (except for those specifically made as of a particular date which shall be true and correct as of such date), except where failure to be true and correct in all respects has not had, and would not be reasonably expected to have, a Material Adverse Effect.   Buyer shall have received a certificate of each of the Sellers to that effect signed by a duly authorized respective officer thereof and dated as of the Closing Date.   The covenants and agreements contained in this Agreement to be complied with by Sellers at or before the Closing shall have been complied with, except to the extent that non-compliance would not result in a Material Adverse Effect. Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized respective officer thereof and dated as of the Closing Date.

5.2.   *Bill of Sale, Assumption and Assignment Agreement.*   Sellers shall have executed and delivered a bill of sale ("Bill of Sale") in the form attached hereto as Exhibit 5.2(a) and an assumption and assignment agreement ("Assumption and Assignment Agreement") in the form attached hereto as Exhibit 5.2(b) conveying to Buyer all of the Purchased Assets and transferring to Buyer (i) the Ethypharm Contract and (ii) such other Additional Assigned Contracts, if any, authorized by the Sale Order to be assumed and assigned to Buyer as of the Closing Date.

5.3.    *Trademarks*.  Sellers shall have executed and delivered to Buyer an Assignment of Trademarks in the form attached hereto as <u>Exhibit 5.3</u> assigning the Trademarks to Buyer.

5.4.    *Patents*.  Sellers shall have executed and delivered to Buyer an Assignment of Patents in the form attached hereto as <u>Exhibit 5.4</u> assigning the Patents to Buyer.

5.5.    *Letter to FDA*.  Sellers shall have delivered to Buyer a letter from Parent to the FDA, duly executed by Parent, transferring the rights to the NDA to Buyer, in a form reasonably satisfactory to Buyer.

5.6.    *Bidding Procedures Order*.  The Bankruptcy Court shall have held a hearing (the "<u>Bidding Procedures Hearing</u>") and shall have entered an order in the Bankruptcy Cases approving procedures for solicitation and consideration by the Bankruptcy Court of bids from third parties for the Purchased Assets (the "<u>Bidding Procedures Order</u>"), which Bidding Procedures Order shall be in form and substance reasonably satisfactory to Sellers and Buyer, and in any event shall provide that:

5.6.1.    Upon satisfaction of the conditions set forth in Section 7.15 hereto, and in accordance with this Agreement, Sellers shall pay to Buyer, without further order of the Bankruptcy Court, the Break-Up Fee.

5.6.2.    the initial bid at the Sale Hearing (as hereinafter defined) must, in Seller's sole discretion, exercised in good faith, be equal to or greater than the consideration provided by Buyer hereunder, with a cash payment at closing that is not less than $20,600,000;

5.6.3.    each subsequent bid must be at least $200,000 greater than the preceding bid; and

5.6.4.    if Buyer elects to participate in bidding at the Sale Hearing, Buyer may credit the Break-Up Fee towards its bid.

5.7.    *Notice of Sale*.  Sellers shall have served a copy of a notice of the sale and assumption and assignment of the Ethypharm Contract and the Additional Assigned Contracts upon (i) all creditors and all other persons who are parties in interest in the Bankruptcy Cases, (ii) all persons with security interests, Liens, or other interests in any of the Purchased Assets, (iii) all parties to the Ethypharm Contract and the Additional Assigned Contracts, and (iv) all other persons required to receive notice of the sale pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  Sellers shall have filed a certificate of such service (the "<u>Certificate of Service</u>") with the Bankruptcy Court in the Bankruptcy Cases.

5.8.    *Sale Order*.  The Bankruptcy Cases shall not been dismissed or converted to Chapter 7 of the Bankruptcy Code and no trustee shall have been appointed.  The Bankruptcy Court shall have entered an order in the Bankruptcy Cases in form and substance reasonably satisfactory to Sellers and Buyer, and in any event that: (i) approves the sale, transfer, assignment, and assumption, as appropriate, of the Purchased Assets (other than Additional Assigned Contracts to be assumed and assigned after the Closing Date) to Buyer upon the terms and conditions set forth herein, free and clear of any and all Liens of any kind or nature

whatsoever; (ii) provides that any and all valid Liens shall attach to the Purchase Price at Closing; and (iii) contains findings that all applicable notice and hearing requirements for the Transaction under the Bankruptcy Code,  Bankruptcy Rules, and any local rules of the Bankruptcy Court have been satisfied, the Transaction is in the best interests of Sellers' estates and creditors in the Bankruptcy Cases, and Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code (the "Sale Order").

5.9.    *Assumption and Assignment Order.*  The Bankruptcy Court shall have entered an order in the Bankruptcy Case independently or in conjunction with the Sale Order approving assumption of the Ethypharm Contract in accordance with section 365(b) of the Bankruptcy Code and assignment thereof to Buyer as of the Closing, which order shall provide that all defaults under the Ethypharm Contract shall have been cured and such order is otherwise in form and substance reasonably acceptable to Sellers and Buyer (the "Assumption and Assignment Order").

5.10.    *Final Orders.*  The Bankruptcy Court shall have entered the Sale Order and Assumption and Assignment Order, and such orders shall not have been rescinded, reversed, modified, or stayed, and shall be in full force and effect and shall be final orders.

5.11.    *No Order.*  No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions and which are not satisfied or resolved or preempted by the Sale Order.

5.12.    *Third Party Consents.*  Solely to the extent that the Sale Order is legally insufficient to transfer the Purchased Assets without consent of third parties, all consents, waivers, or approvals required to be obtained by Sellers in order to transfer any Purchased Assets (other than the Additional Assigned Contracts) or consummate the transactions contemplated hereby, including any required consents, waivers, or approvals from Paul Royalty, shall have been obtained and shall be in full force and effect.

5.13.    *Certified Copies.*  There shall have been delivered to Buyer certified copies of the Sale Order, the Assumption and Assignment Order, and the Certificate of Service entered or filed in the Bankruptcy Cases as well as a certified copy of the docket of the Bankruptcy Cases.

5.14.    *General.*  Buyer shall have received counterpart originals, or certified or other copies, of all documents, including without limitation records of corporate proceedings, that it may reasonably request in connection therewith.

6.    Conditions Precedent to Obligations of Sellers.  Sellers' obligations to sell the Purchased Assets to Buyer and to consummate the other transactions contemplated hereby and by the other Transaction Documents are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, unless expressly waived by Sellers at or prior to the Closing:

6.1.    *Representations and Warranties.*  The representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects, in each case as of the Closing Date as if made on and as of the Closing Date (except for those specifically made as of a

particular date which shall be true and correct as of such date), except where the failure to be true and correct in all respects would not have a material adverse effect on Buyer's ability to consummate the Transaction. Sellers shall have received a certificate of Buyer to that effect signed by a duly authorized officer thereof and dated as of the Closing Date.

6.2. *Payment Acknowledgment, Assumption and Assignment Agreement.* Buyer shall have executed and delivered the Assumption and Assignment Agreement and shall have made the Closing Date Payment.

6.3. *Letter to FDA.* Buyer shall have delivered to Sellers a letter from Buyer to the FDA, duly executed by Buyer, assuming responsibility for the NDA from Sellers, in a form reasonably satisfactory to Sellers.

6.4. *Bankruptcy Court Approval.* The Bankruptcy Court shall have entered the Sale Order and Assumption and Assignment Order, and such orders shall not have been rescinded, reversed, modified, or stayed, and shall be in full force and effect and shall have be final orders.

6.5. *Management Services Agreement.* At or before the Closing, Akrimax and Opal shall have entered into a management services agreement in such form as is reasonably acceptable to Buyer and the Sellers (the "Management Services Agreement") providing for, among other things, Akrimax to maintain regulatory compliance for Opal with respect to the Product.

7.    Covenants of the Parties.

7.1.    *Conduct of Business.*

7.1.1. Between the date hereof and the Closing Date, Sellers shall operate and carry on the operations of their business relating the Product in the ordinary course and substantially as operated as of the date of this Agreement; provided, however, the parties acknowledge and agree that Sellers' ability to operate in the ordinary course is limited by (i) the utilization of cash flow from operations and restrictions on use of cash collateral pursuant to orders of the Bankruptcy Court, (ii) the fact that the business is being operated while in bankruptcy, and (iii) Sellers' inability to control the conduct of contractual counterparties and other third parties, and such limitations may limit Sellers' ability to operate in the ordinary course.

7.1.2. Except (i) as expressly contemplated by this Agreement or the Bidding Procedures, (ii) as approved by an order of the Bankruptcy Court, (iii) as required by applicable law, or (iv) with the express written approval of Buyer, Sellers shall not knowingly take any of the following actions to the extent such action would interfere with the transactions contemplated herein or adversely affect Buyer's ownership or operation of the Purchased Assets after the Closing:

7.1.2.1.    take any action that is intended to result in any of the representations and warranties set forth in this Agreement being or becoming untrue in any material respect;

7.1.2.2.  enter into any amendment, supplement or modification of the Ethypharm Contract;

7.1.2.3.  sell, lease, transfer or otherwise dispose of any of the Purchased Assets, other than (i) inventory sold in the ordinary course of business consistent with past practice and (ii) in connection with the wind-down of Sellers' businesses not related to the Product, other dispositions of non-material, shared portions of the Purchased Assets that will not impair Buyer's use or operation of the Purchased Assets following the Closing;

7.1.2.4.  enter into any Contract relating to the Purchased Assets, the effect of which would be to grant to a third party any license to use any Intellectual Property;

7.1.2.5.  adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or reorganization, other than a plan of reorganization or liquidation in the Bankruptcy Cases;

7.1.2.6.  sell, lease, license, transfer, or otherwise dispose of any Intellectual Property; or

7.1.2.7.  enter into any Contract that contains non-competition restrictions purporting to relate to the Product or the Purchased Assets.

7.1.3.  Notwithstanding anything in this Agreement to the contrary, all of the actions described in this Section 7.1 relate solely to the Purchased Assets and Buyer acknowledges that Sellers may take any actions, in their sole and absolute discretion, relating solely to the Excluded Assets or Excluded Liabilities.

7.2.  *Sales Practices.* From and after the date of this Agreement and through the time of the Closing, Sellers shall sell and ship the Product in quantities and at prices consistent with past shipment and sales practices in all material respects (and not in quantities materially in excess of the historical demand for the Product) and, in particular, and Sellers shall not engage in (i) stop or slow shipping of the Product; (ii) "load" selling of the Product; (iii) encouraging or requiring customers to "buy in" the Product, or (iv) taking any similar actions expected to materially adversely impact sales of the Product following the Closing Date.

7.3.  *Access to Premises, Information, and Contracting Parties.* From and after the date hereof, through the Closing Date, Sellers will permit Buyer and its authorized representatives to have reasonable access during normal operating hours to records in possession of Sellers that reasonably relate to the Product. In addition, prior to the Closing Date, Sellers will permit authorized representatives and professionals of Buyer reasonable access during normal operating hours to all management personnel, offices, and books and records of Sellers related to the Product, and Buyer shall (at Buyer's expense) be permitted to make abstracts from, or copies of, all such books and records. To the extent consistent with Section 7.5.1 hereof,

Sellers shall also use their commercially reasonable efforts to provide Buyer access to the counter-parties to the Schedule 1.1.3 Contracts, Paul Royalty, customers, suppliers, and manufacturing partners, *provided* that Buyer or its representatives and Ethypharm or its representatives may meet at the offices of Sellers' counsel, Ropes & Gray LLP, in the presence of representatives of Sellers and Paul Royalty and at a time and date mutually convenient for Buyer and Sellers, and may not otherwise communicate in any manner.

7.4.    *Non-Assertion*.  Sellers shall not assert against Buyer, or any of its Affiliates or sublicensees, any patents obtained or controlled (in whole or in part) by Sellers prior to or after the Closing Date that would prevent Buyer or its Affiliates or sublicensees from using the Product in connection with (i) researching, developing, making, having made, distributing, using, selling, offering to sell, having sold, marketing, co-marketing, exporting, promoting and co-promoting the Product; or (ii) making or having made the Product solely for selling, distributing, using, offering to sell, importing, marketing, and promoting the Product.

7.5.    *Confidential Information*.

7.5.1.    Each party agrees that it will treat in confidence all documents, materials, and other information obtained (whether obtained before or after the date of this Agreement) regarding the other party during the course of the negotiations of the transactions contemplated hereby and the preparation of this Agreement, the Transaction Documents, and other related documents ("Confidential Information"). Confidential Information shall not be communicated to any third person (other than to each party's respective counsel, accountants, financial advisors, investors and other financing sources and other necessary parties on a "need to know" basis only). Buyer shall not communicate with potential bidders for the Purchased Assets, entities that have signed a confidentiality agreement in respect of potential transactions with Sellers and licensors and other counterparties to the Sellers' material contracts without Sellers' prior written consent. No party shall use any Confidential Information in any manner whatsoever except solely for the negotiations of the transactions contemplated hereby and the purposes of this Agreement; *provided*, however, that (a) the parties may disclose this Agreement and its terms as necessary to file the motion to approve the Sale Order and related motions, to comply with the Bidding Procedures Order, the Sale Order, and related orders, and to market the Purchased Assets to other bidders, and (b) after the Closing, Buyer may use or disclose any Confidential Information included in the Purchased Assets. In the event that the transactions contemplated hereby are not consummated, each party will return all copies of Confidential Information to the other party. Notwithstanding the foregoing, the obligation of each party to treat Confidential Information in confidence shall not include any information which (a) is or becomes available to such party from a source other than the other party; (b) is or becomes available to the public other than as a result of disclosure by such party or its agents; (c) upon advice of counsel, is required to be disclosed under applicable law (including, without limitation, the Bankruptcy Code) or judicial process, but only to the extent it must be disclosed; or (d) is reasonably deemed necessary by such party to disclose to obtain any of the consents or approvals contemplated hereby.

7.5.2. If the transactions contemplated hereby are consummated, (i) all Confidential Information relating solely to the Purchased Assets shall be deemed to be information received in confidence from Buyer, and not to already have been known by Sellers, for purposes of this Section 7.5 and shall be held in confidence by Sellers after the Closing Date pursuant to the requirements set forth in Section 7.5.1, and (ii) all Confidential Information relating in part to the Purchased Assets shall not be used by Sellers to the detriment of Buyer and shall be maintained in confidence after the Closing Date by Sellers in the same manner as Sellers treat their other confidential information.

7.6.  *No Public Announcement.*  Neither Sellers nor Buyer shall, without the approval of the other (which shall not be unreasonably withheld), make any press release or other public announcement regarding the transactions contemplated by this Agreement, except as and to the extent that any such party is so obligated by applicable law, in which case the other party shall be advised and the parties shall use their commercially reasonable efforts to cause a mutually agreeable release or announcement to be issued; *provided* that the foregoing shall not preclude communications or disclosures necessary to (i) implement the provisions of this Agreement; or (ii) comply with accounting obligations or applicable law (including, without limitation, the Bankruptcy Code or securities laws) or judicial process.

7.7.  *Notification to Customers.*  Within five (5) Business Days after the Closing, Buyer and Sellers shall jointly notify all wholesale distributors of the Product: (i) of the transfer of the Purchased Assets to Buyer, (ii) that all purchase orders for Product received by Sellers on or prior to the Closing Date but not shipped prior to 11:59 p.m. (EST or EDT, as the case may be) on the Closing Date will be transferred to Buyer (provided, that, to the extent that any purchase order cannot be so transferred, Sellers and Buyer shall cooperate with each other to ensure that such purchase order is filled and that Buyer receives the same economic benefit associated with filling such purchase order as if such purchase order had been so transferred), and (iii) that all purchase orders for Product placed after the Closing Date should be sent to Buyer at an address determined by Buyer.  Buyer and Sellers shall agree upon an appropriate notice to wholesalers with respect to the transfer of chargeback submission to Buyer effective thirty (30) days after the Closing Date.

7.8.  *Product Responsibility.*

7.8.1.  Subject to Section 7.11, from and after the Closing, Buyer shall be responsible for (i) taking all actions, paying all fees, and conducting all communication with the appropriate Governmental Body required by applicable legal requirements in respect of the Product, including preparing and filing all reports (including adverse drug experience reports) with the appropriate Governmental Body; (ii) taking all actions and conducting all communication with third parties in respect of the Product (whether sold before or after the Closing), including responding to all complaints in respect thereof, including complaints related to tampering or contamination; and (iii) investigating all complaints and adverse drug experiences in respect of the Product (whether sold before or after the Closing).

7.8.2.  Subject to Section 7.11, promptly after the Closing, Buyer and Seller shall cooperate to transfer responsibility to Buyer for the servicing of customer

complaints, notifications of adverse drug experiences in respect of the Product, returns (in accordance with Section 7.9 below), and other customer issues, including contracts related to maintenance of toll-free customer service numbers.

7.8.3.    From and after the Closing until (i) thirty (30) days after the Closing Date and (ii) in the event that Sellers' compliance with this Section 7.8.3 would not result in Sellers incurring any out of pocket costs that either Seller would not otherwise incur, for an additional 150 days following the expiration of such thirty day period, Sellers shall promptly notify Buyer if either Seller receives a complaint or a report of an adverse drug experience in respect of the Product.  In addition, during such time as Sellers maintain any business operations, Sellers shall cooperate with Buyer's reasonable requests and use commercially reasonable efforts at no out of pocket expense to Sellers to assist Buyer in connection with the investigation of and response to any complaint or adverse drug experience related to a Product sold by Seller.

7.8.4.    Subject to Section 7.11, from and after the Closing, Buyer shall be responsible for conducting, handling, or processing, all voluntary and involuntary recalls of units of Product, including recalls required by any Governmental Body, regardless of whether such Product was sold before or after the Closing.

7.8.5.    As soon as practicable following the Closing Date, Buyer shall use commercially reasonable efforts to obtain a new National Drug Code Number ("NDC Number") for the Product and thereafter shall cause such NDC Number to be used on the labeling and packaging for Product manufactured or packaged after receipt of the new NDC Number.  During the ninety (90) day period following the Closing Date, Buyer shall be permitted to sell Inventory that are finished goods (i.e., goods that are fully packaged and ready for immediate sale) as of the Closing Date bearing the NDC Number that is affixed thereon.  Following the expiration of such 90 day period, Buyer shall not sell Product bearing Seller's NDC Number that is not accompanied by an "over-label," "sticker" or packaging insert containing disclosure substantially similar to the following:  "Manufactured by Ethypharm S.A. for Akrimax Pharmaceuticals, LLC.  Distributed and marketed by Akrimax Pharmaceuticals, LLC.  For product information 1-999-383-1733."  Following the Closing, Buyer shall have no right to manufacture or have manufactured or package or have packaged any Product that is labeled with a Seller NDC Number.

7.9.    *Product Returns*.    Subject to Section 7.11, Buyer shall be responsible for processing all Product returns from and after the Closing Date, and Buyer shall, at its sole expense, provide credits, refunds, or replacements, as determined by Buyer in its sole discretion, for all Product returned after the Closing Date, regardless of whether the Product returned was sold before or after the Closing.  In the event that any Product is returned to either Seller, such Seller shall, for a period of (i) thirty (30) days after the Closing Date, and (ii) in the event that Sellers' compliance with this sentence would not result in Sellers incurring any out of pocket costs that either Seller would not otherwise incur and Sellers have otherwise maintained any business operations, for an additional 150 days following the expiration of such thirty day period, promptly notify Buyer of such returned Product and shall use commercially reasonable efforts to

cooperate with Buyer in order that Buyer may provide replacement Product therefore. Each of Buyer, on the one hand, and Sellers, on the other hand, shall be responsible to destroy, or cause to be destroyed, in a manner consistent with applicable laws, all Product sold prior to the Closing Date that is returned to it at their respective cost. Notwithstanding any provision herein to the contrary, neither party nor any of its affiliates shall take any actions with the intention of encouraging the other party's customers or distributors to return Product (it being acknowledged and agreed that Buyer's commencement of promotion, distribution and sale activities with respect to the Product shall not be deemed an action to encourage each Seller's customers or distributors to return Product and that Sellers' operation of their business in a manner consistent with Section 7.1.1 hereof and Sellers' winding up of its affairs in bankruptcy shall not be deemed an action to encourage customers or distributors to return Product).

7.10. *Medicaid and Other Rebates; Reporting; Chargebacks.* The parties will administer all rebates and other similar programs as follows:

7.10.1. Reporting. Subject to Sections 7.10.2 and 7.11, from and after the Closing Date, Buyer shall be responsible for complying in a timely manner with all reporting requirements for the Product under all federal and state government programs, including, without limitation, Medicaid, Medicare, and Department of Veterans Affairs programs (including any reporting obligation of either Seller after the Closing). Sellers will provide to Buyer by not later than the Closing Date all pricing and related information in respect of Product sold prior to Closing necessary to permit Buyer to carry out its reporting responsibilities as provided in the preceding sentence. Such information shall include the Baseline Average Manufacturers Price ("BAMP"), Best Price and Federal Supply Schedule (FSS) contract tracking customer pricing information for the Product, information necessary to administer the rolling average for lagged price concessions for Average Manufacturers Price ("AMP") calculations, and any other information requested by Buyer in order to make the reports and calculations required herein.

7.10.2. Payment of Rebates. Buyer shall pay when due all rebates, chargebacks, and other similar payments for Product bearing a Seller NDC Number (regardless of whether the Product was sold before or after Closing) under all Medicaid, Medicare, or other similar programs that was dispensed pursuant to a prescription with an Rx claim paid date (i.e. date reimbursed by the state or other payor) on or after January 1, 2010.

7.10.3. Payment of Chargebacks. If following Closing a wholesaler or other customer reduces any payment to Buyer as a result of a chargeback which such wholesaler or other customer asserts is due from the Sellers or Buyer, Buyer agrees that Buyer shall be responsible for such chargeback (regardless of whether such chargeback is in respect of Product sold to such wholesaler or other customer before or after Closing) and Buyer shall have no claim against the Sellers in respect of such chargeback.

7.10.4. Covenant Regarding Information Provided for Reporting Purposes. Seller covenants that all information provided to Buyer for purposes of the reporting obligations set forth in this Section 7.10 shall be timely, accurate and complete.

7.11.   *Limitation on Liability.*   Notwithstanding anything in this Agreement to the contrary (but without limiting Buyer's obligations under Sections 7.8, 7.9 or 7.10), with respect to any Product that was sold or manufactured by or on behalf of either Seller prior to the Closing, (i) any actions taken Buyer in respect of such Product (whether pursuant to Sections 7.8, 7.9 or 7.10 of this Agreement or otherwise) shall be taken solely in Buyer's capacity as an agent of Sellers in respect thereof, and (ii) other than the Assumed Liabilities, Buyer shall not assume any liabilities of either Seller, accrued, contingent or otherwise, and whether arising in contract, tort or otherwise.

7.12.   *Tax Matters.*   Buyer shall be responsible for any and all excise, sales, value added, use, registration, stamp, franchise, transfer and similar Taxes, levies, charges and fees incurred in connection with the transactions contemplated by this Agreement.   The parties hereto shall cooperate with each other and with each other's respective representatives, including accounting firms and legal counsel, in connection with the preparation or audit of any Tax Return(s) and any Tax claim or litigation in respect of the Purchased Assets and assumption of the liabilities under this Agreement that include whole or partial taxable periods, activities, operations or events on or prior to the Closing Date, which cooperation shall include, but not be limited to, making available employees, if any, for the purpose of providing testimony and advice, or original documents, or any of the foregoing.

7.13.   *Cure Costs.*   Sellers shall be exclusively responsible for the payment of, and shall pay as and when required by the Sale Order, all Ethypharm Cures in an amount not to exceed $2,900,000 (the "Ethypharm Cure Cap"), and Buyer shall be exclusively and solely responsible for payment of, and shall pay, as and when required by the Sale Order, all Other Cure Amounts. In the event that Ethypharm Cures as finally determined by the Bankruptcy Court exceed the Ethypharm Cure Cap, neither Sellers, on the one hand, nor Buyer, on the other hand, shall be required to pay the amount of such excess, but either party may undertake to pay, such excess. If neither party undertakes to pay such excess, this Agreement shall be deemed terminated pursuant to Section 10.1.1 hereof.

7.14.   *Use of Seller Trade Dress.*   As of the Closing Date, Sellers hereby grant to Buyer and its affiliates, and Buyer hereby accepts, a non-exclusive, non-transferable, non-sublicensable, royalty-free license in the United States of America (including all territories, protectorates, the District of Columbia, and the Commonwealth of Puerto Rico) to use and/or permit its distributors to use (i) the trademarks, tradenames, brands, corporate names, or similar items used by Sellers or any of either Seller's affiliates, other than the Trademarks, and (ii) the layout, designs, and coloring used on the packaging of the Product to the extent used on other product packaging of Sellers or any of either Seller's affiliates (collectively, the "Sellers Trade Dress"), solely to the extent necessary to allow Buyer to (a) distribute the Inventory included in the Purchased Assets; (b) use the training, educational, and promotional materials included in the Purchased Assets; and (c) otherwise perform its obligations under this Agreement and the other Transaction Documents (the "Sellers Trade Dress License").   Buyer acknowledges that the Sellers Trade Dress License is being granted solely for transitional purposes and that Buyer shall use commercially reasonable efforts to cease its use of the Sellers Trade Dress as quickly as is reasonably possible after the Closing Date.   Notwithstanding the foregoing, the Sellers Trade Dress License will terminate (i) with respect to training, educational, and promotional materials containing the Sellers Trade Dress, upon the later to occur of the exhaustion of training,

educational and promotional materials containing Seller Trade Dress or 30 Business Days after the date upon which Buyer receives notice from the FDA that Buyer's training, educational, and promotional materials for the Product that do not refer to the Sellers Trade Dress have been pre-cleared by the FDA pursuant to 21 CFR 314 Subpart H, and (ii) with respect to packaging and labeling of the Product containing Sellers Trade Dress, on the later of exhaustion of any Inventory labeled with Sellers Trade Dress or six months following receipt by Buyer of labeling approval for the Product from the FDA. Buyer shall have no obligation to re-label or over-label the training, educational, and promotional materials or the Inventory.

7.15. *Break-up Fee.* Sellers shall pay to Buyer, without further order of the Bankruptcy Court, $300,000 as reimbursement of Buyer's costs and expenses and as a break-up fee (the "Break-Up Fee") in the event that Sellers would not have the ability to terminate this Agreement pursuant to Section 10.1.5 or 10.1.8 and the Bankruptcy Court fails to approve a sale to Buyer as provided hereunder and instead (a) the Bankruptcy Court approves a sale of the Purchased Assets to an entity (other than an entity affiliated with Buyer) that has submitted a Counteroffer (as hereinafter defined), and such sale closes, (b) Guardian confirms a plan of reorganization under chapter 11 of the Bankruptcy Code, (c) the Agreement is deemed terminated pursuant to the last sentence of Section 7.13, or (d) Sellers otherwise determine not to proceed with the Transaction (other than by reason of a termination of this Agreement pursuant to Section 10.1.5 or 10.1.8). Notwithstanding the foregoing, the Break-Up Fee shall not be payable if the Agreement is terminated pursuant to Section 10.1.1 (other than a deemed termination pursuant to the last sentence of Section 7.13) or evidence submitted to the Bankruptcy Court by Buyer and Sellers pursuant to Sections 7.16(i) and 7.16(ii) is insufficient to permit assumption and assignment of the Ethypharm Contract to Buyer. The Break-Up Fee is intended to compensate Buyer for the time and expense dedicated to this transaction and the value added by Buyer in (i) establishing a bid standard or minimum for other bidders, (ii) placing Sellers' estate property in a sales configuration mode attracting other bidders to an auction and (iii) for serving as a catalyst for other potential or actual bidders. The Break-Up Fee shall constitute an allowed administrative expense claim against Sellers' estate under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall be subject to payment pursuant to a carve out from security interests of Paul Royalty to the extent provided in the cash collateral order of the Bankruptcy Court.

7.16. *Ethypharm Contract Assumption and Assignment.* Buyer shall cooperate with Sellers to provide competent evidence admissible at the Sale Hearing that is sufficient to (i) meet Sellers' applicable burden of proof in establishing adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code in connection with assumption and assignment of the Ethypharm Contract to Buyer, and (ii) establish that Buyer is a reputable company engaged in the pharmaceutical business with a history of regulatory compliance. Notwithstanding anything in this Agreement to the contrary, Buyer shall not be deemed to be in breach of this Agreement if evidence provided by Buyer is insufficient to satisfy the conditions referenced in clauses (i) and (ii) of the immediately preceding sentence. In addition, for purposes of clarity, if the Closing does not occur due to the failure, for any reason, of the condition specified in Section 5.9 hereof to be satisfied, the Deposit (together with interest and income thereon) shall be returned to Buyer.

7.17. *Akrimxax Guarantee*. In the event of the occurrence of the Opal Assignment, Akrimax shall unconditionally guarantee the performance by Opal of all of its obligations hereunder.

8.    Conduct of Auction and Closing of Sale.

8.1.    *Sale Hearing, Competing Bids, Etc.*

8.1.1. Buyer acknowledges that in connection with the sale of the Purchased Assets, Sellers shall have advertised to the public in a commercially reasonable manner as required by the Bankruptcy Code or as shall be directed by the Bankruptcy Court in the Bidding Procedures Order, that the Purchased Assets are for sale and will be sold to the highest or best bidder at a hearing to be conducted in the Bankruptcy Case (the "Sale Hearing"). Buyer shall be entitled to submit further bids at the Sale Hearing, consistent with the terms herein, in the event that a higher or better offer than that reflected herein is received by Sellers. In the event that the highest or best offer, as determined by the Bankruptcy Court, is submitted at the Sale Hearing by a purchaser other than Buyer, then Sellers shall be entitled to close a sale pursuant to such other offer (or, if such other offer does not close, then pursuant to the next highest or best offer) and this Agreement shall be considered null and void; *provided* that the Deposit shall remain in escrow until the earlier of five Business Days after the Sale Hearing and the closing date of a sale to a purchaser other than Buyer, after which it shall be returned to Buyer. Subject to Section 10.1, in the event that a purchaser other than Buyer is determined to have submitted the highest and best offer, and such offer does not timely close, Buyer agrees to purchase the Purchased Assets in accordance with the terms of this Agreement at the last offer submitted by Buyer at the Sale Hearing.

8.1.2. Any counteroffer or bid for any of the Purchased Assets (a "Counteroffer") shall comply with requirements established by Sellers, provided that Sellers may not revise or waive the requirements specified in Section 5.6.

8.2.    *Sellers' Motions in Bankruptcy Court.* Within two Business Days of execution of this Agreement, Sellers will move the Bankruptcy Court (i) to enter the Sale Order and the Bidding Procedures Order, (ii) to schedule the Bidding Procedures Hearing on a date no later than August 26, 2009, and (iii) to schedule the Sale Hearing on a date no later than September 22, 2009.

8.3.    *Preparation for Closing.* Each of the parties hereto agrees to use its good faith efforts to bring about the fulfillment of the conditions precedent contained in this Agreement, including without limitation the obtaining of all necessary consents, approvals, and waivers for the consummation of the transactions contemplated by this Agreement.

8.4.    *Defense of Orders.* Buyer, with cooperation of Sellers, and at Buyer's sole cost and expense, shall defend the Sale Order and the Assumption and Assignment Order in the event that the Closing has occurred as provided hereunder.

8.5.    *Additional Assigned Contracts.* Sellers will use their good faith efforts to obtain the entry of an order or orders of the Bankruptcy Court authorizing assumption and assignment

of any Additional Assigned Contracts that are not covered by the Sale Order or Assumption and
Assignment Order as soon after the Sale Hearing as is practicable and Buyer shall be responsible
for all costs associated with curing any and all defaults under such contracts required to be cured
as a condition of Buyer's assumption thereof.

       9.    <u>Notices</u>.  All notices, demands, consents or other communications which any
party may be required or may desire to give under this Agreement shall be in writing and shall be
deemed to have been duly given (i) upon receipt if mailed by certified mail, return receipt
requested, postage prepaid, (ii) one business day after prepaid deposit with a reputable overnight
delivery service, or (iii) upon receipt if delivered by telecopy or email, the receipt by sender of
confirmation or of recipient's email acknowledgement of receipt being conclusive evidence of
such receipt, in any case to the party to whom the same is so given or made at the address of such
party as set forth below:

| | |
|---|---|
| To Sellers: | Oscient Pharmaceuticals Corporation<br>1000 Winter Street<br>Suite 2200<br>Waltham, MA 02451<br>Telecopier:  (781) 893-9535<br>Email: srauscher@oscient.com<br>Attn:  Steven Rauscher |
| with a copy to: | Ropes & Gray LLP<br>One International Place<br>Boston, MA  02110<br>Telecopier:  (617) 951-7050<br>Email: james.wilton@ropesgray.com<br>Attn:  James M. Wilton, Esq. |
| To Buyer: | Akrimax Pharmaceuticals, LLC<br>11 Commerce Dr.<br>1st Floor, Suite #100<br>Cranford, NJ  07016<br>Telecopier:  (908) 325-7487<br>Email: arubino@Akrimax.com<br>Attn:  Alan Rubino |
| | Akrimax Pharmaceuticals, LLC<br>11 Commerce Dr.<br>1st Floor, Suite #100<br>Cranford, NJ  07016<br>Telecopier:  (908) 325-7487<br>Email: svitiello@Triaxpharma.com<br>Attn:  Salvatore J. Vitiello, Esq. |
| with a copy to: | Lowenstein Sandler LLP<br>65 Livingston Avenue |

Roseland, NJ 07068
Telecopier: (973) 597-2400
Email: mlerner@lowenstein.com
Attn: Michael J. Lerner, Esq.

To Escrow Agent:      Ropes & Gray LLP
One International Place
Boston, MA 02110
Telecopier: (617) 951-7050
Email: james.wilton@ropesgray.com
Attn: James M. Wilton, Esq.

10.   Termination.

10.1.   *Termination Events.*  This Agreement may be terminated by Buyer or Sellers by giving written notice to the other party as follows:

10.1.1.  by mutual written consent of Sellers and Buyer;

10.1.2.  by Buyer at any time after August 26, 2009, if the Bidding Procedures Order is not entered on or before such date;

10.1.3.  by Buyer at any time after September 22, 2009, if the Sale Order has not been entered on or before such date (other than as a result of a material breach of this Agreement by Buyer);

10.1.4.  by Buyer at any time after (i) the third Business Day immediately following the date of entry of the Sale Order, if the Closing has not occurred as a result of either Seller's material breach of its obligations or (ii) September 30, 2009, if the Closing has not occurred for any reason (other than due to a material breach by Buyer of its obligations hereunder, but only to the extent that, for any material breach other than payment of the Purchase Price at Closing, Sellers provided notice to Buyer of such breach and such breach remained uncured for five Business Days following Buyer's receipt of such notice);

10.1.5.  by Sellers at any time after (i) the third Business Day immediately following the date of entry of the Sale Order, if the Closing has not occurred as a result of Buyer's material breach of its obligations, or (ii) September 30, 2009, if the Closing has not occurred for any reason (other than due to a material breach by Sellers of their obligations hereunder, but only to the extent that Buyer provided notice to Sellers of such breach and such breach remained uncured for five Business Days following Sellers' receipt of such notice);

10.1.6.  by Sellers if a higher or better offer (as determined by an order of the Bankruptcy Court) is received for the Purchased Assets or the Bankruptcy Court fails to approve a sale to Buyer;

10.1.7.  by Buyer, if (x) any of the representations and warranties of Sellers contained in this Agreement shall fail to be true and correct, or (y) there shall be a breach by Sellers of their respective covenants or agreements in this Agreement that in case of either (x) or (y) above (i) would result in the failure of a condition set forth in Section 5.1 and (ii) which is not curable or, if curable, is not cured within the earlier of five (5) Business Days after written notice thereof is delivered by Buyer to Sellers or the third Business Day after this date of entry of the Sale Order; provided, that Buyer may not terminate this Agreement pursuant to this Section 10.1.7 if Buyer is in material breach of this Agreement;

10.1.8.  by Sellers, if (x) any of the representations and warranties of Buyer contained in this Agreement shall fail to be true and correct, or (y) there shall be a breach by Buyer of its covenants or agreements in this Agreement that in case of either (x) or (y) above (i) would result in the failure of a condition set forth in Section 6.1 and (ii) which is not curable or, if curable, is not cured within the earlier of five (5) Business Days after written notice thereof is delivered by Sellers to Buyer or the third Business Day after the date of entry of the Sale Order; provided, that Sellers may not terminate this Agreement pursuant to this Section 10.1.8 if either Seller is in material breach of this Agreement;

10.1.9.  by Buyer, if, prior to the Closing, (i) the Bankruptcy Case is dismissed or converted to Chapter 7 or (ii) a trustee is appointed with respect to either Seller.

10.2.  *Effect of Termination.*  Each party's right of termination under Section 10.1 is in addition to any other rights it may have under this Agreement, and the exercise of a right of termination will not be an election of remedies.  Buyer's right to the Break-up Fee under Section 7.15 shall remain in effect notwithstanding a termination of this Agreement under Section 10.1.

11.    Certain Definitions.

11.1.  *Definitions.*  As used in this Agreement, the following terms have the following meanings:

11.1.1.    "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.

11.1.2.    "Business Day" means any day that is not a Saturday, Sunday or other day on which banks located in New York, New York are authorized or obligated to close.

11.1.3.    "Claim" means a suit, claim, action, proceeding, inquiry, investigation, litigation, demand, charge, complaint, grievance, arbitration, indictment, or grand jury subpoena.

11.1.4.    "Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

Case 09-16576    Doc 171-1    Filed 08/07/09    Entered 08/07/09 15:03:05    Desc Exhibit
A-Asset Purchase Agreement    Page 31 of 65


11.1.5.    "<u>Contract</u>" means any written or oral agreement, arrangement, understanding, lease, license, sublicense, or instrument or other contractual or similar arrangement or commitment to which either Seller is a party.

11.1.6.    "<u>Cure Costs</u>" means all cure, compensation and restatement costs required to be paid to the non-debtor party to such contract in connection with the assumption and assignment of each Assumed Contract assumed and assigned to Buyer hereunder pursuant to Section 365 of the Bankruptcy Code.

11.1.7.    "<u>Ethypharm Cures</u>" means all Cure Costs (whether such costs arise in respect of the period occurring before, on or after the Petition Date) due from Sellers to Ethypharm under the Ethypharm Contract, including but not limited to the Ethypharm Inventory Cures.

11.1.8.    "<u>Ethypharm Inventory Cures</u>" means all Cure Costs related to payments due from Sellers to Ethypharm under the Ethypharm Contract with respect to Inventory purchased by Sellers from Ethypharm prior to the Closing.

11.1.9.    "<u>GAAP</u>" means United States generally accepted accounting principles.

11.1.10.    "<u>Governmental Body</u>" means a domestic or foreign national, federal, state, provincial, or local governmental, regulatory or administrative authority, department, agency, commission, court, tribunal, arbitral body or self-regulated entity having jurisdiction over the Sellers or the Purchased Assets.

11.1.11.    "<u>Intellectual Property</u>" means, to the extent relating to the Product, whether owned or licensed, whether related to use in the United States or another country, (i) any and all patents (including design patents, industrial designs and utility models) and patent applications (including docketed patent disclosures awaiting filing, reissues, divisions, continuations, continuations-in-part and extensions), patent disclosures awaiting filing determination, inventions and improvements thereto, (ii) trademarks, service marks, certification marks, trade names, brand names, trade dress, logos, business and product names, slogans, and registrations and applications for registration thereof together with all goodwill associated therewith and all uniform resource locators, e-mail and other internet addresses and domain names and applications and registrations therefor (collectively, "<u>URLs</u>") , (iii) copyrights (including software and software systems) and registrations thereof, (iv) databases and database systems; (v) inventions, processes, designs, formulae, trade secrets, know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications, domain names, discoveries and confidential business information, (vi) intellectual property rights similar to any of the foregoing, (vii) computer software and web site, (viii) copies and tangible embodiments thereof (in whatever form or medium, including electronic media) and (ix) all contracts or licenses for the use of any of the foregoing, in the case of each of the foregoing together with all goodwill directly or indirectly associated therewith.

11977205_16.DOC                                        - 28 -

11.1.12.    "Intellectual Property Rights" means the Patents, Trademarks, Copyrights, Product Know-How and Technical Information and other rights as indicated in Section 1.1, and all other Intellectual Property owned, licensed, or otherwise controlled by Sellers related to the Product, including copies and tangible embodiments thereof, in whatever form or medium, including electronic media.

11.1.13.    "Lien" means any security interest, mortgage, pledge, lien, encumbrance, right, hypothecation, option, charge or claim of any nature whatsoever.

11.1.14.    "Material Adverse Effect" means a material adverse effect on (i) the business, results of operations, assets, or financial condition of the Sellers related to the Product, other than any such effect attributable to any action or omission of Parent or Guardian taken with the prior written consent of Buyer, or (ii) the ability of Sellers to consummate the transactions contemplated by this Agreement.

11.1.15.    "Other Cure Amounts" means all Cure Costs (whether such costs arise in respect of the period occurring before, on or after the Petition Date) related to the Additional Assigned Contracts that constitute Assumed Contracts.

11.1.16.    "Person" means any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, joint-stock company, trust, Governmental Body or other entity.

11.1.17.    "Tax" or "Taxes" means all taxes, charges, fees, imposts, levies or other assessments, including all net income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest and any penalties, fines, additions to tax or additional amounts thereon, imposed by any taxing authority (federal, state, local or foreign) and shall include any successor or transferee liability in respect of Taxes.

11.1.18.    "Tax Returns" means all returns, declarations, reports, forms, estimates, information returns and statements required to be filed in respect of any Taxes or to be supplied to a taxing authority in connection with any Taxes.

12.    Waiver.  The rights and remedies of the parties to this Agreement are cumulative and not alternative.  Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement, the Transaction Documents, or the other documents referred to herein will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.   To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement, the Transaction Documents, or the other documents referred to herein can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in

the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement, the Transaction Documents, or the other documents referred to herein.

13.   Entire Agreement.   The agreement of the parties that is comprised of this Agreement, the Exhibits and Schedules hereto, and the other documents referred to herein sets forth the entire agreement and understanding between the parties and supersedes any prior written agreement or understanding and any prior or contemporaneous oral agreement or undertaking relating to the subject matter of this Agreement.   This Agreement may not be amended or modified except by a written agreement duly executed by each of the parties hereto.

14.   Assignment.   This Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permissible assigns of Sellers and Buyer, including any successor trustee appointed in the Bankruptcy Cases.   Prior to the Closing, Buyer may not assign its rights and obligations hereunder without Sellers' written consent, provided that Buyer may assign, without written consent of Sellers, all or any portion of its rights and obligations hereunder to Opal (provided that no such assignment shall relieve Buyer of its obligations hereunder) (the "Opal Assignment").

15.   Governing Law; Bankruptcy Court Jurisdiction.   This Agreement and all Claims with respect thereto shall be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and, where state law is implicated, the laws of the State of New York without regard to any conflict of laws rules thereof that might indicate the application of the laws of any other jurisdiction.   The parties agree that the Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Agreement, the Bidding Procedures Order, the Sale Order, and the Assumption and Assignment Order.

16.   No Third Party Beneficiaries.   Nothing in this Agreement is intended or shall be construed to give any person or entity, other than the parties hereto, any legal or equitable right, remedy, or claim under or in respect of this Agreement, the Bidding Procedures Order, and the Assumption and Assignment Order or any provision contained herein or in any schedule or exhibit attached hereto.

17.   No Liability of Officers and Directors.   The parties hereto acknowledge and agree that any individual executing this Agreement or any certificates or other documents contemplated by this Agreement on behalf of Buyer or Sellers do so on behalf of such entities and not in their individual capacities.   As such, no officer, director, employee, or agent of Buyer or Sellers shall have any liability hereunder.

18.   Survival of Representations and Warranties.   All representations and warranties contained in Sections 3 and 4 hereof shall expire on the Closing Date.

19.   Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes and all of which together shall constitute one and the same instrument.   The exchange of copies of this Agreement or amendments thereto and of executed signature pages by facsimile transmission or by email

transmission in portable digital format, or similar format, shall constitute effective execution and delivery of such instrument(s) as to the parties and may be used in lieu of the original Agreement or amendment for all purposes.  Signatures of the parties transmitted by facsimile or by email in portable digital format, or similar format, shall be deemed to be their original signatures for all purposes.

20. <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect, if all of the essential terms and conditions herein for each party remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable, *provided* that all of the essential terms and conditions herein for each party remain in full force and effect.

21. <u>Headings</u>.  The headings contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope or intent of this Agreement.

IN WITNESS WHEREOF, Sellers and Buyer have caused this Agreement to be executed by their respective duly authorized officers as of the day and year first written above.

GUARDIAN II ACQUISITION CORPORATION

By:

Name:     Steven M. Rauscher
Title:      President and Chief Executive
            Officer

OSCIENT PHARMACEUTICALS
CORPORATION

By:

Name:     Steven M. Rauscher
Title:      President and Chief Executive
            Officer

*Signature Page to Asset Purchase Agreement*

AKRIMAX PHARMACEUTICALS, LLC

By: _____

    Name:  Alan Rubino
    Title:   President

## EXHIBIT 1.5.1.1

## JOINT ESCROW INSTRUCTIONS

1. <u>Establishment of Escrow Account</u>.  Pursuant to Section 1.5.1 of the attached Asset Purchase Agreement (the "<u>Purchase Agreement</u>"), (a) Buyer shall deliver to Ropes & Gray LLP, as escrow agent (together with its successors, "<u>Escrow Agent</u>") cash in the amount of $1,200,000, which amount represents a deposit on the Purchase Price as set forth in the Purchase Agreement.  Such amount, together with interest thereon and all other amounts from time to time held by Escrow Agent pursuant to the terms hereof, are herein referred to as the "<u>Escrow Funds</u>."  Escrow Agent hereby agrees to hold the Escrow Funds in an interest bearing deposit account with Citizens Bank (the "<u>Escrow Account</u>") as provided in these Joint Escrow Instructions.  The purpose of the Escrow Account is to provide a source from which any amounts which may become owing to Sellers under the Purchase Agreement may be paid.  Capitalized terms defined in the Purchase Agreement and not otherwise defined herein are used herein with the meanings so defined.

2. <u>Disposition of Escrow Funds</u>.  Escrow Agent will hold the Escrow Funds in its possession in the Escrow Account until authorized hereunder to deliver such Escrow Funds as follows:

      2.1.    As provided in a joint written direction of Buyer and Sellers;

      2.2.    As provided in Sections 1.5.1, 7.16 and 8.1.1 of the Purchase Agreement;

      2.3.    As provided in a written direction by Buyer or Sellers following termination of the Purchase Agreement pursuant to Section 10 of the Purchase Agreement, <u>provided</u>, <u>however</u>, if the Bankruptcy Court has approved a sale of the Purchased Assets to a bidder other than Buyer, then Sellers may hold the Escrow Funds until the earlier of the closing of the sale to such bidder or five Business Days after the Sale Hearing; or

      2.4.    As provided in an order of the Bankruptcy Court or other court of competent jurisdiction.

3. <u>Escrow Agent</u>.

      3.1.    Escrow Agent shall have no duties or responsibilities, including, without limitation, any duty to review or interpret the Purchase Agreement, except those expressly set forth herein.  Buyer acknowledges that Ropes & Gray LLP is counsel to Sellers and agrees that Ropes & Gray LLP may continue to advise and represent Sellers, including in connection with any dispute related to the Purchase Agreement or the Escrow Funds.

      3.2.    If Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions from Buyer or Sellers with respect to the Escrow Account, which, in its opinion, are in conflict with any of the provisions of this Escrow Agreement, or if Buyer or Sellers, for any reason, contest instructions delivered by the other with respect to the Escrow Account, it shall be entitled to refrain from taking any action until it shall be directed otherwise in writing by Buyer and Sellers or by order of the Bankruptcy Court or other court of competent

jurisdiction.  Escrow Agent shall be protected in acting upon any notice, request, waiver, consent, receipt, or other document reasonably believed by Escrow Agent to be signed by the proper party or parties.

      3.3.    Escrow Agent shall not be liable for any error or judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law, or for anything that it may do or refrain from doing in connection herewith, except its own bad faith, gross negligence or willful misconduct, and Escrow Agent shall have no duties to anyone except Buyer and Sellers.  Escrow Agent shall have no liability related to the selection of the financial institution in which the Escrow Funds are maintained.

      3.4.    Escrow Agent may consult legal counsel in the event of any dispute or question as to the construction of these Joint Escrow Instructions, or Escrow Agent's duties hereunder, and Escrow Agent shall incur no liability and shall be fully protected with respect to any action taken or omitted in good faith in accordance with the opinion and instructions of such counsel.

      3.5.    In the event of any disagreement between Buyer and Sellers or any of them, and/or any other person, resulting in adverse claims and demands being made in connection with or for the Escrow Funds, Escrow Agent shall be entitled at its option to refuse to comply with any such claim or demand, so long as such disagreement shall continue, and in so doing Escrow Agent shall not be or become liable for damages or interest to Buyer or Sellers or to any person named herein for its failure or refusal to comply with such conflicting or adverse demands.  Escrow Agent shall be entitled to continue so to refrain and refuse so to act until all differences shall have been resolved by agreement and Escrow Agent shall have been notified thereof in writing signed by Buyer and Sellers.  In the event of such disagreement, Escrow Agent in its discretion may file a suit in interpleader for the purpose of having the respective rights of the claimants adjudicated, if Escrow Agent determines such action to be appropriate under the circumstances, and may deposit with the court in which the suit in interpleader was filed the Escrow Funds and any other property held hereunder.  Buyer and Sellers agree, jointly and severally, to pay all out-of-pocket costs and expenses incurred by Escrow Agent in such action, including reasonable attorney's fees.  Solely as between Buyer and Sellers, such costs shall be borne in equal proportions by Buyer, on the one hand, and Sellers, on the other hand.

      3.6.    Buyer and Sellers hereby jointly and severally indemnify, defend, and hold Escrow Agent harmless from all losses, costs, and expenses that may be incurred by it as a result of its involvement in any arbitration or litigation arising from the performance of its duties hereunder, *provided* that such losses, costs, and expenses shall not have resulted from the bad faith, willful misconduct, or gross negligence of Escrow Agent.  Solely as between Buyer and Sellers, such indemnification shall be borne in equal proportions by Buyer, on the one hand, and Sellers, on the other hand.  Such indemnification shall survive termination of the escrow established hereunder until extinguished by any applicable statute of limitations.

      3.7.    Escrow Agent does not own or have any interest in the Escrow Account or the Escrow Funds but is serving as escrow holder only, having only possession thereof and agreeing to hold and distribute the Escrow Funds in accordance with the terms and conditions of this Escrow Agreement.  This paragraph shall survive notwithstanding any termination of this Escrow Agreement or the resignation of Escrow Agent.

3.8. Notices hereunder shall be delivered and shall be deemed to have been duly given if given in accordance with Section 9 of the Purchase Agreement.

3.9. Escrow Agent (and any successor Escrow Agent) may at any time resign as such by delivering the Escrow Funds to (i) any banking corporation or trust company organized under the laws of the United States or of any state which corporation or company is jointly designated by the other parties hereto in writing as successor escrow agent and consents in writing to act as successor escrow agent or (ii) the Bankruptcy Court or any other court of competent jurisdiction; whereupon Escrow Agent shall be discharged of and from any and all further obligations arising in connection with this Escrow Agreement. The resignation of the Escrow Agent will take effect on the earlier of (x) the appointment of a successor escrow agent by Buyer and Sellers and delivery of the Escrow Funds to such successor escrow agent (or delivery of the Escrow Funds to the Bankruptcy Court or any other court of competent jurisdiction) or (y) the day that is 60 days after the date of delivery of its written notice of resignation to Buyer and Sellers. If at that time the Escrow Agent has not received a designation of a successor escrow agent, the Escrow Agent's sole responsibility after that time shall be to safekeep the Escrow Funds until receipt of a designation of successor escrow agent, a joint written instruction as to disposition of the Escrow Funds by Buyer and Sellers, or a final order of the Bankruptcy Court or any other court of competent jurisdiction mandating disposition of the Escrow Funds.

3.10. With respect to notices or actions of Buyer hereunder, Escrow Agent may require that such notices or actions be affirmed by both Akrimax Pharmaceuticals, LLC and Opal Pharmaceuticals Acquisition, LLC.

Dated August _7_, 2009

ACKNOWLEDGED AND AGREED:

**Ropes & Gray LLP, Escrow Agent**

By: _____

Name: D. Ross Martin

Title: Partner

**Akrimax Pharmaceuticals, LLC, Buyer**

By: _Alan Rubino_

Name:   Alan Rubino
Title:    President

**Sellers:**

**Oscient Pharmaceuticals Corporation**

By: _____

Name: Steven M. Rauscher

Title: President and Chief Executive Officer

**Guardian II Acquisition Corporation**

By: _____

Name: Steven M. Rauscher

Title: President and Chief Executive Officer

**EXHIBIT 5.2(a)**

**BILL OF SALE**

Pursuant to that certain Asset Purchase Agreement, dated as of August __, 2009 (the "**Purchase Agreement**"), by and among Akrimax Pharmaceuticals, LLC, a Delaware limited liability company ("**Buyer**") on the one hand, and Oscient Pharmaceuticals Corporation, a Massachusetts corporation ("**Oscient**"), and Guardian II Acquisition Corporation, a Delaware corporation and a wholly-owned subsidiary of Oscient ("**Oscient Subsidiary**") (each of Oscient and Oscient Subsidiary is referred to herein as a "**Seller**"), each a Debtor and Debtor in Possession under Case No. 09-16576 pending in the United States Bankruptcy Court for the District of Massachusetts, on the other hand, and for good and valuable consideration, the receipt and sufficiency of which each Seller hereby expressly acknowledges, each Seller hereby sells, transfers, assigns and delivers to Opal Pharmaceuticals Acquisition, LLC, its successors and assigns, to have and to hold forever, all of its respective right, title and interest in and to all of the Purchased Assets which are not specifically transferred to Buyer pursuant to another assignment or other instrument being executed and delivered by Buyer and such Seller concurrently herewith.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used herein shall have the same meanings as such terms have when utilized in the Purchase Agreement.

Notwithstanding anything to the contrary herein, each Seller is executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Purchase Agreement, and Buyer accepts this Bill of Sale on such basis. To the extent of any conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, each Seller has caused this Bill of Sale to be executed as of the _____ day of _____, 2009.

**SELLERS:**

Oscient Pharmaceuticals Corporation,
a Massachusetts corporation and Chapter 11 Debtor and
Debtor in Possession


By:_____
Name:
Title:


Guardian II Acquisition Corp.
a Delaware corporation and Chapter 11 Debtor and
Debtor in Possession


By:_____
Name:
Title:

**EXHIBIT 5.2(b)**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), dated as of _____, 2009, is made and entered into by and among Oscient Pharmaceuticals Corporation, a Massachusetts corporation ("**Oscient**"), Guardian II Acquisition Corp., a Delaware corporation and a wholly-owned subsidiary of Oscient ("**Oscient Subsidiary**") (each of Oscient and Oscient Subsidiary is referred to herein as a "**Seller**" and collectively, "**Sellers**"), each a Chapter 11 Debtor and Debtor in Possession under Case No. 09-16576 pending in the United States Bankruptcy Court for the District of Massachusetts, on the one hand, and Opal Pharmaceuticals Acquisition, LLC, a Delaware limited liability company ("**Buyer**"), on the other hand. Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings set forth in that certain Asset Purchase Agreement, dated as of August 7, 2009 (the "**Purchase Agreement**"), by and among Sellers and Akrimax Pharmaceuticals, LLC ("**Akrimax**").

WHEREAS, prior to the date hereof, Akrimax has assigned all of its rights and obligations under the Purchase Agreement to Buyer; and

WHEREAS, concurrently with the execution and delivery of this Agreement, Buyer and Sellers are consummating the transaction contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.    Assignment and Assumption.  In accordance with and subject to the terms and conditions of the Purchase Agreement, and except as set specifically set forth herein, each Seller hereby assigns, transfers and conveys to Buyer, all of such Seller's respective right, title and interest in and to the Assumed Contracts listed in Exhibit A hereto, and Buyer hereby accepts and agrees to and does hereby assume the Assumed Liabilities.

2.    Limitation. Notwithstanding anything to the contrary contained herein, Buyer does not hereby assume or agree to perform or pay any liabilities or obligations of any Seller that are not Assumed Liabilities (provided that this sentence shall in no way limit Buyer's obligations under the Purchase Agreement).

3.    Amendments.   This Agreement may only be amended by a writing signed by Buyer and each Seller.

4.    Execution in Counterparts.  This Agreement may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Agreement bearing their original signature as soon thereafter as possible.

5.    Delivery Pursuant to Purchase Agreement.   Notwithstanding anything to the contrary herein, each of the Sellers and Buyer is executing and delivering this Agreement in accordance with and subject to all of the terms and provisions of the Purchase Agreement. To

the extent of any conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

6.      Binding Effect.  This Agreement shall be binding upon, and shall inure to the benefit of, Buyer and each Seller and their respective successors and assigns.

7.      Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

8.      Headings.  The section and paragraph headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the parties hereto as of the date first above written.

<u>**SELLERS**</u>:

GUARDIAN II ACQUISITION CORPORATION

By:_____
    Name:
    Title:

OSCIENT PHARMACEUTICALS
CORPORATION

By:_____
    Name:
    Title:

<u>**BUYER**</u>:

OPAL PHARMACEUTICALS ACQUISITION,
LLC

By:_____
    Name:
    Title:

Exhibit A

Assumed Contracts

Amended and Restated Development, License and Supply Agreement, dated as of July 31, 2006, by and among Ethypharm, S.A., Ethypharm Industries, SA and Guardian II Acquisition Corporation, as assignee of Reliant Pharmaceuticals, Inc.

[TO BE UPDATED FOR ANY ADDITIONAL ASSUMED CONTRACTS]

## EXHIBIT 5.3

## TRADEMARK ASSIGNMENT

This TRADEMARK ASSIGNMENT (this "**Assignment**"), dated as of _____, 2009, is made and entered into by and among Oscient Pharmaceuticals Corporation, a Massachusetts corporation ("**Oscient**"), Guardian II Acquisition Corp., a Delaware corporation and a wholly-owned subsidiary of Oscient, (the "**Oscient Subsidiary**") (each of Oscient and Oscient Subsidiary is referred to herein as an "**Assignor**" and together, "**Assignors**"), each a Chapter 11 Debtor and Debtor in Possession under Case No. 09-16576 pending in the United States Bankruptcy Court for the District of Massachusetts, on the one hand, and Opal Pharmaceuticals Acquisition, LLC, a Delaware limited liability company ("**Assignee**"), on the other hand. Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings set forth in that certain Asset Purchase Agreement, dated as of August 7, 2009 (the "**Purchase Agreement**"), by and among Assignors and Akrimax Pharmaceuticals, LLC ("**Akrimax**").

WHEREAS, prior to the date hereof, Akrimax has assigned all of its rights and obligations under the Purchase Agreement to Assignee; and

WHEREAS, concurrently with the execution and delivery of this Assignment, Assignors and Assignee are consummating the transaction contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.    <u>Assignment</u>. In accordance with and subject to the terms and conditions of the Purchase Agreement, and except as set specifically set forth herein, each Assignor hereby assigns, transfers and conveys to Assignee, all of such Assignor's respective right, title and interest in and to the trademarks and trademark applications listed in <u>Exhibit A</u> (the **Trademarks**), including without limitation the goodwill of the business appurtenant thereto and which is symbolized thereby, and the right to renew any registration therefor, to be held and enjoyed by Assignee for its own use and benefit and for the use and benefit of its successors, assigns and legal representatives, to be used as fully and entirely as said rights would have been held and enjoyed by such Assignor had this assignment and sale not been made, together with all claims for damage by reason of past, present or future infringement of said Trademark with the right to sue and collect the same for its own use or for the use of its successors, assigns or other legal representatives, including any trademarks and trademark applications claiming priority to and/or benefit of the Trademarks including those filed in any foreign country/countries. Each Assignor hereby authorizes and requests the United States Commissioner of Patents and Trademarks, and any officials of foreign countries whose duty is to issue trademarks on applications as aforesaid, to issue all Trademarks in the name of Assignee in accordance with the terms of this Assignment.

2.    <u>Limitation</u>. Notwithstanding anything to the contrary contained herein, Assignee does not hereby assume or agree to perform or pay any liabilities or obligations of either Assignor that are not Assumed Liabilities (provided that this sentence shall in no way limit Buyer's obligations under the Purchase Agreement).

3.      Amendments.   This Agreement may only be amended by a writing signed by each Assignor and Assignee.

4.      Execution in Counterparts.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

5.      Delivery Pursuant to Purchase Agreement.   Notwithstanding anything to the contrary herein, each of the Assignors and Assignee is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement.  To the extent of any conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

6.      Binding Effect.  This Assignment shall be binding upon, and shall inure to the benefit of, Assignors and Assignee and their respective successors and assigns.

7.      Governing Law.   This Assignment shall be governed by and construed in accordance with the laws of the State of New York.

8.      Headings.  The section and paragraph headings contained in this Assignment are for reference purposes only and shall not in any way affect the meaning or interpretation of this Assignment.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, this Assignment has been duly executed and delivered by the parties hereto as of the date first above written.

**ASSIGNORS**:

GUARDIAN II ACQUISITION CORPORATION

By:_____
    Name:
    Title:

OSCIENT PHARMACEUTICALS CORPORATION

By:_____
    Name:
    Title:

**ASSIGNEE**:

OPAL PHARMACEUTICALS ACQUISITION, LLC

By:_____
    Name:
    Title:

<u>Exhibit A</u>

**U.S. Trademarks**

| | |
|---|---|
| Mark: | ANTARA |
| Class: | 5 |
| Serial Number: | 78/433786 |
| Filing Date: | 06/11/2004 |
| Registration No.: | 3101801 |
| Registration Date: | 06/06/2006 |
| Status: | Registered |

**Foreign Trademarks**

None

**EXHIBIT 5.4**

**PATENT ASSIGNMENT**

This PATENT ASSIGNMENT (this "**Assignment**"), dated as of _____, 2009, is made and entered into by and among Oscient Pharmaceuticals Corporation, a Massachusetts corporation ("**Oscient**"), Guardian II Acquisition Corp., a Delaware corporation and a wholly-owned subsidiary of Oscient, (the "**Oscient Subsidiary**") (each of Oscient and Oscient Subsidiary is referred to herein as an "**Assignor**" and together, "**Assignors**"), each a Chapter 11 Debtor and Debtor in Possession under Case No. 09-16576 pending in the United States Bankruptcy Court for the District of Massachusetts, on the one hand, and Opal Pharmaceuticals Acquisition, LLC, a Delaware limited liability company ("**Assignee**"), on the other hand.  Unless otherwise defined herein, all capitalized terms used in this Agreement shall have the meanings set forth in that certain Asset Purchase Agreement, dated as of August 7, 2009 (the "**Purchase Agreement**"), by and among Assignors, and Akrimax Pharmaceuticals, LLC ("**Akrimax**").

WHEREAS, prior to the date hereof, Akrimax has assigned all of its rights and obligations under the Purchase Agreement to Assignee; and

WHEREAS, concurrently with the execution and delivery of this Assignment, Assignors and Assignee are consummating the transaction contemplated by the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.      <u>Assignment</u>.  In accordance with and subject to the terms and conditions of the Purchase Agreement, and except as set specifically set forth herein, each Assignor hereby assigns, transfers and conveys to Assignee, all of such Assignor's respective right, title and interest in and to the patents and patent applications listed in <u>Exhibit A</u> (the "**Patents**"), including all patents and patent applications claiming priority to and/or benefit of the Patents including divisions, continuations, and continuations-in-part thereof and all reissues, reexaminations, and extensions thereof, and all priority rights under the International Convention for the Protection of Industrial Property for every member country, and all applications for patents (including related rights such as utility-model registrations, registrations, inventor's certificates, and the like) heretofore or hereafter filed in any foreign country/countries, and all patents (including all extensions, renewals and reissues thereof) granted for in any foreign country/countries.     Each Assignor hereby authorizes and requests the United States Commissioner of Patents and Trademarks, and any officials of foreign countries whose duty is to issue patents on applications as aforesaid, to issue all Patents in the name of Assignee in accordance with the terms of this Assignment.

2.      <u>Limitation</u>.  Notwithstanding anything to the contrary contained herein, the Assignee does not hereby assume or agree to perform or pay any liabilities or obligations of either Assignor that are not Assumed Liabilities (provided that this sentence shall in no way limit Buyer's obligations under the Purchase Agreement).

3.      <u>Amendments</u>.   This Assignment may only be amended by a writing signed by each Assignor and Assignee.

4.      <u>Execution in Counterparts</u>.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

5.      <u>Delivery Pursuant to Purchase Agreement</u>.  Notwithstanding anything to the contrary herein, each of the Assignors and Assignee is executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement.  To the extent of any conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

6.      <u>Binding Effect</u>.  This Assignment shall be binding upon, and shall inure to the benefit of, Assignors and Assignee and their respective successors and assigns.

7.      <u>Governing Law</u>.  This Assignment shall be governed by and construed in accordance with the laws of the State of New York.

8.      <u>Headings</u>.  The section and paragraph headings contained in this Assignment are for reference purposes only and shall not in any way affect the meaning or interpretation of this Assignment.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, this Assignment has been duly executed and delivered by the parties hereto as of the date first above written.

<u>**ASSIGNORS**</u>:

GUARDIAN II ACQUISITION CORPORATION


By:_____
    Name:
    Title:


OSCIENT PHARMACEUTICALS
CORPORATION


By:_____
    Name:
    Title:



<u>**ASSIGNEE**</u>:

OPAL PHARMACEUTICALS ACQUISITION,
LLC



By:_____
    Name:
    Title:

Exhibit A

**Patents**

| Country | Application No./ Application Date | Title | Patent/Pub. No. Grant/Pub. Date | Status |
|---------|-----------------------------------|-------|---------------------------------|--------|
| US | 07/083,409 08/10/1987 | Medicine based on fenofibrate, and a method of preparing it | 4,800,079 01/24/1989 | GRANTED (Expired 08/10/2007) |
| US | 10/030,262 04/17/2002 | Pharmaceutical composition containing fenofibrate and the preparation method | 7,101,574 09/05/2006 | GRANTED (Expires 08/20/2020) |
| US | 07/256,836 10/12/1988 | Method of preparing controlled release fenofibrate | 4,961,860 10/09/1990 | GRANTED (Expired 10/9/2007, or earlier if subject to terminal disclaimer) |
| US | 10/677,861 10/03/2003 | Pharmaceutical composition containing fenofibrate and method for the preparation thereof | 2004-0137055 07/15/2004 | PENDING |
| US | 11/509,806 08/25/2006 | Pharmaceutical composition containing fenofibrate and the preparation method | 2007-0071812 03/29/2007 | PENDING |
| US | 11/111,971 04/22/2005 | Treating metabolic syndrome with fenofibrate | 2006-0083783 04/20/2006 | PENDING |
| US | 12/155,937 06/11/2008 | Pharmaceutical composition containing fenofibrate and the preparation method for the preparation thereof | 2008-0248101 10/09/2008 | PENDING |

## SCHEDULE 1.1.1

### U.S. Trademarks

| | |
|---|---|
| Mark: | ANTARA |
| Class: | 5 |
| Serial Number: | 78/433786 |
| Filing Date: | 06/11/2004 |
| Registration No.: | 3101801 |
| Registration Date: | 06/06/2006 |
| Status: | Registered |

### Foreign Trademarks

None

**Schedule 1.1.3**

**REDACTED**

## SCHEDULE 1.1.4

### Patents

| Country | Application No./ Application Date | Title | Patent/Pub. No. Grant/Pub. Date | Status |
|---------|-----------------------------------|-------|----------------------------------|--------|
| US | 07/083,409 08/10/1987 | Medicine based on fenofibrate, and a method of preparing it | 4,800,079 01/24/1989 | GRANTED (Expired 08/10/2007) |
| US | 10/030,262 04/17/2002 | Pharmaceutical composition containing fenofibrate and the preparation method | 7,101,574 09/05/2006 | GRANTED (Expires 08/20/2020) |
| US | 07/256,836 10/12/1988 | Method of preparing controlled release fenofibrate | 4,961,860 10/09/1990 | GRANTED (Expired 10/9/2007, or earlier if subject to terminal disclaimer) |
| US | 10/677,861 10/03/2003 | Pharmaceutical composition containing fenofibrate and method for the preparation thereof | 2004-0137055 07/15/2004 | PENDING |
| US | 11/509,806 08/25/2006 | Pharmaceutical composition containing fenofibrate and the preparation method | 2007-0071812 03/29/2007 | PENDING |
| US | 11/111,971 04/22/2005 | Treating metabolic syndrome with fenofibrate | 2006-0083783 04/20/2006 | PENDING |
| US | 12/155,937 06/11/2008 | Pharmaceutical composition containing fenofibrate and the preparation method for the preparation thereof | 2008-0248101 10/09/2008 | PENDING |

12010519_6.DOC

5

## SCHEDULE 1.2.8

### Excluded U.S. Trademarks and Trademark Applications

| | |
|---|---|
| Mark: | FACTIVE |
| Registration No.: | 2281877 |
| Status: | Registered |

| | |
|---|---|
| Mark: | Oscient Pharmaceuticals |
| Application No.: | 78366336 |
| Status: | Pending |

| | |
|---|---|
| Mark: | Oscient |
| Application No.: | 78357764 |
| Registration No.: | 3555208 |
| Status: | Registered |

| | |
|---|---|
| Mark: | Genome Therapeutics Corporation |
| Application No.: | 76444204 |
| Registration No.: | 2883604 |
| Status: | Registered |

| | |
|---|---|
| Mark: | Genome Therapeutics |
| Application No.: | 75922263 |
| Registration No.: | 2699145 |
| Status: | Registered |

### Excluded Foreign Trademarks and Trademark Applications

| | |
|---|---|
| Mark: | Genome Therapeutics |
| Country: | Canada |
| Application No.: | 122464600 |
| Status: | Pending |

| | |
|---|---|
| Mark: | Oscient |
| Country: | Norway |
| Application No.: | 200514194 |
| Status: | Pending |

12010519_6.DOC

| | |
|---|---|
| Mark: | Oscient |
| Country: | European Community |
| Application No.: | 3948486 |
| Registration No.: | 3948486 |
| Status: | Registered |

| | |
|---|---|
| Mark: | Oscient |
| Country: | New Zealand |
| Application No.: | 715657 |
| Registration No.: | 715657 |
| Status: | Registered |

| | |
|---|---|
| Mark: | Oscient |
| Country: | International Register |
| Registration No.: | 869790 |
| Status: | Registered |

12010519_6 DOC

## SCHEDULE 3.7

### Licenses to the Product

Abbott Laboratories ("Abbott") and Reliant Pharmaceuticals, Inc. ("Reliant") entered into a binding term sheet in 2006 in settlement of *Reliant Pharmaceuticals, Inc. v. Abbott Laboratories, et al* (Civil Action No. 04-350, D. Del.). Pursuant to this term sheet, Abbott granted a non-exclusive license to Reliant and agreed not to sue Reliant for patent infringement with respect to certain patents owned or licensed by Abbott if Reliant made regular payments to Abbott. The license and this term sheet were assigned to Sellers in connection with the sale of ANTARA to Sellers. Guardian has taken an assignment of certain rights under this term sheet. No license to any patents licensed to Reliant or Guardian under the term sheet are being transferred to Buyer. Seller is aware of certain patents owned by Abbott that may be infringed by sale of the Product. Sellers have not made payments pursuant to the Abbott agreement since 2008.

12010519_6.DOC

8

## SCHEDULE 3.9

### References

Reliant is entitled to reference clinical data related to ANTARA as of the closing date of the sale of ANTARA to Sellers, and to reference the NDAs for the purpose of (i) securing a label amendment for Reliant's Omacor product or (ii) to research, develop, obtain regulatory approval for, make, have made, use, commercialize, offer for sale, sell, or import/export (a) any product the right to which was not transferred from Reliant to Sellers or (b) ANTARA, in territories in which Reliant did not transfer to Sellers the right to sell ANTARA.

12010519_6.DOC

## SCHEDULE 3.11

### Inventory as of July 13, 2009

| Product Type | Number of Capsules |
|---|---|
| Unpackaged Capsules | 10,482,311.00 |
| Finished Goods Held at Catalent and Anderson | 2,251,584.00 |
| Finished Goods Held at I.C.S. | 11,078,810.00 |
| Samples | 1,761,235.00 |

12010519_6.DOC

## SCHEDULE 3.12

### Product Distribution Practices

Since January 1, 2009, prior to the date hereof, the Sellers have delivered shipments of ANTARA to Medco Health Solutions, Inc. in excess of the Sellers' customary shipment amounts and at a price below Sellers' customary pricing, as set forth below:

| Ship Date | Gross Amount | Net Amount (Less 5% Discount) |
|---|---|---|
| 06/29/2009 | 2,385,504.00 | 2,266,228.80 |
| 06/29/2009 | 1,594,854.00 | 1,515,111.30 |
| 06/29/2009 | 51,505.20 | 48,929.94 |
|  | $4,031,863.20 | $3,830,270.04 |

12010519_6 DOC

## SCHEDULE 3.13.2

### Defaults

Under the terms of the Ethypharm Contract, Sellers must pay Ethypharm a royalty of 5% of net sales of the Product, provided that the royalty may be reduced by up to 25% of any royalties required to be paid to third parties with respect to licenses of intellectual property related to the Product. Sellers had historically paid royalty rates at 3.25%. Sellers ceased payment to Abbott Laboratories with respect to a license of intellectual property related to the Product in 2008. Accordingly, Sellers may be required to pay to Ethypharm a royalty of an additional 1.75% from and after the time Sellers ceased making payments to Abbott Laboratories.

12010519_6.DOC