## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
**In re**                              :      **Chapter 11**
                                        :
**OSCIENT PHARMACEUTICALS**            :      **Case Nos. 09-16576-HJB**
**CORPORATION, et al.,**[1]            :
                                        :      **(Jointly Administered)**
                                        :
**Debtors**            :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DISCLOSURE STATEMENT IN SUPPORT OF THE FIRST AMENDED JOINT PLAN
OF REORGANIZATION OF OSCIENT PHARMACEUTICALS, GUARDIAN II
ACQUISITION CORPORATION AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF OSCIENT PHARMACEUTICALS CORPORATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**Mintz, Levin, Cohn, Ferris,
    Glovsky and Popeo, P.C.**
One Financial Center
Boston, Massachusetts 02111
Attn: Richard E. Mikels
Attn: Paul J. Ricotta
Attn: Kevin J. Walsh




ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS OF OSCIENT
PHARMACEUTICALS
CORPORATION

**K&L Gates LLP**
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Attn: Charles A. Dale III
Attn: Mackenzie L. Shea

**Ropes & Gray LLP**
One International Place
Boston, Massachusetts 02110
Attn: James M. Wilton
Attn: James A. Wright III

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

Dated: April 21, 2010

---

[1] The Debtors in these cases are Oscient Pharmaceuticals Corporation (Case No. 09-16576) and Guardian II Acquisition Corporation (Case No. 09-16579).

> This Disclosure Statement and the documents accompanying it contain a number of defined terms, which are denoted with capital letters. Capitalized terms that are not otherwise defined in the Disclosure Statement shall have the meanings ascribed to such terms in the Plan, a copy of which is attached hereto as **Exhibit A.**

This Disclosure Statement describes the First Amended Joint Plan of Reorganization for Oscient Pharmaceuticals Corporation and Guardian II Acquisition Corporation proposed by the Debtors and the Official Committee of Unsecured Creditors of Oscient Pharmaceuticals Corporation under Chapter 11 of the Bankruptcy Code (the "Plan") filed on behalf of each of the Debtors. The Plan and Disclosure Statement have been filed in the Debtors' jointly-administered bankruptcy cases, which are currently pending in the United States Bankruptcy Court for the District of Massachusetts. The Plan is a plan for the Estates of both Oscient and Guardian and cannot be confirmed unless confirmed with respect to both Debtors. However, post-confirmation each Estate will be separately administered and all expenses and liabilities of each Estate shall be satisfied from the assets of the respective Estate.

**The Debtors and the Creditors' Committee urge all Holders of Claims in Impaired Classes receiving Ballots to accept the Plan.**

This Disclosure Statement (and the other Exhibits hereto), the Plan, the accompanying Ballots, if any, and the related materials delivered together herewith are being furnished by the Debtors and the Creditors' Committee to the respective holders of Impaired Claims pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation by the Debtors and the Creditors' Committee of votes to accept or reject the Plan (and the transactions contemplated thereby), as described herein.

This Disclosure Statement is designed to provide adequate information to enable holders of Claims against the Debtors to make an informed judgment on the Plan. All Creditors are encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the Exhibits hereto and other documents referenced as filed with the Bankruptcy Court.

Confirmation and consummation of the Plan are subject to conditions precedent that could lead to delays in consummation of the Plan. There can be no assurance that the Plan will be confirmed or that each of these conditions precedent to consummation will be satisfied or waived. Even after the Effective Date, distributions under the Plan may be subject to substantial delays for holders of Claims that are Disputed.

This Disclosure Statement has not yet been approved by order of the Bankruptcy Court as containing adequate information of a kind and in sufficient detail to enable holders of Claims to make an informed judgment with respect to voting to accept or reject the Plan.

i

With the exception of historical information, some matters discussed herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from future results expressed or implied by such forward-looking statements.

No party is authorized by the Debtors or the Creditors' Committee to give any information or make any representations with respect to the Plan other than that which is contained in this Disclosure Statement. No representation or information concerning either Debtor or the value of their properties has been authorized by either Debtor, other than as set forth herein. Any information or representation given to obtain your acceptance or rejection of the Plan that is different from or inconsistent with the information or representations contained herein and in the Plan should not be relied upon by any holders of Claims in voting on the Plan.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring Claims against, Equity Interests in or securities of the Debtors should evaluate this Disclosure Statement only in light of the purpose for which it was prepared.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "Commission") or by any state securities commission or similar public, governmental or regulatory authority, and neither such Commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

With respect to contested matters, adversary proceedings and other pending or threatened actions (whether or not pending), this Disclosure Statement and the information contained herein shall not be construed as an admission or stipulation by any entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import.

This Disclosure Statement shall neither be admissible in any other proceeding involving the Debtors or any other party nor be construed to be providing any legal, business, financial or tax advice. Each holder of a claim should, therefore, consult with its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan, or the transactions contemplated thereby.

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the summaries thereof contained in this Disclosure Statement.

BOS-1348582 v18

## INCORPORATION OF DOCUMENTS BY REFERENCE

This Disclosure Statement incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith. The following documents are incorporated by reference herein in their entirety:

Each Debtor's *Schedules of Assets and Liabilities*, filed August 12, 2009, including all amendments and restatements thereto filed through the date of the approval of this Disclosure Statement.

Each Debtor's *Statement of Financial Affairs*, filed August 12, 2009, including all amendments and restatements thereto filed through the date of the approval of this Disclosure Statement.

The Debtors' joint *Monthly Operating Reports*, including all amendments thereto filed with the U.S. Trustee through the date of the approval of this Disclosure Statement.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein modifies or supersedes such statement.

## AVAILABLE INFORMATION

Certain documents filed in these Chapter 11 Cases, including the Debtors' Schedules of Assets and Liabilities, their Statements of Financial Affairs, the Plan, and this Disclosure Statement are available on the public docket for the Chapter 11 Cases maintained by the Bankruptcy Court.

## LIST OF EXHIBITS

| | |
|---|---|
| <u>Exhibit A</u> | First Amended Joint Plan of Reorganization for Oscient Pharmaceuticals Corporation and Guardian II Acquisition Corporation proposed by the Debtors and the Official Committee of Unsecured Creditors of Oscient Pharmaceuticals Corporation under Chapter 11 of the Bankruptcy Code |
| <u>Exhibit B</u> | Forms of Ballots |
| <u>Exhibit C</u> | [Calculation of FACTIVE Royalty] |
| <u>Exhibit D</u> | Liquidation Analysis |
| <u>Exhibit E</u> | [Disclosure Statement Order] |

iii

# TABLE OF CONTENTS

**Page**

I. SUMMARY ...................................................................................................................1
    A.    Rules of Interpretation ...............................................................................1
    B.    Purpose of the Plan ....................................................................................1
    C.    Treatment of Claims and Equity Interests .................................................3
    D.    Claims Estimates ........................................................................................7
    E.    Consummation of the Plan..........................................................................8
    F.    Certain Factors to be Considered Prior to Voting ......................................8
    G.    Voting and Confirmation.............................................................................8

II. BACKGROUND ...........................................................................................................9
    A.    Business Overview .....................................................................................9
    B.    Corporate Structure..................................................................................10
    C.    Product Descriptions.................................................................................11
    D.    Corporate Headquarters and Other Facilities ..........................................13
    E.    Summary of Pre-petition Indebtedness.....................................................13
    F.    Management of the Debtors......................................................................20

III. EVENTS LEADING TO THE CHAPTER 11 CASES ...............................................21
    A.    Indebtedness and Near Term Debt Maturities...........................................21
    B.    Generic Competition.................................................................................21
    C.    Turnaround Efforts ...................................................................................22

IV. THE CHAPTER 11 CASES.........................................................................................23
    A.    Overview of Chapter 11............................................................................23
    B.    Administration of the Chapter 11 Cases ..................................................24
    C.    Ownership of the ANTARA NDA .............................................................32
    D.    Creditors' Committee's Assertion of Other Claims and Causes of Action
           Against Paul Royalty .................................................................................35
    E.    Paul Royalty's "Interest" In FACTIVE Sale Proceeds...............................36
    F.    Paul Royalty's "Trust Claim" Against Oscient ........................................36

V. SUMMARY OF CHAPTER 11 PLAN..........................................................................37
    A.    Settlement with Paul Royalty ...................................................................37
    B.    Settlement with Abbott.............................................................................42

VI. UNCLASSIFIED CLAIMS AGAINST EITHER DEBTOR.......................................44
    A.    Administrative Claims ..............................................................................44
    B.    Priority Tax Claims...................................................................................44
    C.    Professional Fees......................................................................................44

VII. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS
    AGAINST OSCIENT PHARMACEUTICALS CORPORATION ...................................45
    A.    Summary of Classification and Treatment of Classified Claims and Equity
           Interests.....................................................................................................45

    B.    Classification and Treatment of Claims and Equity Interests ...............46
    C.    Cram Down.................................................................................................47

VIII. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS
    AGAINST GUARDIAN II ACQUISITION CORPORATION....................................47
    A.    Summary of Classification and Treatment of Classified Claims and Equity
        Interests....................................................................................................47
    B.    Classification and Treatment of Claims and Equity Interests ...............48
    C.    Cram Down.................................................................................................51

IX. MEANS FOR IMPLEMENTATION OF THE PLAN .............................................51
    A.    Compromise of Controversies. .................................................................51
    B.    Vesting and Distribution of Assets. ..........................................................51
    C.    Dissolution of the Debtors.........................................................................52
    D.    Cancellation of Notes, Instruments, Debentures, and Equity Interests. ......52
    E.    Cancellation of Liens. ...............................................................................52
    F.    Corporate Action. .....................................................................................52
    G.    Creation of the Oscient Trust. ..................................................................53
    H.    Guardian Post-Effective Date; Guardian Disbursing Agent.....................56
    I.    Establishment of Administrative Bar Date. ...............................................57
    J.    Allocation of Administrative Claims Between Estates...............................57

X. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................57
    A.    Assumption of Executory Contracts and Unexpired Leases. ...................57
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases............58

XI. PROVISIONS GOVERNING DISTRIBUTIONS.....................................................58
    A.    Date of Distributions.................................................................................58
    B.    Disbursing Agents. ...................................................................................58
    C.    Distribution Record Date...........................................................................59
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...........59
    E.    Disputed Claims Reserve..........................................................................60
    F.    Direction Letters to Record Holders .........................................................60

XII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS .............................................61
    A.    Prosecution of Objections to Claims. .......................................................61
    B.    Estimation of Claims. ...............................................................................61
    C.    Payments and Distributions on Disputed Claims. ....................................62
    D.    Debtors' Rights and Defenses Preserved...................................................62

XIII. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE....62
    A.    Conditions Precedent to Confirmation. .....................................................62
    B.    Conditions Precedent to the Effective Date................................................62
    C.    Modification of Plan. ................................................................................63
    D.    Effect of Withdrawal or Revocation.....................**Error! Bookmark not defined.**
    E.    Reservation of Rights. ..............................................................................64

v

F.        Substantial Consummation of Plan........................................................................64

XIV. EFFECT OF PLAN CONFIRMATION.................................................................................64
A.        Binding Effect........................................................................................................64
B.        Releases.................................................................................................................64
C.        Exculpation and Limitation of Liability. .............................................................66
D.        Injunction..............................................................................................................66
E.        Term of Bankruptcy Injunction or Stays. ...........................................................67
F.        Termination of Subordination Rights and Settlement of Related Claims. ...........67

XV. RETENTION OF JURISDICTION .......................................................................................67

XVI. MISCELLANEOUS PROVISIONS ....................................................................................68
A.        Payment of Statutory Fees. ..................................................................................68
B.        Certain Indenture Trustee Fees and Expenses. ...................................................68
C.        Governing Law. ....................................................................................................68
D.        Severability...........................................................................................................68
E.        Inconsistency.........................................................................................................68
F.        Filing of Additional Documents. ..........................................................................68
G.        Service of Documents............................................................................................69
H.        Section 1125(e) of the Bankruptcy Code..............................................................69
I.        Exemption from Certain Transfer Taxes. .............................................................70
J.        Tax Reporting and Compliance. ...........................................................................70
K.        Schedules and Exhibits..........................................................................................70
L.        No Prejudice. .......................................................................................................70
M.        Allocation of Payments..........................................................................................71
N.        Dissolution of Statutory Committees.....................................................................71

XVII. SOLICITATION AND VOTING PROCEDURES ............................................................71
A.        Solicitation Package...............................................................................................71
B.        Distribution of the Solicitation Package ...............................................................72
C.        Who May Vote ......................................................................................................74
D.        Temporary Allowance of Disputed Claims for Voting Purposes ..........................74
E.        Establishing Claim Amounts .................................................................................74
F.        General Ballot Tabulation......................................................................................75
G.        Special Provision Related to Paul Royalty ...........................................................76

XVIII. CONFIRMATION PROCEDURES ..................................................................................76
A.        Confirmation Generally .........................................................................................76
B.        The Confirmation Hearing......................................................................................77
C.        Statutory Requirements for Confirmation of the Plan ...........................................78
D.        Identity of Persons to Contact for More information .............................................89
E.        Other Risk Factors Associated With the Plan or Distributions Thereunder..........89
F.        Disclosure Statement Disclaimer...........................................................................90

XIX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....92

vi

    A.      Liquidation Under Chapter 7 .................................................................................92

XX. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES .................92
    A.      Federal Income Tax Consequences ........................................................94
    B.      Federal Income Tax Treatment of Equity Interests ..............................95
    C.      Withholding and Reporting ....................................................................95

XXI. CONCLUSION AND RECOMMENDATION ...................................................................96

BOS-1348582 v18

# I. SUMMARY

The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement and in the Plan. Unless otherwise stated herein, section ("<u>Section</u>" or "<u>§</u>") references are to the United States Bankruptcy Code, 11 U.S.C. §§ *et seq.* (the "<u>Bankruptcy Code</u>").

## A.     Rules of Interpretation

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (c) unless otherwise specified, all reference herein to "Articles" are references to Articles hereof or hereto; (d) captions and headings to Articles are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation hereof; (e) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (f) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## B.     Purpose of the Plan

The purpose of the Plan is to facilitate the liquidation of the Debtors' Estates and the distribution of their remaining assets to holders of Allowed Claims. The Plan also effects a settlement between Oscient,[2] Guardian, the Creditors' Committee and Paul Royalty Fund Holdings II ("<u>Paul Royalty</u>"), an affiliate of Paul Capital Partners, and a settlement between Oscient, Guardian, and Abbott Laboratories ("<u>Abbott</u>"). Copies of the Plan are attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.

The Debtors and the Creditors' Committee believe the Plan provides the best recovery possible for holders of Allowed Claims against both Estates and strongly recommend that, if such holders are entitled to vote, they vote to accept the Plan.

IN THE EVENT VOTERS DO NOT ACCEPT THE CHAPTER 11 PLAN, THESE CHAPTER 11 CASES MAY BE CONVERTED TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. IN THAT EVENT, THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THERE WOULD BE (1) NO RECOVERY TO ANY

---

[2] Hereinafter all references to such settlement include Oscient claims asserted by the Creditors' Committee on behalf of the Oscient Estate.

CREDITORS OF GUARDIAN OTHER THAN HOLDERS OF PAUL ROYALTY
GUARDIAN CLAIMS AGAINST THE GUARDIAN ESTATE; AND (2) THE DEBTORS
AND CREDITORS' COMMITTEE BELIEVE THAT THERE WOULD LIKELY BE A
SUBSTANTIALLY REDUCED RECOVERY TO HOLDERS OF ALLOWED OSCIENT
UNSECURED CLAIMS IN THE OSCIENT ESTATE.

PURSUANT TO SECTION 1141(d)(3) OF THE BANKRUPTCY CODE, THE PLAN
DOES NOT CONTAIN A DISCHARGE FOR THE DEBTORS AS (1) THE PLAN IS A
LIQUIDATING PLAN, (2) THE DEBTORS WILL NOT BE ENGAGING IN THE BUSINESS
AFTER THE CONSUMMATION OF THE PLAN AND THEREFORE (3) THE DEBTORS
ARE NOT ENTITLED TO A DISCHARGE UNDER SECTION 727(A) OF THE
BANKRUPTCY CODE.

## 1.  Settlement with Paul Royalty

The settlement in the Plan between Oscient, Guardian, the Creditors' Committee and Paul
Royalty will significantly increase the recovery for Oscient's unsecured creditors (other than
Paul Royalty), provide a recovery to certain of Guardian's unsecured creditors if their claim is
less than $1,500 or if they agree to reduce their claim to $1,500, allow the Debtors to distribute
the vast majority of their assets to creditors earlier than would otherwise be possible had the
issues been fully litigated, and avoid the costs of litigating multiple complex factual and legal
disputes involving Paul Royalty and/or intercompany claims between the Debtors' Estates,
saving millions of dollars for creditors.  Pursuant to Fed. R. Bankr. P. 9019, the Plan provides,
*inter alia*, for Paul Royalty to waive 100% of its claims against the Oscient Estate, resulting in an
approximately $62.4 million reduction in claims against the Oscient estate.  In addition to the
claim waiver, the terms of the settlement contemplate a transfer of $1 million from the Guardian
Estate to the Oscient Trustee.  In exchange, the Debtors and the Creditors' Committee agree to
the Allowed amount of Paul Royalty's claims and to settle certain disputes regarding
intercompany claims and the distribution of proceeds of the sale of Guardian's primary asset,
ANTARA.  Guardian unsecured creditors will also benefit from the settlement between Oscient,
Guardian, the Creditors' Committee and Paul Royalty by having the opportunity to participate in
a convenience class which will get paid in full on the Effective Date.

**The Debtors and the Creditors' Committee estimate that the settlement with Paul
Royalty, including the $62.4 million waiver of Paul Royalty's claims against Oscient,
including without limitation, Paul Royalty's claims under the 12.5% Notes and the
payment of $1 million from the Guardian Estate to the Oscient Trustee, will greatly
enhance the distribution to holders of Oscient Unsecured Claims from approximately 9.6%
to approximately 22.5%, subject to the actual amount of all claims of any kind Allowed
against the Oscient Estate and the total value of Assets available for distribution to Holders
of such claims.**

## 2.  Settlement with Abbott

The settlement in the Plan between Oscient, Guardian, and Abbott also benefits Oscient's
unsecured creditors by eliminating administrative and unsecured claims against Oscient's Estate.

- 2 -

The settlement with Abbott provides for Abbott to receive an Allowed Administrative Claim against Guardian for $750,000, and for Abbott to waive its other claims against both Guardian and Oscient. Abbott has asserted unsecured claims of approximately $5.2 million against both Guardian and Oscient, as well as additional unsecured claims contingent on future events and significant administrative expense claims. The settlement avoids the risk, cost, and delay of litigating with Abbott over these claims without any cost to Oscient's Estate.

As a result of the settlements with Paul Royalty and Abbott, the Debtors are able to complete the orderly liquidation of their Estates and distribute their remaining assets to holders of Allowed Claims in accordance with the terms of the Plan. The Debtors and the Creditors' Committee believe that the Plan provides the best recoveries possible for holders of Allowed Claims and strongly recommend that, if such holders are entitled to vote, they vote to accept the Plan. The Debtors and the Creditors' Committee believe that any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation, and additional costs and, ultimately, would significantly reduce the recoveries for holders of Allowed Claims.

### C.    Treatment of Claims and Equity Interests

The Plan divides all Claims against and Equity Interests in the Debtors into various classes with the exception that certain Claims which are not required to be classified are treated as unclassified. The tables set forth below summarize the Classes of Claims and Equity Interests under the Plan, the treatment and projected recovery of such Classes under the Plan and such Classes' entitlement to vote on the Plan.

### 1.    Unclassified Claims

| Class of Unclassified Claim | Projected Claims | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[3] |
|---|---|---|---|---|
| Administrative Claims | The Debtors currently are unable to estimate the amount of Claims in this Class for either Debtor. | Paid in full in Cash. | N/A | 100% |
| Priority Tax Claims | $0.00[4] | Paid in full in Cash. | N/A | 100% |

---

[3] The Projected Recoveries under the Plan are based upon certain assumptions as further discussed below.

[4] Estimated priority tax claims as of 12/31/09.

- 3 -

| Class of Unclassified Claim | Projected Claims | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[3] |
|---|---|---|---|---|
| Professional Fees | $[675,000][5] | Paid in full in Cash, subject to allowance by the Bankruptcy Court. | N/A | 100% |

---

[5] Estimated accrued, but unpaid professional fees as of March 31, 2010. This estimate does not include amounts incurred after such date.

- 4 -

## 2.    Oscient Claims and Equity Interests:

| Oscient Claims and Equity Interests | Projected Claims (Approximation) | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[6] |
|---|---|---|---|---|
| Oscient Class 1 - Oscient Secured Claims | $0.00. The Debtors believe there are no Oscient Secured Claims. | Return of collateral or paid in full in Cash. | Unimpaired (deemed to accept) | 100% |
| Oscient Class 2 - Oscient Other Priority Claims | $200,000. | Paid in full in Cash. | Unimpaired (deemed to accept) | 100% |
| Oscient Class 3 - Oscient Unsecured Claims | $78.8 million[7] | Will receive, on the Effective Date, a Pro-Rata Share of the Oscient Trust Interests. | Impaired (entitled to vote) | 22.5% |
| Oscient Class 4 - Oscient Subordinated Securities Claims | $0.00. The Debtors believe there are no Oscient Subordinated Securities Claims | No recovery. | Impaired (deemed to reject) | 0% |
| Oscient Class 5 - Oscient Equity Interests | All Equity Interests in Oscient. | No recovery. | Impaired (deemed to reject) | 0% |

## 3.    Guardian Claims and Equity Interests:

| Guardian Claims and Equity Interests | Projected Claims (Approximation) | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[8] |
|---|---|---|---|---|
| Guardian Class 1 – Paul Royalty | $82,928,485[9] | Initial distribution of cash on the Effective Date and later distribution | Impaired (entitled to | [57.3%] |

---

[6] The Projected Recoveries under the Plan are based upon certain assumptions as further discussed below.

[7] The $78.8 million amount represents a reduction in the amount of general unsecured claims against Oscient from approximately $141.0 million, pursuant to the terms of the settlement with Paul Royalty. The estimate of $78.8 million for Oscient Class 3 Claims consists of (i) the reduction to $0.00 of Paul Royalty Oscient Claims pursuant to the settlement (which includes the 12.5% Notes held by Paul Royalty), (ii) approximately $49.2 million of Second Lien Notes (excluding the 2008 Paul Royalty Note) under which Oscient is the primary obligor; (iii) the 3.5% Notes, (iv) the 3½ % Notes, (v) 2009 Notes; and (vi) general unsecured claims, excluding claims asserted by Abbott.

[8] The Projected Recoveries under the Plan are based upon certain assumptions as discussed further below.

- 5 -

| Guardian Claims and Equity Interests | Projected Claims (Approximation) | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[9] |
|---|---|---|---|---|
| Guardian Claims | | of assets remaining following all other required distributions by Guardian. | vote) | |
| Guardian Class 2 – Guardian Second Lien Claims | $51.3 million[10] | No recovery. | Impaired (deemed to reject) | 0%[11] |
| Guardian Class 3 - Guardian Other Secured Claims | $0.00. The Debtors believe there are no Guardian Other Secured Claims. | Return of collateral or paid in full in Cash. | Unimpaired (deemed to accept) | 100% |
| Guardian Class 4 - Guardian Other Priority Claims | $2,050. | Paid in full in Cash. | Unimpaired (deemed to accept) | 100% |
| Guardian Class 5 - Guardian Unsecured Claims | $97.3 million[12] | No recovery. | Impaired (deemed to reject) | 0%[13] |

[9] As agreed to pursuant to the terms of the settlement between the Debtors, the Creditors' Committee, and Paul Royalty.

[10] Including the 2008 Paul Royalty Note, which is part of the Second Lien Notes.

[11] For the benefit of its parent, Guardian provided an upstream guarantee of the Second Lien Notes, including a lien on substantially all of Guardian's assets. Pursuant to the terms of an Intercreditor Agreement, such lien is expressly junior to the Paul Royalty lien on substantially all of Guardian's assets. While the Holders of Second Lien Notes will receive no distribution on account of their subordinated position, such Holders have Oscient Unsecured Claims and will receive a projected 22.5% recovery from the Oscient Estate.

[12] The estimate of $97.3 million in Claims in Guardian Class 5 (a) includes (i) an approximately $51.3 million unsecured deficiency claim for the Holders of Guardian Second Lien Claims; (ii) an approximately $40 million intercompany claim by Oscient, payment of which is contractually subordinated to payment of Paul Royalty's claims, (iii) an estimate of approximately $6 million in general unsecured claims, but (b) excludes any unsecured deficiency claims of Paul Royalty with respect to the Paul Royalty Guardian Claims. As discussed above, the Holders of Guardian Second Lien Claims will benefit from the Paul Royalty settlement through an enhanced distribution in respect of their claims against the Oscient Estate.

[13] As described below, a Holder of an Allowed Guardian Unsecured Claim (other than an Oscient Intercompany Claim or a Guardian Second Lien Deficiency Claim) may agree prior to the Effective Date in a writing to the Debtors to unconditionally waive any amount of such Claim in excess of $1,500, in which case such Allowed Guardian Unsecured Claim shall be so reduced and shall be an Allowed Guardian Convenience Claim and receive the treatment provided for such Claims.

- 6 -

| Guardian Claims and Equity Interests | Projected Claims (Approximation) | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[8] |
|---|---|---|---|---|
| Guardian Class 6 - Guardian Convenience Claims | $1,500 | Paid in full in Cash | Unimpaired (deemed to accept) | 100% |
| Guardian Class 7 - Guardian Subordinated Securities Claims | $0.00. The Debtors believe there are no Guardian Subordinated Securities Claims. | No recovery. | Impaired (deemed to reject) | 0% |
| Guardian Class 8 - Guardian Equity Interests | All Equity Interests in Guardian. | No recovery. | Impaired (deemed to reject) | 0% |

## D.     Claims Estimates

The Debtors estimate that the aggregate amount of unsecured, non-priority Claims against the Oscient Estate is approximately $141 million[14] (all of which is unsecured) and that the aggregate amount of Claims against the Guardian Estate is approximately $140.0 million (of which $82.9 million is secured debt owed to Paul Royalty and $57.3 million is unsecured[15])[16]. These estimates do not account for the impact of the Claim objection, reconciliation and resolution process or the settlements with Paul Royalty and Abbott provided for in the Plan. With respect to Guardian, these estimates assume that the Second Lien Notes claims are entirely unsecured deficiency claims and that Paul Royalty does not have any unsecured deficiency claims against Guardian. These estimates are approximate and based upon numerous assumptions. There is no guarantee that the ultimate amount of Claims will conform to these estimates. Further, additional claims may be filed or identified during the Claims objection, reconciliation, and resolution process that may materially affect the foregoing estimates. Although the Debtors believe that certain Claims may be without merit and objections to such Claims may be brought, there can be no assurance that these objections, if brought, will be successful.

---

[14] Excluding intercompany debt, but including the Paul Royalty Oscient Claims before the settlement contemplated under the Plan.

[15] The $57.3 million in unsecured claims includes the deficiency claim for Holders of Guardian Second Lien Claims, while excluding intercompany debt.

[16] Excluding certain claims that were improperly scheduled or filed against Oscient and/or Guardian as being secured, priority, or unsecured, subject to the Claims objection, reconciliation, and resolution process.

- 7 -

### E.    Consummation of the Plan

Following Confirmation of the Plan, the Plan will be consummated on the Effective Date, which the Debtors expect will occur on the fifteenth (15) day after the Confirmation Date, provided that (a) no stay of the Confirmation Order is in effect; and (b) all conditions to Consummation of the Plan set forth in ARTICLE XIII "Conditions Precedent to Confirmation and the Effective Date" have been satisfied or waived. Distributions to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date.

### F.    Certain Factors to be Considered Prior to Voting

HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER THE RISKS SET FORTH HEREIN PRIOR TO ACCEPTING OR REJECTING THE PLAN.

### G.    Voting and Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan.

Oscient Class 3 (Oscient Unsecured Claims) and Guardian Class 1 (Paul Royalty Guardian Claims) are entitled to vote to accept or reject the Plan. Each such Class will have accepted the Plan if (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan, and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence on [_____ 2010 at _____] (prevailing Eastern Time) before the Bankruptcy Court at [_____]. Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class of Claims in the Estate of each Debtor that is Impaired under the Plan.

THE DEBTORS AND THE CREDITORS' COMMITTEE WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO THE CLASSES OF CLAIMS AND EQUITY INTERESTS THAT ARE DEEMED TO REJECT THE PLAN

The Bankruptcy Court has approved [_____ 2010 at _____] (prevailing Eastern Time), as the voting deadline (the "Voting Deadline") for delivering Ballots with respect to the Plan. In order to assure that votes are counted to accept or reject the Plan, all Ballots must be properly executed, completed and delivered by: (a) first class mail; (b) overnight courier; or (c) personal delivery so that they are actually received, in accordance with the instructions set forth in the Ballots, no later than the Voting Deadline by the Debtors' solicitation agent, The Garden City Group, Inc. (the "Solicitation Agent").

- 8 -

The Debtors, in consultation with the Creditors' Committee, reserve the right to extend the Voting Deadline.

The Solicitation Agent will answer any questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote or accept or reject the Plan.

If you have any questions on voting procedures, please contact the Solicitation Agent at the telephone number or email address set forth on the Ballots.

TO BE COUNTED, BALLOTS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AGENT NO LATER THAN [_____] (PREVAILING EASTERN TIME) ON [_____ 2010]. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS. THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

## II. BACKGROUND

### A.    Business Overview

Oscient Pharmaceuticals Corporation ("Oscient") and its wholly-owned subsidiary, Guardian II Acquisition Corporation ("Guardian" and collectively with Oscient, the "Debtors") were commercial-stage pharmaceutical companies marketing two Food and Drug Administration ("FDA") approved products in the United States. The parent, Oscient owned FACTIVE® (gemifloxacin mesylate) tablets, a fluoroquinolone antibiotic. Its wholly-owned subsidiary, Guardian, owned ANTARA® (fenofibrate) capsules, a cardiovascular product. Prior to June 20, 2009, the Debtors promoted ANTARA and FACTIVE through their national sales force, which targeted primary care physicians, cardiologists, endocrinologists, and pulmonologists.

ANTARA is approved by the FDA to treat hypercholesterolemia (high blood cholesterol) and hypertriglyceridemia (high triglycerides) in combination with a healthy diet. Guardian licensed the rights to ANTARA from Ethypharm S.A. of France ("Ethypharm") and began promoting ANTARA in late August 2006. In 2008, ANTARA generated approximately $70 million in net revenues. FACTIVE is indicated for the treatment of community-acquired pneumonia of mild to moderate severity and acute bacterial exacerbations of chronic bronchitis. Oscient licensed the rights to gemifloxacin, the active ingredient in FACTIVE tablets, from LG Life Sciences of the Republic of Korea ("LG Life Sciences") and launched FACTIVE in the U.S. market in September 2004. In 2008, FACTIVE generated approximately $16 million in net

- 9 -

revenues.  In addition to FACTIVE, Oscient also owned a late-stage antibiotic candidate, Ramoplanin for the treatment of *Clostridium difficile*-associated disease.

As of December 31, 2008, the Debtors' consolidated financial statements (which included both Debtors) showed (i) cash and cash equivalents totaling approximately $17,193,000, which included $4,598,000 in restricted cash, (ii) total net revenues of approximately $86,848,000 for the year ended December 31, 2008, and (iii) total costs and expenses of approximately $167,210,000 for the year ended December 31, 2008.

As of the Petition Date, the Debtors' principal source of revenue was sales of ANTARA capsules by Guardian and FACTIVE tablets by Oscient.  The Debtors marketed ANTARA and FACTIVE through their sales and marketing organization which targeted community-based physicians in the U.S.  The Debtors employed a team of professionals with experience in insurance, government reimbursement, medical affairs and marketing.  Prior to bankruptcy, the Debtors' strategy was to maximize the sales of their existing products and leverage their sales force and commercial infrastructure by acquiring new primary care products via transactions, including acquisition, in-licensing and co-promotion agreements for the U.S. marketplace.

As of December 31, 2008, the Debtors had 316 full-time employees, with 257 field employees across the U.S. and 59 employees in their Waltham, Massachusetts and Skillman, New Jersey offices.  In February and March 2009, the Debtors implemented a reduction in personnel affecting certain office personnel and approximately 32% of their sales and marketing teams.  The Debtors' reduced their sales force to more aggressively preserve their financial resources and position themselves for a potential partnership or acquisition.  Around the same time as the reduction in force and to further facilitate the companies' re-positioning, the Debtors engaged Broadpoint Capital, Inc. ("Broadpoint") to advise the Debtors on strategic options, including the potential sale of the Debtors.

As of March 20, 2009, after the initial reduction in force, the Debtors' sales and marketing organization was comprised of approximately 168 field sales personnel, including 150 sales representatives, as well as district managers and regional sales directors.  In June 2009, the Debtors implemented a further reduction in force, which included the termination of the Debtors' approximately 150 remaining sales representatives, the employees in the Debtors' sales coordination office in Skillman, New Jersey, and also certain employees serving supporting functions in the Waltham, Massachusetts headquarters.  As of June 20, 2009, the Debtors had 9 full-time employees, and approximately 26 full-time contract employees.

## B.     Corporate Structure

The Debtors in these cases are Oscient, a Massachusetts corporation, and Guardian, a Delaware corporation that is a wholly-owned subsidiary of Oscient.  As of the Petition Date, Oscient, as the parent corporation of Guardian, conducted substantially all of the Debtors' operations and was the party to the majority of contracts with the Debtors' suppliers and vendors.  Oscient was also the licensee with respect to FACTIVE as discussed further below.  Prior to the Debtors' June 2009 reduction in force, Oscient employed a national sales force to promote both ANTARA and FACTIVE in the U.S.

- 10 -

Guardian was formed in connection with the Debtors' acquisition of ANTARA and as of the Petition Date, owned substantially all rights to ANTARA intellectual property, including patent and application claims that relate to pharmaceutical compositions containing fenofibrate using the drug delivery technologies incorporated in ANTARA, methods of their use and treatment, and methods of preparing the same.

Guardian had no administrative, sales, or other employees. As a result, Oscient serviced all operations of Guardian, including all operations related to ANTARA, under a written servicing agreement between the Debtors. Guardian paid Oscient for these services.

### C.    Product Descriptions

As of the Petition Date, Guardian had one primary asset, ANTARA and Oscient had two primary assets, FACTIVE and Ramoplanin, a late-stage investigational antibiotic candidate.

### 1.    <u>ANTARA</u>

ANTARA is a once-daily formulation of fenofibrate approved for use in combination with a diet restricted in saturated fat and cholesterol to (i) reduce elevated LDL-C ("bad" cholesterol), triglyceride, and apolipoprotein B (free floating fats in the blood) levels and (ii) increase HDL-C ("good" cholesterol) in adult patients with high cholesterol or an abnormal concentration of lipids in the blood. Fenofibrate products work primarily to lower triglycerides and increase HDL-C, which makes the drug an attractive alternative for those patients whose LDL-C is well controlled. ANTARA received FDA approval in November 2004. The Debtors began marketing ANTARA in 43 mg and 130 mg doses in August 2006. For the fiscal year ended December 31, 2008, ANTARA generated sales revenues of $70,330,000, representing approximately 81.5% of the Debtors' total sales revenues.

In 2008, total U.S. sales of fenofibrate products were approximately $2.3 billion, a 16% increase over 2007 sales. The fenofibrate market has experienced a 15% average annual growth in sales since 2004 with growth in 2008 over 2007 slowing to 10%. ANTARA's sales accounted for approximately 5% of the U.S. fenofibrate sales for the year ending December 31, 2008.

### (a)    <u>Ethypharm License Agreement</u>

On August 18, 2006, Guardian acquired the rights to ANTARA in the U.S. from Reliant Pharmaceuticals Inc. ("<u>Reliant</u>") for $78.0 million plus approximately $4.3 million for ANTARA inventory, excluding estimated transaction costs. As part of this transaction, Reliant sold, transferred, conveyed, and assigned to Guardian all of its right, title, and interest in and to an extensive list of specified assets (collectively, the "<u>Acquired Assets</u>"). The Acquired Assets included ANTARA and all related assets, including clinical data, inventory, ANTARA® trademark in the U.S., and certain related contracts and licenses covering intellectual property rights related to the ANTARA products. Oscient executed the APA solely as a guarantor of Guardian's payment and performance obligations thereunder and was not a purchaser of the Acquired Assets.

- 11 -

The centerpiece of the acquisition was Reliant's assignment to Guardian of an exclusive license for ANTARA in the U.S. from Ethypharm. Under the agreement with Ethypharm, Guardian assumed all of the rights and obligations related to the development, manufacturing, marketing and sale of ANTARA in the U.S. ANTARA capsules are covered by a U.S. patent relating to formulations containing fenofibrate and methods of preparing the same that extends through August 2020. The license to Guardian included this one U.S. patent and several pending patent applications which relate to the formulation. In addition, Guardian was assigned a patent application which was filed by Reliant relating to methods of treatment. Guardian also acquired exclusive rights to ANTARA trademarks, trade names, domain names and logos in the license agreement.

In conjunction with obtaining financing for the acquisition of ANTARA from Reliant discussed further below, Guardian entered into a Security Agreement with Paul Royalty under which Guardian granted Paul Royalty a security interest in substantially all of its assets, including all rights to ANTARA intellectual property, in order to secure its performance under the financing agreements with Paul Royalty.

> *(b)*   *New Drug Application*

Pursuant to the terms of the written Asset Purchase Agreement dated July 21, 2006 by and between Reliant, Guardian, and Oscient, Guardian also acquired the New Drug Application #21-695 (the "ANTARA NDA") and the Investigational New Drug application ("IND") covering ANTARA in the U.S. The Acquired Assets expressly included "Registrations," which included the ANTARA NDA. The circumstances surrounding Guardian's acquisition of the ANTARA NDA from Reliant are discussed in greater detail below.

> *(c)*   *Paragraph IV Certifications*

The Debtors received notices of a Paragraph IV certification from each of Lupin Limited and Paddock Laboratories, Inc., notifying the Debtors of the filing of an Abbreviated New Drug Application ("ANDA") with the FDA seeking approval for a generic version of ANTARA. These ANDA filings are discussed in greater detail at ARTICLE III, Section B "Generic Competition" below.

## 2.   **FACTIVE**

FACTIVE is a member of the fluoroquinolone class of antibiotics. FACTIVE was approved by the FDA in 2003 for the treatment of community-acquired pneumonia of mild to moderate severity and acute bacterial exacerbations of chronic bronchitis. For the fiscal year ended December 31, 2008, FACTIVE generated sales revenues of $15,995,000, representing approximately 18.5% of the Debtors' total sales revenues.

On May 30, 2008, the Debtors received notice of a Paragraph IV certification from Orchid Healthcare, a Division of Orchid Chemicals & Pharmaceuticals Ltd. ("Orchid") notifying the Debtors of the filing of an Abbreviated New Drug Application ("ANDA") with the FDA for a generic version of FACTIVE. The ANDA filing by Orchid is discussed in greater detail below.

- 12 -

### 3.   **Ramoplanin**

Ramoplanin is a late-stage investigational antibiotic candidate for the treatment of *Clostridium difficile*-associated disease ("CDAD"). Clostridium difficile is a bacterium that causes diarrhea and more serious intestinal conditions such as colitis. In October 2001, the Debtors in-licensed U.S. and Canadian rights to Ramoplanin from Vicuron Pharmaceuticals Inc. ("Vicuron"), a wholly-owned subsidiary of Pfizer Inc., and on February 3, 2006, acquired worldwide rights from Vicuron, thereby assuming full rights to the manufacturing, development and commercialization of Ramoplanin. Ramoplanin is a novel antibiotic and has a unique profile that may make it particularly well-suited for killing bacteria in the GI tract. The Debtors had completed Phase II clinical trials studying the use of Ramoplanin for CDAD, but due to their financial difficulties before the Petition Date, had suspended clinical development and were exploring the potential out-licensing, co-development, or sale of Ramoplanin with a partner, licensee or buyer.

Pursuant to the Debtors' acquisition of worldwide rights to Ramoplanin from Pfizer (formerly Vicuron), the Debtors were responsible for the manufacture of both the active pharmaceutical ingredient and finished dosage form of Ramoplanin. The Debtors planned to seek a partner for Ramoplanin who would be required to produce both the active pharmaceutical ingredient and the final dosage form to support related manufacturing activities.

### D.   **Corporate Headquarters and Other Facilities**

The Debtors leased their executive offices located at 1000 Winter Street, Suite 2200, Waltham, Massachusetts (the "Winter Street Facility"). As of the Petition Date, the Debtors leased approximately 36,000 square feet of space at the Winter Street Facility, and the term of the existing lease was until March 31, 2012. On October 30, 2009, the Debtors, with the consent of the landlord, moved to reject the existing lease for the Winter Street Facility effective November 30, 2009. In connection with rejection of the existing lease, the Debtors and landlord agreed on the terms of a new lease pursuant to which the Debtors now occupy a significantly reduced amount of space at the Winter Street Facility for an initial three-month term and thereafter on a month-to-month basis terminable by either party on 30 days written notice at a monthly rent of approximately $8,000. The purpose of the new lease was to provide the Debtors with limited office space for use during the process of confirmation of the Plan and wind-down of these Chapter 11 Cases.

In addition to the Winter Street Facility, the Debtors leased two other properties as of the Petition Date, the Debtors' commercial sales and marketing offices located at 23 Orchard Road, Suite B103, Skillman, New Jersey (the "Orchard Road Facility"), and the Debtors' west coast facility located at 7000 Shoreline Court, South San Francisco, California (the "West Coast Facility"). The Debtors rejected both of these leases during the course of these Chapter 11 Cases.

### E.   **Summary of Pre-petition Indebtedness**

As of the Petition Date, the Debtors had a substantial level of debt. The chart below sets forth approximate amounts outstanding under certain credit and related facilities on or about the

Petition Date:

| Credit or Related Facility | Approximate Principal Amount Outstanding as of the Petition Date | Estimated Interest Amount Outstanding as of the Petition Date | Obligor | Secured Status of Debt |
|---|---|---|---|---|
| **12% senior secured note held by Paul Royalty (the "Paul Royalty Note")**<br><br>Issued pursuant to a Note Purchase Agreement, dated as of July 21, 2006, among Guardian and **Paul Royalty** (the "Note Purchase Agreement") | **$20,000,000** | **$4,157,381** | Guardian | Secured by first lien on substantially all of Guardian's assets |
| **Revenue Interests Assignment Agreement (the "RIAA")**<br><br>Dated as of July 21, 2006, among Oscient, Guardian, and **Paul Royalty**, as amended on November 5, 2008 | **$60,261,879**[17] | N/A | Oscient and Guardian | Secured by first lien on substantially all of Guardian's assets |
| **12.50% convertible guaranteed senior notes due January 15, 2011 (the "Second Lien Notes")**<br><br>Issued under the Indenture, dated as of November 25, 2008, April 15, 2009, and May 15, 2009 between Oscient, as issuer, Guardian, as guarantor, and U.S. Bank National Association, as | **$49,960,000**[18] | **$1,462,765** | Oscient and Guardian | Secured by second lien on substantially all of Guardian's assets |

---

[17] Title of column as "approximate principal amount outstanding" is inapplicable to the amount shown, as such amount represents a calculation of the Put/Call Price due under the RIAA.

[18] Including the 2008 Paul Royalty Note. As part of the settlement embodied in the Plan, Paul Royalty has waived its distribution on this Claim in the Oscient Estate.

- 14 -

| | | | | |
|---|---|---|---|---|
| trustee (the "Second Lien Notes Indenture") | | | | |
| **3.50% convertible promissory notes due 2011 (the "3.5% Notes")**<br><br>Issued under the Indenture, dated as of May 1, 2007, among Oscient, as issuer, and U.S. Bank National Association, as trustee | $12,687,000 | $85,108 | Oscient | Unsecured |
| **3½% senior convertible promissory notes due April 2011 (the "3½% Notes")**<br><br>Issued under the Indenture, dated May 10, 2004, among Oscient, as issuer, and U.S. Bank National Association, as trustee | $829,000 | $5,641 | Oscient | Unsecured |
| **5% convertible promissory notes due December 2009 (the "2009 Notes")**<br><br>Issued under the Note Amendment and Exchange Agreement, dated as of November 17, 2003, among Genesoft Pharmaceuticals, Inc., Genome Therapeutics Corp., and the holders party thereto, as amended by Amendment No. 1 to Note Amendment and Exchange Agreement, dated as of January 28, 2009, among Oscient and the holders party thereto | $1,300,000 | $400,398 | Oscient | Unsecured |

1.    **Pre-petition Financial Arrangements with Paul Royalty**

In the summer of 2006, the Debtors entered into several financial agreements with Paul Royalty, including the Revenue Interests Assignment Agreement, the Note Purchase Agreement, and the Common Stock and Warrant Purchase Agreement, in consideration for an aggregate amount of approximately $70 million. The funds obtained from Paul Royalty were used to finance the Debtors' acquisition of ANTARA.

- 15 -

      *(a)*    *Revenue Interest Assignment Agreement*

On July 21, 2006, the Debtors entered into a Revenue Interests Assignment Agreement ("RIAA") with Paul Royalty, an affiliate of Paul Capital Partners pursuant to which the Debtors assigned to Paul Royalty the right to receive a portion of the net revenues from FACTIVE tablets and ANTARA capsules for $40 million. To secure its obligations to Paul Royalty, Guardian also granted Paul Royalty a security interest in substantially all of its assets. Guardian's obligations under the RIAA (and its obligations under the Paul Royalty Note, the Note Purchase Agreement and any amounts due under the Put Option under the RIAA discussed and defined further below) are secured by a first priority security interest in substantially all of Guardian's assets, including rights to ANTARA intellectual property. Although Oscient is a co-obligor with respect to obligations under the RIAA, Oscient did not grant a security interest to Paul Royalty. Furthermore, although under the RIAA Oscient assigned to Paul Royalty a percentage interest in revenues of FACTIVE, Paul Royalty did not record a Uniform Commercial Code financing statement with respect to its interest in this asset.

Pursuant to the RIAA, Oscient sold to Paul Royalty the right to receive a specified percentage of Oscient's net sales in the U.S. (and the net sales of its affiliates and licensees) of FACTIVE tablets and Guardian sold to Paul Royalty the right to receive a specified percentage of Guardian's net sales in the U.S. (and the net sales of its affiliates and licensees) of ANTARA capsules, in each case until December 31, 2016 in exchange for an aggregate of $40 million from Paul Royalty. The percentage payable to Paul Royalty on net sales of ANTARA and FACTIVE was tiered based on the Debtors' annual net revenues and was 9% as of the Petition Date.

Under the Debtors' arrangement with Paul Royalty, upon the occurrence of certain events, Paul Royalty could require the Debtors to repurchase the rights assigned to it. Under the RIAA, in the event the Debtors, among other things, experienced a change of control, suffered certain bankruptcy events, transferred any or substantially all of their rights in either ANTARA or FACTIVE, transferred all or substantially all of their assets, breached certain material covenants, representations or warranties under the RIAA, or suspended sales of ANTARA due to an injunction or as a result of a lawsuit filed by certain third parties (generally, a "Put Event"), Paul Royalty had the right (the "Put Option") to require the Debtors to repurchase from Paul Royalty, in cash, the assigned interests under the RIAA at a price (the "Put/Call Price") that equaled the greater of: (i) 200% of cumulative payments made by Paul Royalty under the RIAA less the cumulative payments previously paid to Paul Royalty; or (b) the amount which would provide Paul Royalty, when taken together with the payments previously paid, a 22% internal rate of return. Paul Royalty made one payment of $40,000,000 under the RIAA. Upon the sale of substantially all of the assets related to FACTIVE and ANTARA, the Debtors were automatically required to repurchase the assigned interests at the Put/Call Price. Upon a Put Event, the outstanding principal and interest in the $20 million Paul Royalty Note issued by Guardian would also become immediately due and payable to Paul Royalty. Through July 13, 2009, the Debtors paid Paul Royalty approximately $20 million pursuant to the RIAA. Under the terms of the Put Option, the Debtors calculated the Put/Call Price to be approximately $60 million as of the Petition Date. Pursuant to the terms of the settlement with Paul Royalty, the Debtors and the Creditors' Committee have agreed to the Put/Call Price of $60,261,879.

      *(b)*    *Amendment to Revenue Interests Assignment Agreement*

- 16 -

On November 5, 2008, the Debtors and Paul Royalty entered into a First Amendment to the RIAA (the "Amendment"). The Amendment was entered into in order to secure Paul Royalty's consent to the grant of a second lien against Guardian's assets. Specifically, the Amendment provided, among other things, that Paul Royalty consented to the grant by Guardian of a second-ranking security interest in and to the assets of Guardian to secure Guardian's guarantee of the 12.50% Notes that were issued in Oscient's 2008 Exchange Offer (discussed and defined further below) (the "Second Lien Notes"). The Amendment provided that any acceleration or failure to pay the Second Lien Notes would be considered a Put Event as further described above whereby Paul Royalty could have the right to demand that the Debtors repurchase the assigned interests under the RIAA at the Put/Call Price and the amounts outstanding under the Paul Royalty Note would immediately become due and payable.

As part of the Amendment, the Debtors issued to Paul Royalty (i) a $2.0 million aggregate principal amount note (the "2008 Paul Royalty Note") with terms substantially identical to the Second Lien Notes issued in the 2008 Exchange Offer, and (ii) 500,000 shares of Oscient's common stock. The Debtors further agreed to (a) pay Paul Royalty a greater portion of the net revenues from sales of FACTIVE and ANTARA if defined revenue levels were not achieved, and (b) amend the exercise price of the Common Stock and Warrant Purchase Agreement dated August 18, 2006 issued to Paul Royalty to purchase 288,018 shares of Oscient's common stock from $6.94 to $0.45, the closing price of its common stock on the NASDAQ Global Market on the date immediately preceding the closing of the 2008 Exchange Offer.

### (c)    Note Purchase Agreement

In connection with its acquisition of ANTARA, on July 21, 2006, Guardian entered into a Note Purchase Agreement (the "Note Purchase Agreement") with Paul Royalty pursuant to which Guardian issued and sold a $20,000,000 aggregate principal amount 12% senior secured note (the "Paul Royalty Note"), due on the fourth anniversary of the closing date. The Debtors estimated the Paul Royalty Note to have a balance of $24.2 million as of the Petition Date. After adjusting for adequate protection payments made post-petition, the Debtors estimate the amount of the Paul Royalty Note to be $22.7 million.

Interest on the Paul Royalty Note was payable semi-annually in arrears on the last day of each of March and September. Guardian had the option to pay interest in cash or to have 50% of the interest paid in cash and 50% of the interest added to principal. As of December 31, 2008, Guardian had exercised its option to add approximately $3,015,000 of interest expense payable to the principal of the Paul Royalty Note. In the event of default, with "event of default" defined as a continuing Put Event under the RIAA as described in more detail above, the outstanding principal and interest in the Paul Royalty Note would become immediately due and payable.

### (d)    Common Stock and Warrant Purchase Agreement

As part of the financing, the Debtors and Paul Royalty also entered into a Common Stock and Warrant Purchase Agreement (the "Stock and Warrant Purchase Agreement"), pursuant to which, in exchange for $10 million, the Debtors sold to Paul Royalty 1,388,889 shares (the "Shares") of Oscient's common stock, at a price of $7.20 per share and issued Paul Royalty a warrant (the "Warrant") to purchase 288,018 shares of common stock (the "Warrant Shares") at

- 17 -

an exercise price of $6.94 per share. In accordance with the Amendment to the RIAA noted above, the Debtors amended the exercise price on the Warrant Shares to $0.45 per share, the closing price of its common stock on the NASDAQ Global Market on the date immediately preceding the closing of the 2008 Exchange Offer. The Warrant was not exercised prior to the Petition Date.

## 2.   Security and Intercreditor Agreements

Guardian and Paul Royalty entered into a security agreement in August 2006 under which Guardian granted to Paul Royalty a senior security interest in and to substantially all assets owned by Guardian (the "First Priority Lien") in order to secure its payment obligations (the "First Lien Obligations") to Paul Royalty under the RIAA, the Note Purchase Agreement, and the Paul Royalty Note.

On November 25, 2008, Guardian and U.S. Bank National Association, in its capacity as collateral agent for the holders of Second Lien Notes (the "Indenture Trustee"), entered into a Security Agreement under which Guardian granted a second priority security interest in and to substantially all assets owned by Guardian (the "Second Priority Lien") in order to secure Guardian's guarantee of Oscient's obligations with respect to the Second Lien Notes (the "Second Lien Obligations") under that certain Indenture dated as of November 25, 2008, between Oscient as issuer, Guardian as guarantor, and Indenture Trustee, as trustee (the "Second Lien Notes Indenture").

Also on November 25, 2008, Paul Royalty, the Indenture Trustee, and the Debtors entered into an Intercreditor Agreement (the "Intercreditor Agreement") pursuant to which the parties agreed that the First Priority Lien would remain senior in all respects and prior to the Second Priority Lien and that the Second Priority Lien would be junior and subordinate in all respects to the First Priority Lien.

## 3.   Other Pre-petition Indebtedness

*(a)*   *Second Lien Notes-12.50% Convertible Guaranteed Senior Notes due January 15, 2011*

On November 25, 2008, the Debtors issued $85,184,000 in aggregate principal amount of 12.50% Convertible Guaranteed Senior Notes due January 15, 2011 (the "Second Lien Notes"). The Second Lien Notes, and 21,310,549 shares of Oscient common stock, were issued in exchange for $212,979,000 in aggregate principal amount of Oscient's 3.5% Notes (discussed below) (the "2008 Exchange Offer").

Guardian's guarantee of the Second Lien Notes Indenture is secured by a second priority lien on substantially all of the assets of Guardian, including rights to the ANTARA intellectual property, pursuant to a Security Agreement, dated as of November 25, 2008, among Guardian and the Indenture Trustee, as collateral agent for the holders of the Second Lien Notes. To secure Paul Royalty's consent to the grant of this lien, Oscient, Guardian, and Paul Royalty entered into the First Amendment to the RIAA (as discussed above). On April 15, 2009, an interest payment of $4,013,000 was paid in kind by adding the interest payment to the

- 18 -

outstanding principal amount of the Second Lien Notes. On the same date, an additional $97,000 was paid in kind on the 2008 Paul Royalty Note.

As of July 13, 2009, the holders of $58,700,000 in principal amount of Second Lien Notes had converted such Second Lien Notes into over 50 million shares of common stock of Oscient pursuant to the Second Lien Notes' voluntary conversion feature. On the other hand, on May 15, 2009, holders of $15,366,000 in principal amount of 2009 Notes (discussed below) converted their 2009 Notes into $15,366,000 in principal amount of Second Lien Notes. Accordingly, the total principal amount of Second Lien Notes outstanding on July 13, 2009 was approximately $47,863,000. When including accrued but unpaid interest, the total balance of the Second Lien Notes was approximately $49.2 million as of the Petition Date.

(b)   *3.5% Notes - 3.50% Convertible Promissory Notes due 2011*

Oscient is the obligor under approximately $12,687,000 in principal amount of the 3.5% Notes. The 3.5% Notes were to mature in April 2011 and were convertible into Oscient common stock. As noted above, in the 2008 Exchange Offer, the Debtors successfully exchanged $212,979,000 of aggregate principal amount of 3.5% Notes for common stock and $85,184,000 aggregate principal amount of Second Lien Notes. The remaining 3.5% Notes are obligations to holders that did not participate in the 2008 Exchange Offer.

(c)   *3½% Notes – 3.50 % Senior Convertible Promissory Notes*
*due 2011*

Oscient is the obligor under approximately $829,000 in principal amount of the 3½% Notes. The 3½% Notes were to mature in April 2011 and were convertible into Oscient common stock. On June 26, 2004, Oscient issued $152,750,000 in principal amount of 3½% Notes pursuant to the Indenture, dated as of May 10, 2004, among Oscient, as issuer, and U.S. Bank National Association, as trustee. In May 2007, Oscient completed an exchange offer with certain holders of the 3½% Notes in which Oscient exchanged $151,921,000 in aggregate principal amount of its new 3.5% Notes for $151,921,000 in aggregate principal amount of then-outstanding 3½% Notes (the "2007 Exchange Offer"). The remaining 3½% Notes are obligations to holders that did not participate in the 2007 Exchange Offer.

(d)   *2009 Notes-5% Convertible promissory notes due December 1,*
*2009*

Oscient is the obligor under approximately $1,300,000 in principal amount of 2009 Notes. The 2009 Notes were to mature on December 1, 2009, were convertible to Oscient common stock, and provided their holders the option to exchange the 2009 Notes for the Second Lien Notes at face value. As described above, many holders of the 2009 Notes availed themselves of the option to convert to Second Lien Notes in the months prior to the filing of these Chapter 11 Cases.

### 4.    Common Stock

Oscient was a reporting company under Section 12(b) of the Securities and Exchange Act of 1934.  Its common stock was publicly traded on The NASDAQ Global Market under the symbol "OSCI."  As of July 13, 2009, there were approximately 100,050,736 shares of Oscient common stock outstanding.  As of June 20, 2009, there were approximately 499 shareholders of record, including holders of restricted stock.

### 5.    Trade Debt

As of the Petition Date, the Debtors estimated that Oscient had unsecured obligations of approximately $14.4 million to vendors, suppliers, service providers, and other trade creditors and that Guardian had unsecured obligations of approximately $6 million, consisting primarily of claims held by Abbott.  The Debtors have not as of yet reconciled these claims and thus the amount allowed for these claims may be less.

### F.    Management of the Debtors

### 1.    Oscient

The following persons comprise the Board of Directors and executive officers of Oscient:

| Name | Position |
|---|---|
| David K. Stone | Chairman of the Board of Directors |
| Steven M. Rauscher | President, Chief Executive Officer, and Director |
| Philippe Maitre | Executive Vice President and Chief Financial Officer |
| Gregory B. Brown, M.D. | Director |
| Robert J. Hennessey | Director |
| William R. Mattson, Jr. | Director |
| William S. Reardon | Director |
| Norbert G. Riedel, Ph.D. | Director |

### 2.    Guardian

Steven Rauscher and Philippe Maitre hold the same executive positions with respect to Guardian.  The following persons comprise the Board of Directors for Guardian:

| Name | Position |
|---|---|
|  |  |

- 20 -

| Steven M. Rauscher | President, Chief Executive Officer, and Director |
| Philippe Maitre | Executive Vice President, Chief Financial Officer, and Director |

Manuel J. Bougoulas holds the position of Vice President of Finance for both Debtors.

## III. EVENTS LEADING TO THE CHAPTER 11 CASES

The Debtors sought protection under Chapter 11 of the Bankruptcy Code for two principal reasons: (i) a highly leveraged balance sheet with significant near term debt maturities; and (ii) the potential advent of generic competition for the Debtors' primary commercial products, ANTARA and FACTIVE.

### A.    Indebtedness and Near Term Debt Maturities.

On the Petition Date, the Debtors had substantial amounts of secured and unsecured debt maturing in the next twelve to twenty-four months. The unprecedented contraction of the equity and credit markets in the U.S. and the general downturn in the domestic and global economy prevented the Debtors from raising funds necessary to repay or to refinance this debt. In November 2008, the Debtors successfully exchanged $212,979,000 of aggregate principal amount of unsecured debt for common stock and $85,184,000 aggregate principal amount of Second Lien Notes in the 2008 Exchange Offer discussed above. In January 2009, Oscient successfully extended the maturity of its 2009 Notes to December 1, 2009, and a number of the 2009 Notes later exchanged into Second Lien Notes with later maturities. Nevertheless, the Debtors' leveraged balance sheet and the imminent maturities of their debt obligations hindered the Debtors from acquiring new products and entering into new licensing and co-promotion agreements, which would have maximized the value of the Debtors' primary care sales force and their commercial infrastructure.

### B.    Generic Competition.

Shortly after the closing of the 2008 Exchange Offer, the Debtors received notice of a Paragraph IV certification from Lupin Limited ("Lupin") notifying the Debtors of the filing of an Abbreviated New Drug Application ("ANDA") with the FDA for a generic version of ANTARA. Lupin's certification notice alleged that a key ANTARA patent, U.S. Patent No. 7,101,574 (the "'574 Patent"), which was owned by Ethypharm, exclusively licensed to Guardian, and listed in the FDA Orange Book, was invalid and/or would not be infringed by Lupin's commercial manufacture, use, or sale of the drug product described in Lupin's ANDA.

On May 18, 2009, the Debtors received notice of a Paragraph IV certification from Paddock Laboratories Inc. ("Paddock"), notifying the Debtors that Paddock had also filed an ANDA with the FDA for a generic version of ANTARA. As with the Lupin ANDA, Paddock alleged that the '574 Patent was invalid and/or would not be infringed by Paddock's commercial manufacture, use, or sale of the drug product described in Paddock's ANDA.

- 21 -

On January 14, 2009, in response to the filing of Lupin's ANDA, Oscient, along with Guardian and Ethypharm, filed a lawsuit in the United States District Court for the District of Maryland against Lupin and its subsidiary Lupin Pharmaceuticals, Inc., for infringement of the '574 Patent. In accordance with the Hatch-Waxman Act of 1984, pending resolution of the lawsuit, FDA approval of Lupin's ANDA was stayed until the earlier of thirty months from the date of receipt of the Paragraph IV certification notice, or the date of a District Court decision finding that the '574 Patent is either invalid, unenforceable, or not infringed by the drug product which is the subject of Lupin's ANDA.

If Paddock's or Lupin's ANDA received approval, a generic version of ANTARA would have become available in the U.S., significantly decreasing the value of Guardian's ANTARA rights. ANTARA was the Debtors' primary product, generating more than eighty percent of its revenues. The Paragraph IV certifications of Lupin and Paddock generated substantial uncertainty concerning the prospects of ANTARA, thereby raising concerns about the Debtors' long term profitability and limited the Debtors' options for raising capital, acquiring products, and entering into new strategic partnerships.

Additionally, on May 30, 2008, the Debtors received notice of a Paragraph IV certification from Orchid Healthcare, a Division of Orchid Chemicals & Pharmaceuticals Ltd. ("Orchid"), notifying the Debtors of the filing of an ANDA with the FDA for a generic version of FACTIVE, the Debtors' secondary product that comprised approximately 16% of the Debtors' gross revenues. Orchid's notice set forth allegations that eight of the nine FDA Orange Book listed patents were invalid and/or would not be infringed by Orchid's manufacture, importation, use, or sale of the product for which the ANDA was submitted. The notice did not, however, include a Paragraph IV certification with respect to U.S. Patent No. 5,633,262, which is also listed in the FDA Orange Book. Accordingly, the FDA could not finally approve Orchid's ANDA until the expiry of U.S. Patent No. 5,633,262 in June 2015. On the Petition Date, the Debtors were evaluating whether to commence litigation in response to Orchid's Paragraph IV certification.

## C.    Turnaround Efforts

In response to the Debtors' financial difficulties, the Debtors' management team took significant steps to adapt the Debtors' operations and capital structure to the increasingly competitive pharmaceutical and biotechnology industries and to reduce their overall cost structure. These efforts included the exchange offers noted above in 2007 and 2008, which substantially restructured and reduced the Debtors' debt obligations. The Debtors also implemented a significant reduction in personnel in February and March 2009 and a further reduction in June 2009.

The Debtors and their advisors also explored multiple restructuring alternatives, including strategic acquisitions or partnerships, the sale of all or portions of the Debtors' various operations, new debt issuances or equity capital infusions, reorganizations of the Debtors' operations, and a comprehensive restructuring of the Debtors' balance sheet. As part of this process, on February 11, 2009, the Debtors engaged Broadpoint Capital, Inc. ("Broadpoint"), to advise the Debtors on strategic options, including a reorganization on a stand-alone basis or the

- 22 -

potential sale of the Debtors' business. To investigate the opportunities for a sale of the Debtors' business or other business combinations, Broadpoint approached approximately 130 potentially interested parties, including both strategic and financial entities, to investigate opportunities for a sale or reorganization of the Debtors' business. In addition, the Debtors engaged in a dialogue with Paul Royalty and other creditor constituencies regarding debt restructuring.

## IV. THE CHAPTER 11 CASES

### A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code's "absolute priority" rule which governs distribution priorities how a chapter 11 plan may treat different classes of dissimilarly situated creditors and equity interest holders.

Commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case. The bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan enjoins creditors of a debtor from taking any action to collect on any debt that arose prior to the confirmation of the chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement has not yet been approved in accordance with the requirements of section 1125 of the Bankruptcy Code.

The following is a general summary of the Chapter 11 Cases, including, without limitation, the administration of the Chapter 11 Cases, the Debtors' actions since the chapter 11 filings, and the orderly wind-down of the Debtors' operations following the chapter 11 filings.

- 23 -

B.   **Administration of the Chapter 11 Cases**

1.   **Customary "First Day" Orders**

As in many large chapter 11 cases, the Debtors filed a variety of customary motions on the Petition Date or shortly thereafter which were designed to facilitate their smooth transition into bankruptcy.

(a)   *Joint Administration*

On July 14, 2009, the Bankruptcy Court entered a final order allowing the joint administration of these Chapter 11 Cases solely for procedural purposes.

(b)   *Employee Wage Order*

On July 15, 2009, the Bankruptcy Court entered a final order granting the Debtors authority to pay pre-petition wages and benefits owed to employees (including, but not limited to, vacation pay, health insurance, 401(k) plan, and other benefits) in the ordinary course of the Debtors' businesses.

Prior to the Petition Date, the Debtors reduced their employee force to the minimum personnel necessary to operate the Debtors' business during these Chapter 11 Cases. Following this reduction in force in June 2009, the Debtors retained 9 salaried employees as well as 26 contractors, some of whom were former employees of the Debtors that provided temporary transitional consulting services related to their former positions at the request of the Debtors. These contractors worked in various positions for the Debtors including, but not limited to, accounting, administrative, and operational support.

In an effort to prevent the loss of critical personnel, the Debtors initiated a retention program (the "Retention Program") in March 2009. Under the Retention Program, each participating employee was entitled to receive and retain a cash sum (the "Retention Inducement Award") if he or she remained employed with the Debtors through December 31, 2009, or was terminated before that date other than for cause, death, or disability. The maximum amount of the Retention Inducement Award to which a Key Employee received was determined by his or her position and length of employment. The Retention Program was approved as part of the order authorizing the payment of pre-petition wages and benefits to employees.

(c)   *Cash Management Order*

On July 20, 2009, as amended by orders dated July 31, 2009 and November 30, 2009, the Bankruptcy Court entered a final order authorizing the Debtors to continue using their established cash management system, bank accounts, and business forms in the ordinary course of their business so as not to disrupt the Debtors' collections from sales of ANTARA and FACTIVE.

As part of the Cash Management Order, the Debtors were not required to invest and deposit their funds in new debtor-in-possession accounts in accordance with section 345 of the

- 24 -

Bankruptcy Code because the Debtors' existing accounts were deemed in compliance with those requirements because they were fully guaranteed in an unlimited amount by the Federal Deposit Insurance Corporation (the "FDIC") at least until December 31, 2009 under the Transaction Account Guarantee Program ("TAGP"), which was thereafter extended to June 30, 2009.

In addition, the Debtors and Paul Royalty agreed to transfer the applicable percentage on post-petition FACTIVE sales (due under the RIAA) to a separate account to be held in escrow pending further order of the Bankruptcy Court and such account was subsequently established by the Debtors for that purpose. The Debtors and Paul Royalty agreed to transfer the applicable percentage with respect to ANTARA sales directly to Paul Royalty as part of the Cash Collateral Order discussed further below.

(d)   *Sales and Use Tax Order*

On July 15, 2009, the Bankruptcy Court entered an order authorizing the Debtors to remit and pay certain sales, use, franchise, and other taxes as well as other governmental charges (such as incorporation, license, and distribution fees) to various federal, state, local, and foreign taxing authorities incurred in the ordinary course of business as such payments became due.

(e)   *Insurance Order*

On July 31, 2009, the Bankruptcy Court entered a final order authorizing the Debtors to continue their insurance policies, which provided coverage for workers' compensation, personal injuries, crime, director and officer liability, transportation and storage of cargo, umbrella, and various other product- and property-related and general liabilities. The Debtors were authorized to pay any pre-petition premiums or costs related thereto to avoid cancellation, default, alteration, or lapse to the coverage, benefits, or proceeds provided under such policies and to renew or purchase new policies in the ordinary course of business.

(f)   *Interim Compensation Order*

Shortly after the Petition Date, the Debtors sought to establish procedures whereby professionals retained in these Chapter 11 Cases could be compensated on a monthly and interim basis by receiving a percentage of their fees billed and expenses incurred for services performed. On July 31, 2009, the Court entered an order granting the relief requested and establishing interim compensation procedures for professionals utilized by the Debtors and the Creditors' Committee.

(g)   *Ordinary Course Professionals Order*

On July 14, 2009, the Debtors filed a motion requesting authority to employ and pay the reasonable fees and expenses of professionals such as attorneys, accountants, and other consultants utilized in the ordinary course of business to advise and assist the Debtors in the operation of their business and to defend the Debtors in matters arising in the ordinary course of business. The services provided by these professionals were necessary to the Debtors' ongoing business operations and to preserve the value of their assets. On July 31, 2009, the Court granted

- 25 -

BOS-1348582 v18