# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **OSCIENT PHARMACEUTICALS** | : | **Case Nos. 09-16576-HJB** |
| **CORPORATION, et al.,[1]** | : |  |
|  | : | **(Jointly Administered)** |
| **Debtors** | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - x

**DISCLOSURE STATEMENT IN SUPPORT OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF OSCIENT PHARMACEUTICALS, GUARDIAN II ACQUISITION CORPORATION AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF OSCIENT PHARMACEUTICALS CORPORATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**Mintz, Levin, Cohn, Ferris,**
**Glovsky and Popeo, P.C.**
One Financial Center
Boston, Massachusetts 02111
Attn: Richard E. Mikels
Attn: Paul J. Ricotta
Attn: Kevin J. Walsh

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS OF OSCIENT
PHARMACEUTICALS
CORPORATION

**K&L Gates LLP**
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Attn: Charles A. Dale III
Attn: Mackenzie L. Shea

**Ropes & Gray LLP**
One International Place
Boston, Massachusetts 02110
Attn: James M. Wilton
Attn: James A. Wright III

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

Dated: May 27, 2010

---

[1] The Debtors in these cases are Oscient Pharmaceuticals Corporation (Case No. 09-16576) and Guardian II Acquisition Corporation (Case No. 09-16579).

> This Disclosure Statement and the documents accompanying it contain a number of defined terms, which are denoted with capital letters. Capitalized terms that are not otherwise defined in the Disclosure Statement shall have the meanings ascribed to such terms in the Plan, a copy of which is attached hereto as **Exhibit A.**

This Disclosure Statement describes the First Amended Joint Plan of Reorganization for Oscient Pharmaceuticals Corporation and Guardian II Acquisition Corporation proposed by the Debtors and the Official Committee of Unsecured Creditors of Oscient Pharmaceuticals Corporation under Chapter 11 of the Bankruptcy Code (the "Plan") filed on behalf of each of the Debtors. The Plan and Disclosure Statement have been filed in the Debtors' jointly-administered bankruptcy cases, which are currently pending in the United States Bankruptcy Court for the District of Massachusetts. The Plan is a plan for the Estates of both Oscient and Guardian and cannot be confirmed unless confirmed with respect to both Debtors. However, post-confirmation, each Estate will be separately administered and all expenses and liabilities of each Estate shall be satisfied from the assets of the respective Estate.

**The Debtors and the Creditors' Committee urge all Holders of Claims in Impaired Classes receiving Ballots to accept the Plan.**

This Disclosure Statement (and the other Exhibits hereto), the Plan, the accompanying Ballots, if any, and the related materials delivered together herewith are being furnished by the Debtors and the Creditors' Committee to the respective holders of Impaired Claims pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation by the Debtors and the Creditors' Committee of votes to accept or reject the Plan (and the transactions contemplated thereby), as described herein.

This Disclosure Statement is designed to provide adequate information to enable holders of Claims against the Debtors to make an informed judgment on the Plan. All Creditors are encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the Exhibits hereto and other documents referenced as filed with the Bankruptcy Court.

Confirmation and consummation of the Plan are subject to conditions precedent that could lead to delays in consummation of the Plan. There can be no assurance that the Plan will be confirmed or that each of these conditions precedent to consummation will be satisfied or waived. Even after the Effective Date, distributions under the Plan may be subject to substantial delays for holders of Claims that are Disputed.

This Disclosure Statement has been approved by order of the Bankruptcy Court as containing adequate information of a kind and in sufficient detail to enable holders of Claims to make an informed judgment with respect to voting to accept or reject the Plan.

With the exception of historical information, some matters discussed herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are subject to risks, uncertainties and other factors that could cause actual results to differ materially from future results expressed or implied by such forward-looking statements.

No party is authorized by the Debtors or the Creditors' Committee to give any information or make any representations with respect to the Plan other than that which is contained in this Disclosure Statement. No representation or information concerning either Debtor or the value of their properties has been authorized by either Debtor, other than as set forth herein. Any information or representation given to obtain your acceptance or rejection of the Plan that is different from or inconsistent with the information or representations contained herein and in the Plan should not be relied upon by any holders of Claims in voting on the Plan.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling or transferring Claims against, Equity Interests in or securities of the Debtors should evaluate this Disclosure Statement only in light of the purpose for which it was prepared.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "Commission") or by any state securities commission or similar public, governmental or regulatory authority, and neither such Commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

With respect to contested matters, adversary proceedings and other pending or threatened actions (whether or not pending), this Disclosure Statement and the information contained herein shall not be construed as an admission or stipulation by any entity, but rather as statements made in settlement negotiations governed by Rule 408 of the Federal Rules of Evidence and any other rule or statute of similar import.

This Disclosure Statement shall neither be admissible in any other proceeding involving the Debtors or any other party nor be construed to be providing any legal, business, financial or tax advice. Each holder of a claim should, therefore, consult with its own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan, or the transactions contemplated thereby.

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the summaries thereof contained in this Disclosure Statement.

## INCORPORATION OF DOCUMENTS BY REFERENCE

This Disclosure Statement incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith. The following documents are incorporated by reference herein in their entirety:

Each Debtor's *Schedules of Assets and Liabilities*, filed August 12, 2009, including all amendments and restatements thereto filed through the date of the approval of this Disclosure Statement.

Each Debtor's *Statement of Financial Affairs*, filed August 12, 2009, including all amendments and restatements thereto filed through the date of the approval of this Disclosure Statement.

The Debtors' joint *Monthly Operating Reports*, including all amendments thereto filed with the U.S. Trustee through the date of the approval of this Disclosure Statement.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein modifies or supersedes such statement.

## AVAILABLE INFORMATION

Certain documents filed in these Chapter 11 Cases, including the Debtors' Schedules of Assets and Liabilities, their Statements of Financial Affairs, the Plan, and this Disclosure Statement are available on the public docket for the Chapter 11 Cases maintained by the Bankruptcy Court.

## LIST OF EXHIBITS

| | |
|---|---|
| <u>Exhibit A</u> | First Amended Joint Plan of Reorganization for Oscient Pharmaceuticals Corporation and Guardian II Acquisition Corporation proposed by the Debtors and the Official Committee of Unsecured Creditors of Oscient Pharmaceuticals Corporation under Chapter 11 of the Bankruptcy Code |
| <u>Exhibit B</u> | Forms of Ballots |
| <u>Exhibit C</u> | Disclosure Statement Order |

iii

## TABLE OF CONTENTS

**Page**

I. SUMMARY ........................................................................................................... 1
    A.    Rules of Interpretation ............................................................... 1
    B.    Purpose of the Plan ................................................................... 1
    C.    Treatment of Claims and Equity Interests ................................ 3
    D.    Claims Estimates ...................................................................... 7
    E.    Consummation of the Plan ........................................................ 8
    F.    Certain Factors to be Considered Prior to Voting .................... 8
    G.    Voting and Confirmation ........................................................... 8

II. BACKGROUND ................................................................................................. 9
    A.    Business Overview .................................................................... 9
    B.    Corporate Structure ................................................................ 11
    C.    Product Descriptions .............................................................. 11
    D.    Corporate Headquarters and Other Facilities ........................ 13
    E.    Summary of Pre-petition Indebtedness .................................. 14
    F.    Management of the Debtors .................................................... 21

III. EVENTS LEADING TO THE CHAPTER 11 CASES .................................... 22
    A.    Indebtedness and Near Term Debt Maturities. ...................... 22
    B.    Generic Competition. .............................................................. 22
    C.    Turnaround Efforts .................................................................. 23

IV. THE CHAPTER 11 CASES ............................................................................ 24
    A.    Overview of Chapter 11 .......................................................... 24
    B.    Administration of the Chapter 11 Cases ................................ 24
    C.    Ownership of the ANTARA NDA ............................................ 33
    D.    Creditors' Committee's Assertion of Other Claims and Causes of Action
          Against Paul Royalty .............................................................. 36
    E.    Paul Royalty's "Interest" In FACTIVE Sale Proceeds ............ 36
    F.    Paul Royalty's "Trust Claim" Against Oscient ........................ 37

V. SUMMARY OF CHAPTER 11 PLAN .............................................................. 37
    A.    Settlement with Paul Royalty .................................................. 37
    B.    Settlement with Abbott ............................................................ 43

VI. UNCLASSIFIED CLAIMS AGAINST EITHER DEBTOR ............................... 45
    A.    Administrative Claims .............................................................. 45
    B.    Priority Tax Claims .................................................................. 45
    C.    Professional Fees. ................................................................... 45

VII. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS
    AGAINST OSCIENT PHARMACEUTICALS CORPORATION ................. 46
    A.    Summary of Classification and Treatment of Classified Claims and Equity
          Interests .................................................................................. 46

iv

B.      Classification and Treatment of Claims and Equity Interests ...............................46
C.      Cram Down........................................................................................................48

VIII. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS
      AGAINST GUARDIAN II ACQUISITION CORPORATION......................................48
A.      Summary of Classification and Treatment of Classified Claims and Equity
        Interests.............................................................................................................49
B.      Classification and Treatment of Claims and Equity Interests ...............................49
C.      Cram Down........................................................................................................52

IX. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................52
A.      Compromise of Controversies. ............................................................................52
B.      Vesting and Distribution of Assets. .....................................................................52
C.      Dissolution of the Debtors. .................................................................................53
D.      Cancellation of Notes, Instruments, Debentures, and Equity Interests. ...............53
E.      Cancellation of Liens. .........................................................................................53
F.      Corporate Action. ...............................................................................................54
G.      Creation of the Oscient Trust..............................................................................54
H.      Guardian Post-Effective Date; Guardian Disbursing Agent.................................57
I.      Establishment of Administrative Bar Date. ..........................................................58
J.      Allocation of Administrative Claims Between Estates...........................................58

X. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................59
A.      Assumption of Executory Contracts and Unexpired Leases. ................................59
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases............59

XI. PROVISIONS GOVERNING DISTRIBUTIONS..................................................................59
A.      Date of Distributions...........................................................................................59
B.      Disbursing Agents. .............................................................................................60
C.      Distribution Record Date.....................................................................................60
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions............60
E.      Disputed Claims Reserve.....................................................................................61
F.      Direction Letters to Record Holders of the 2009 Notes .......................................62
G.      Distributions by the Indenture Trustees...............................................................62

XII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ................................................62
A.      Prosecution of Objections to Claims. ..................................................................62
B.      Estimation of Claims. ..........................................................................................63
C.      Payments and Distributions on Disputed Claims. ................................................63
D.      Debtors' Rights and Defenses Preserved..............................................................63

XIII. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE....64
A.      Conditions Precedent to Confirmation. ................................................................64
B.      Conditions Precedent to the Effective Date..........................................................64
C.      Modification of Plan............................................................................................65
D.      Effect of Failure of Effective Date. ......................................................................65

E.    Reservation of Rights. ....................................................................65
F.    Substantial Consummation of Plan. ..............................................65

XIV. EFFECT OF PLAN CONFIRMATION ....................................................65
A.    Binding Effect. ................................................................................65
B.    Releases. ..........................................................................................65
C.    Exculpation and Limitation of Liability. ......................................67
D.    Injunction. .......................................................................................67
E.    Term of Bankruptcy Injunction or Stays. .....................................68
F.    Termination of Subordination Rights and Settlement of Related Claims. ......68

XV. RETENTION OF JURISDICTION ............................................................68

XVI. MISCELLANEOUS PROVISIONS ..........................................................69
A.    Payment of Statutory Fees. ............................................................69
B.    Certain Indenture Trustee Fees and Expenses. .............................69
C.    Governing Law. ...............................................................................69
D.    Reserved. .........................................................................................69
E.    Inconsistency. ..................................................................................69
F.    Filing of Additional Documents. ...................................................70
G.    Service of Documents. ....................................................................70
H.    Section 1125(e) of the Bankruptcy Code. ......................................71
I.     Exemption from Certain Transfer Taxes. ......................................71
J.     Tax Reporting and Compliance. ....................................................71
K.    Schedules and Exhibits. ..................................................................71
L.    No Prejudice. ...................................................................................71
M.   Allocation of Payments. ..................................................................72
N.    Dissolution of Statutory Committees. ............................................72

XVII. SOLICITATION AND VOTING PROCEDURES ...................................72
A.    Solicitation Package. .......................................................................72
B.    Distribution of the Solicitation Package ........................................73
C.    Voting Instructions and General Tabulation Procedures ..............73
D.    Who May Vote .................................................................................75
E.    Temporary Allowance of Disputed Claims for Voting Purposes ..75
F.    Establishing Claim Amounts ..........................................................75
G.    General Ballot Tabulation. ..............................................................76
H.    Special Provision Related to Paul Royalty .....................................77

XVIII. CONFIRMATION PROCEDURES ........................................................78
A.    Confirmation Generally ..................................................................78
B.    The Confirmation Hearing. .............................................................78
C.    Statutory Requirements for Confirmation of the Plan ..................79
D.    Identity of Persons to Contact for More information ....................90
E.    Other Risk Factors Associated With the Plan or Distributions Thereunder ..........90
F.    Disclosure Statement Disclaimer. ..................................................91

vi

XIX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....93
    A.    Liquidation Under Chapter 7 ...............................................................93

XX. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES .................93
    A.    Federal Income Tax Consequences .........................................................95
    B.    Federal Income Tax Treatment of Equity Interests ...............................96
    C.    Withholding and Reporting .....................................................................96

XXI. CONCLUSION AND RECOMMENDATION .................................................................97

BOS-1348582 v18

# I. SUMMARY

The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement and in the Plan. Unless otherwise stated herein, section ("Section" or "§") references are to the United States Bankruptcy Code, 11 U.S.C. §§ *et seq.* (the "Bankruptcy Code").

## A.    Rules of Interpretation

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (c) unless otherwise specified, all reference herein to "Articles" are references to Articles hereof or hereto; (d) captions and headings to Articles are inserted for convenience of reference only and are not intended to be part of or to affect the interpretation hereof; (e) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (f) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## B.    Purpose of the Plan

The purpose of the Plan is to facilitate the liquidation of the Debtors' Estates and the distribution of their remaining assets to holders of Allowed Claims. The Plan also effects a settlement between Oscient,[2] Guardian, the Creditors' Committee and Paul Royalty Fund Holdings II ("Paul Royalty"), an affiliate of Paul Capital Partners, and a settlement between Oscient, Guardian, and Abbott Laboratories ("Abbott"). Copies of the Plan are attached hereto as **Exhibit A** and incorporated herein by reference.

The Debtors and the Creditors' Committee believe the Plan provides the best recovery possible for holders of Allowed Claims against both Estates and strongly recommend that, if such holders are entitled to vote, they vote to accept the Plan.

IN THE EVENT VOTERS DO NOT ACCEPT THE CHAPTER 11 PLAN, THESE CHAPTER 11 CASES MAY BE CONVERTED TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. IN THAT EVENT, THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THERE WOULD BE (1) NO RECOVERY TO ANY

---

[2] Hereinafter, all references to such settlement include Oscient claims asserted by the Creditors' Committee on behalf of the Oscient Estate.

Signature Page

CREDITORS OF GUARDIAN OTHER THAN HOLDERS OF PAUL ROYALTY
GUARDIAN CLAIMS AGAINST THE GUARDIAN ESTATE; AND (2) THE DEBTORS
AND THE CREDITORS' COMMITTEE BELIEVE THAT THERE WOULD LIKELY BE A
SUBSTANTIALLY REDUCED RECOVERY TO HOLDERS OF ALLOWED OSCIENT
UNSECURED CLAIMS IN THE OSCIENT ESTATE.

PURSUANT TO SECTION 1141(d)(3) OF THE BANKRUPTCY CODE, THE PLAN
DOES NOT CONTAIN A DISCHARGE FOR THE DEBTORS AS (1) THE PLAN IS A
LIQUIDATING PLAN, (2) THE DEBTORS WILL NOT BE ENGAGING IN THE BUSINESS
AFTER THE CONSUMMATION OF THE PLAN AND THEREFORE (3) THE DEBTORS
ARE NOT ENTITLED TO A DISCHARGE UNDER SECTION 727(A) OF THE
BANKRUPTCY CODE.

### 1.    Settlement with Paul Royalty

The settlement in the Plan between Oscient, Guardian, the Creditors' Committee and Paul
Royalty will significantly increase the recovery for Oscient's unsecured creditors (other than
Paul Royalty), provide a recovery to certain of Guardian's unsecured creditors if their claim is
less than $1,500 or if they agree to reduce their claim to $1,500, allow the Debtors to distribute
the vast majority of their assets to creditors earlier than would otherwise be possible had the
issues been fully litigated, and avoid the costs of litigating multiple complex factual and legal
disputes involving Paul Royalty and/or intercompany claims between the Debtors' Estates,
saving millions of dollars for creditors.  Pursuant to Fed. R. Bankr. P. 9019, the Plan provides,
*inter alia*, for Paul Royalty to waive 100% of its claims against the Oscient Estate, resulting in an
approximately $62.4 million reduction in claims against the Oscient estate.  In addition to the
claim waiver, the terms of the settlement contemplate a transfer of $1 million from the Guardian
Estate to the Oscient Trustee.  In exchange, the Debtors and the Creditors' Committee agree to
the Allowed amount of Paul Royalty's claims and to settle certain disputes regarding
intercompany claims and the distribution of proceeds of the sale of Guardian's primary asset,
ANTARA.  Guardian unsecured creditors will also benefit from the settlement between Oscient,
Guardian, the Creditors' Committee and Paul Royalty by having the opportunity to participate in
a convenience class which will get paid in full on the Effective Date.

**The Debtors and the Creditors' Committee estimate that the settlement with Paul
Royalty, including the $62.4 million waiver of Paul Royalty's claims against Oscient,
including without limitation, Paul Royalty's claims under the 12.5% Notes and the
payment of $1 million from the Guardian Estate to the Oscient Trustee, will greatly
enhance the distribution to holders of Oscient Unsecured Claims from approximately 9.6%
to approximately 22.5%, subject to the actual amount of all claims of any kind Allowed
against the Oscient Estate and the total value of Assets available for distribution to Holders
of such claims.**

### 2.    Settlement with Abbott

The settlement in the Plan between Oscient, Guardian, and Abbott also benefits Oscient's
unsecured creditors by eliminating administrative and unsecured claims against Oscient's Estate.

- 2 -

The settlement with Abbott provides for Abbott to receive an Allowed Administrative Claim against Guardian for $750,000, and for Abbott to waive its other claims against both Guardian and Oscient. Abbott has asserted unsecured claims of approximately $5.2 million against both Guardian and Oscient, as well as additional unsecured claims contingent on future events and significant administrative expense claims. The settlement avoids the risk, cost, and delay of litigating with Abbott over these claims without any cost to Oscient's Estate.

As a result of the settlements with Paul Royalty and Abbott, the Debtors are able to complete the orderly liquidation of their Estates and distribute their remaining assets to holders of Allowed Claims in accordance with the terms of the Plan. The Debtors and the Creditors' Committee believe that the Plan provides the best recoveries possible for holders of Allowed Claims and strongly recommend that, if such holders are entitled to vote, they vote to accept the Plan. The Debtors and the Creditors' Committee believe that any alternative to Confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation, and additional costs and, ultimately, would significantly reduce the recoveries for holders of Allowed Claims.

### C.    Treatment of Claims and Equity Interests

The Plan divides all Claims against and Equity Interests in the Debtors into various classes with the exception that certain Claims which are not required to be classified are treated as unclassified. The tables set forth below summarize the Classes of Claims and Equity Interests under the Plan, the treatment and projected recovery of such Classes under the Plan and such Classes' entitlement to vote on the Plan.

### 1.    Unclassified Claims

| Class of Unclassified Claim | Projected Claims | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[3] |
|---|---|---|---|---|
| Administrative Claims | The Debtors currently are unable to estimate the amount of Claims in this Class for either Debtor. | Paid in full in Cash. | N/A | 100% |
| Priority Tax Claims | $0.00[4] | Paid in full in Cash. | N/A | 100% |

---

[3] The Projected Recoveries under the Plan are based upon certain assumptions as further discussed below.

[4] Estimated priority tax claims as of 12/31/09.

- 3 -

| Class of Unclassified Claim | Projected Claims | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[3] |
|---|---|---|---|---|
| Professional Fees | $675,000[5] | Paid in full in Cash, subject to allowance by the Bankruptcy Court. | N/A | 100% |

---

[5] Estimated accrued, but unpaid professional fees as of March 31, 2010.  This estimate does not include amounts incurred after such date.

- 4 -

## 2.    Oscient Claims and Equity Interests:

| Oscient Claims and Equity Interests | Projected Claims (Approximation) | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[6] |
|---|---|---|---|---|
| Oscient Class 1 - Oscient Secured Claims | $0.00. The Debtors believe there are no Oscient Secured Claims. | Return of collateral or paid in full in Cash. | Unimpaired (deemed to accept) | 100% |
| Oscient Class 2 - Oscient Other Priority Claims | $200,000. | Paid in full in Cash. | Unimpaired (deemed to accept) | 100% |
| Oscient Class 3 - Oscient Unsecured Claims | $78.8 million[7] | Will receive, on the Effective Date, a Pro-Rata Share of the Oscient Trust Interests. | Impaired (entitled to vote) | 22.5% |
| Oscient Class 4 - Oscient Subordinated Securities Claims | $0.00. The Debtors believe there are no Oscient Subordinated Securities Claims | No recovery. | Impaired (deemed to reject) | 0% |
| Oscient Class 5 - Oscient Equity Interests | All Equity Interests in Oscient. | No recovery. | Impaired (deemed to reject) | 0% |

---

[6] The Projected Recoveries under the Plan are based upon certain assumptions as further discussed below.

[7] The $78.8 million amount represents a reduction in the amount of general unsecured claims against Oscient from approximately $141.0 million, pursuant to the terms of the settlement with Paul Royalty. The estimate of $78.8 million for Oscient Class 3 Claims consists of (i) the reduction to $0.00 of Paul Royalty Oscient Claims pursuant to the settlement (which includes the 12.5% Notes held by Paul Royalty), (ii) approximately $49.2 million of Second Lien Notes (excluding the 2008 Paul Royalty Note) under which Oscient is the primary obligor; (iii) the 3.5% Notes, (iv) the 3½ % Notes, (v) 2009 Notes; and (vi) general unsecured claims, excluding claims asserted by Abbott.

- 5 -

### 3.    Guardian Claims and Equity Interests:

| Guardian Claims and Equity Interests | Projected Claims (Approximation) | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[8] |
|---|---|---|---|---|
| Guardian Class 1 – Paul Royalty Guardian Claims | $82,928,485[9] | Initial distribution of cash on the Effective Date and later distribution of assets remaining following all other required distributions by Guardian. | Impaired (entitled to vote) | 57.3% |
| Guardian Class 2 – Guardian Second Lien Claims | $51.3 million[10] | No recovery. | Impaired (deemed to reject) | 0%[11] |
| Guardian Class 3 - Guardian Other Secured Claims | $0.00. The Debtors believe there are no Guardian Other Secured Claims. | Return of collateral or paid in full in Cash. | Unimpaired (deemed to accept) | 100% |
| Guardian Class 4 - Guardian Other Priority Claims | $2,050. | Paid in full in Cash. | Unimpaired (deemed to accept) | 100% |
| Guardian Class 5 - Guardian Unsecured Claims | $97.3 million[12] | No recovery. | Impaired (deemed to reject) | 0%[13] |

---

[8] The Projected Recoveries under the Plan are based upon certain assumptions as discussed further below.

[9] As agreed to pursuant to the terms of the settlement between the Debtors, the Creditors' Committee, and Paul Royalty.

[10] Including the 2008 Paul Royalty Note, which is part of the Second Lien Notes.

[11] For the benefit of its parent, Guardian provided an upstream guarantee of the Second Lien Notes, including a lien on substantially all of Guardian's assets. Pursuant to the terms of an Intercreditor Agreement, such lien is expressly junior to the Paul Royalty lien on substantially all of Guardian's assets. While the Holders of Second Lien Notes will receive no distribution from the Guardian Estate on account of their subordinated position, such Holders have Oscient Unsecured Claims and will receive a projected 22.5% recovery from the Oscient Estate.

[12] The estimate of $97.3 million in Claims in Guardian Class 5 (a) includes (i) an approximately $51.3 million unsecured deficiency claim for the Holders of Guardian Second Lien Claims; (ii) an approximately $40 million intercompany claim by Oscient, payment of which is contractually subordinated to payment of Paul Royalty's claims, (iii) an estimate of approximately $6 million in general unsecured claims, but (b) excludes any unsecured deficiency claims of Paul Royalty with respect to the Paul Royalty Guardian Claims. As discussed above, the

- 6 -

BOS-1348582 v18

| Guardian Claims and Equity Interests | Projected Claims (Approximation) | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan[8] |
|---|---|---|---|---|
| Guardian Class 6 - Guardian Convenience Claims | $1,500 | Paid in full in Cash | Unimpaired (deemed to accept) | 100% |
| Guardian Class 7 - Guardian Subordinated Securities Claims | $0.00. The Debtors believe there are no Guardian Subordinated Securities Claims. | No recovery. | Impaired (deemed to reject) | 0% |
| Guardian Class 8 - Guardian Equity Interests | All Equity Interests in Guardian. | No recovery. | Impaired (deemed to reject) | 0% |

### D.    Claims Estimates

The Debtors estimate that the aggregate amount of unsecured, non-priority Claims against the Oscient Estate is approximately $141 million[14] (all of which is unsecured) and that the aggregate amount of Claims against the Guardian Estate is approximately $140.0 million (of which $82.9 million is secured debt owed to Paul Royalty and $57.3 million is unsecured[15])[16]. These estimates do not account for the impact of the Claim objection, reconciliation and resolution process or the settlements with Paul Royalty and Abbott provided for in the Plan. With respect to Guardian, these estimates assume that the Second Lien Notes claims are entirely

---

Holders of Guardian Second Lien Claims will benefit from the Paul Royalty settlement through an enhanced distribution in respect of their claims against the Oscient Estate.

[13] As described below, a Holder of an Allowed Guardian Unsecured Claim (other than an Oscient Intercompany Claim or a Guardian Second Lien Deficiency Claim) may agree prior to the Effective Date in a writing to the Debtors to unconditionally waive any amount of such Claim in excess of $1,500, in which case such Allowed Guardian Unsecured Claim shall be so reduced and shall be an Allowed Guardian Convenience Claim and receive the treatment provided for such Claims.

[14] Excluding intercompany debt, but including the Paul Royalty Oscient Claims before the settlement contemplated under the Plan.

[15] The $57.3 million in unsecured claims includes the deficiency claim for Holders of Guardian Second Lien Claims, while excluding intercompany debt.

[16] Excluding certain claims that were improperly scheduled or filed against Oscient and/or Guardian as being secured, priority, or unsecured, subject to the Claims objection, reconciliation, and resolution process.

BOS-1348582 v18

unsecured deficiency claims and that Paul Royalty does not have any unsecured deficiency claims against Guardian. These estimates are approximate and based upon numerous assumptions. There is no guarantee that the ultimate amount of Claims will conform to these estimates. Further, additional claims may be filed or identified during the Claims objection, reconciliation, and resolution process that may materially affect the foregoing estimates. Although the Debtors believe that certain Claims may be without merit and objections to such Claims may be brought, there can be no assurance that these objections, if brought, will be successful.

### E.      Consummation of the Plan

Following Confirmation of the Plan, the Plan will be consummated on the Effective Date, which the Debtors expect will occur on the fifteenth (15) day after the Confirmation Date, provided that (a) no stay of the Confirmation Order is in effect; and (b) all conditions to Consummation of the Plan set forth in ARTICLE XIII "Conditions Precedent to Confirmation and the Effective Date" have been satisfied or waived. Distributions to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date.

### F.      Certain Factors to be Considered Prior to Voting

HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER THE RISKS SET FORTH HEREIN PRIOR TO ACCEPTING OR REJECTING THE PLAN.

### G.      Voting and Confirmation

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to Confirmation of the Plan.

Oscient Class 3 (Oscient Unsecured Claims) and Guardian Class 1 (Paul Royalty Guardian Claims) are entitled to vote to accept or reject the Plan. Each such Class will have accepted the Plan if (a) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan, and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence on **June 29, 2010** at **2:00 p.m.** (prevailing Eastern Time) before the Bankruptcy Court at 300 State Street, Springfield, MA. Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class of Claims in the Estate of each Debtor that is Impaired under the Plan.

THE DEBTORS AND THE CREDITORS' COMMITTEE WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO THE CLASSES OF CLAIMS AND EQUITY INTERESTS THAT ARE DEEMED TO REJECT THE PLAN

BOS-1348582 v18

The Bankruptcy Court has approved **June 28, 2010** at **12:00 p.m.** (prevailing Eastern Time), as the voting deadline (the "Voting Deadline") for delivering Ballots with respect to the Plan. In order to assure that votes are counted to accept or reject the Plan, all Ballots must be properly executed, completed and delivered by: (a) first class mail; (b) overnight courier; or (c) personal delivery so that they are actually received, in accordance with the instructions set forth in the Ballots, no later than the Voting Deadline by the Debtors' solicitation agent, The Garden City Group, Inc. (the "Solicitation Agent").

The Debtors, in consultation with the Creditors' Committee, reserve the right to extend the Voting Deadline.

The Solicitation Agent will answer any questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

The Solicitation Agent will also process and tabulate ballots for each Class entitled to vote or accept or reject the Plan.

If you have any questions on voting procedures, please contact the Solicitation Agent at the telephone number or email address set forth on the Ballots.

TO BE COUNTED, BALLOTS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE SOLICITATION AGENT NO LATER THAN 12:00 P.M. (PREVAILING EASTERN TIME) ON JUNE 28, 2010. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS. THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

## II. BACKGROUND

### A.    Business Overview

Oscient Pharmaceuticals Corporation ("Oscient") and its wholly-owned subsidiary, Guardian II Acquisition Corporation ("Guardian" and collectively with Oscient, the "Debtors") were commercial-stage pharmaceutical companies marketing two Food and Drug Administration ("FDA") approved products in the United States. The parent, Oscient owned FACTIVE® (gemifloxacin mesylate) tablets, a fluoroquinolone antibiotic. Its wholly-owned subsidiary, Guardian, owned ANTARA® (fenofibrate) capsules, a cardiovascular product. Prior to June 20, 2009, the Debtors promoted ANTARA and FACTIVE through their national sales force, which targeted primary care physicians, cardiologists, endocrinologists, and pulmonologists.

ANTARA is approved by the FDA to treat hypercholesterolemia (high blood cholesterol) and hypertriglyceridemia (high triglycerides) in combination with a healthy diet. Guardian

- 9 -

licensed the rights to ANTARA from Ethypharm S.A. of France ("Ethypharm") and began promoting ANTARA in late August 2006. In 2008, ANTARA generated approximately $70 million in net revenues. FACTIVE is indicated for the treatment of community-acquired pneumonia of mild to moderate severity and acute bacterial exacerbations of chronic bronchitis. Oscient licensed the rights to gemifloxacin, the active ingredient in FACTIVE tablets, from LG Life Sciences of the Republic of Korea ("LG Life Sciences") and launched FACTIVE in the U.S. market in September 2004. In 2008, FACTIVE generated approximately $16 million in net revenues. In addition to FACTIVE, Oscient also owned a late-stage antibiotic candidate, Ramoplanin for the treatment of *Clostridium difficile*-associated disease.

As of December 31, 2008, the Debtors' consolidated financial statements (which included both Debtors) showed (i) cash and cash equivalents totaling approximately $17,193,000, which included $4,598,000 in restricted cash, (ii) total net revenues of approximately $86,848,000 for the year ended December 31, 2008, and (iii) total costs and expenses of approximately $167,210,000 for the year ended December 31, 2008.

As of the Petition Date, the Debtors' principal source of revenue was sales of ANTARA capsules by Guardian and FACTIVE tablets by Oscient. The Debtors marketed ANTARA and FACTIVE through their sales and marketing organization which targeted community-based physicians in the U.S. The Debtors employed a team of professionals with experience in insurance, government reimbursement, medical affairs and marketing. Prior to bankruptcy, the Debtors' strategy was to maximize the sales of their existing products and leverage their sales force and commercial infrastructure by acquiring new primary care products via transactions, including acquisition, in-licensing and co-promotion agreements for the U.S. marketplace.

As of December 31, 2008, the Debtors had 316 full-time employees, with 257 field employees across the U.S. and 59 employees in their Waltham, Massachusetts and Skillman, New Jersey offices. In February and March 2009, the Debtors implemented a reduction in personnel affecting certain office personnel and approximately 32% of their sales and marketing teams. The Debtors' reduced their sales force to more aggressively preserve their financial resources and position themselves for a potential partnership or acquisition. Around the same time as the reduction in force and to further facilitate the companies' re-positioning, the Debtors engaged Broadpoint Capital, Inc. ("Broadpoint") to advise the Debtors on strategic options, including the potential sale of the Debtors.

As of March 20, 2009, after the initial reduction in force, the Debtors' sales and marketing organization was comprised of approximately 168 field sales personnel, including 150 sales representatives, as well as district managers and regional sales directors. In June 2009, the Debtors implemented a further reduction in force, which included the termination of the Debtors' approximately 150 remaining sales representatives, the employees in the Debtors' sales coordination office in Skillman, New Jersey, and also certain employees serving supporting functions in the Waltham, Massachusetts headquarters. As of June 20, 2009, the Debtors had 9 full-time employees, and approximately 26 full-time contract employees.

- 10 -

### B.    Corporate Structure

The Debtors in these cases are Oscient, a Massachusetts corporation, and Guardian, a Delaware corporation that is a wholly-owned subsidiary of Oscient. As of the Petition Date, Oscient, as the parent corporation of Guardian, conducted substantially all of the Debtors' operations and was the party to the majority of contracts with the Debtors' suppliers and vendors. Oscient was also the licensee with respect to FACTIVE as discussed further below. Prior to the Debtors' June 2009 reduction in force, Oscient employed a national sales force to promote both ANTARA and FACTIVE in the U.S.

Guardian was formed in connection with the Debtors' acquisition of ANTARA and as of the Petition Date, owned substantially all rights to ANTARA intellectual property, including patent and application claims that relate to pharmaceutical compositions containing fenofibrate using the drug delivery technologies incorporated in ANTARA, methods of their use and treatment, and methods of preparing the same.

Guardian had no administrative, sales, or other employees. As a result, Oscient serviced all operations of Guardian, including all operations related to ANTARA, under a written servicing agreement between the Debtors. Guardian paid Oscient for these services.

### C.    Product Descriptions

As of the Petition Date, Guardian had one primary asset, ANTARA and Oscient had two primary assets, FACTIVE and Ramoplanin, a late-stage investigational antibiotic candidate.

### 1.    <u>ANTARA</u>

ANTARA is a once-daily formulation of fenofibrate approved for use in combination with a diet restricted in saturated fat and cholesterol to (i) reduce elevated LDL-C ("bad" cholesterol), triglyceride, and apolipoprotein B (free floating fats in the blood) levels and (ii) increase HDL-C ("good" cholesterol) in adult patients with high cholesterol or an abnormal concentration of lipids in the blood. Fenofibrate products work primarily to lower triglycerides and increase HDL-C, which makes the drug an attractive alternative for those patients whose LDL-C is well controlled. ANTARA received FDA approval in November 2004. The Debtors began marketing ANTARA in 43 mg and 130 mg doses in August 2006. For the fiscal year ended December 31, 2008, ANTARA generated sales revenues of $70,330,000, representing approximately 81.5% of the Debtors' total sales revenues.

In 2008, total U.S. sales of fenofibrate products were approximately $2.3 billion, a 16% increase over 2007 sales. The fenofibrate market has experienced a 15% average annual growth in sales since 2004 with growth in 2008 over 2007 slowing to 10%. ANTARA's sales accounted for approximately 5% of the U.S. fenofibrate sales for the year ending December 31, 2008.

*(a)    <u>Ethypharm License Agreement</u>*

- 11 -

On August 18, 2006, Guardian acquired the rights to ANTARA in the U.S. from Reliant Pharmaceuticals Inc. ("Reliant") for $78.0 million plus approximately $4.3 million for ANTARA inventory, excluding estimated transaction costs. As part of this transaction, Reliant sold, transferred, conveyed, and assigned to Guardian all of its right, title, and interest in and to an extensive list of specified assets (collectively, the "Acquired Assets"). The Acquired Assets included ANTARA and all related assets, including clinical data, inventory, ANTARA® trademark in the U.S., and certain related contracts and licenses covering intellectual property rights related to the ANTARA products. Oscient executed the APA solely as a guarantor of Guardian's payment and performance obligations thereunder and was not a purchaser of the Acquired Assets.

The centerpiece of the acquisition was Reliant's assignment to Guardian of an exclusive license for ANTARA in the U.S. from Ethypharm. Under the agreement with Ethypharm, Guardian assumed all of the rights and obligations related to the development, manufacturing, marketing and sale of ANTARA in the U.S. ANTARA capsules are covered by a U.S. patent relating to formulations containing fenofibrate and methods of preparing the same that extends through August 2020. The license to Guardian included this one U.S. patent and several pending patent applications which relate to the formulation. In addition, Guardian was assigned a patent application which was filed by Reliant relating to methods of treatment. Guardian also acquired exclusive rights to ANTARA trademarks, trade names, domain names and logos in the license agreement.

In conjunction with obtaining financing for the acquisition of ANTARA from Reliant discussed further below, Guardian entered into a Security Agreement with Paul Royalty under which Guardian granted Paul Royalty a security interest in substantially all of its assets, including all rights to ANTARA intellectual property, in order to secure its performance under the financing agreements with Paul Royalty.

### (b)     New Drug Application

Pursuant to the terms of the written Asset Purchase Agreement dated July 21, 2006 by and between Reliant, Guardian, and Oscient, Guardian also acquired the New Drug Application #21-695 (the "ANTARA NDA") and the Investigational New Drug application ("IND") covering ANTARA in the U.S. The Acquired Assets expressly included "Registrations," which included the ANTARA NDA. The circumstances surrounding Guardian's acquisition of the ANTARA NDA from Reliant are discussed in greater detail below.

### (c)     Paragraph IV Certifications

The Debtors received notices of a Paragraph IV certification from each of Lupin Limited and Paddock Laboratories, Inc., notifying the Debtors of the filing of an Abbreviated New Drug Application ("ANDA") with the FDA seeking approval for a generic version of ANTARA. These ANDA filings are discussed in greater detail at ARTICLE III, Section B "Generic Competition" below.

- 12 -

## 2.   FACTIVE

FACTIVE is a member of the fluoroquinolone class of antibiotics.  FACTIVE was approved by the FDA in 2003 for the treatment of community-acquired pneumonia of mild to moderate severity and acute bacterial exacerbations of chronic bronchitis.  For the fiscal year ended December 31, 2008, FACTIVE generated sales revenues of $15,995,000, representing approximately 18.5% of the Debtors' total sales revenues.

On May 30, 2008, the Debtors received notice of a Paragraph IV certification from Orchid Healthcare, a Division of Orchid Chemicals & Pharmaceuticals Ltd. ("Orchid") notifying the Debtors of the filing of an Abbreviated New Drug Application ("ANDA") with the FDA for a generic version of FACTIVE.  The ANDA filing by Orchid is discussed in greater detail below.

## 3.   Ramoplanin

Ramoplanin is a late-stage investigational antibiotic candidate for the treatment of *Clostridium difficile*-associated disease ("CDAD").  Clostridium difficile is a bacterium that causes diarrhea and more serious intestinal conditions such as colitis.  In October 2001, the Debtors in-licensed U.S. and Canadian rights to Ramoplanin from Vicuron Pharmaceuticals Inc. ("Vicuron"), a wholly-owned subsidiary of Pfizer Inc., and on February 3, 2006, acquired worldwide rights from Vicuron, thereby assuming full rights to the manufacturing, development and commercialization of Ramoplanin.  Ramoplanin is a novel antibiotic and has a unique profile that may make it particularly well-suited for killing bacteria in the GI tract.  The Debtors had completed Phase II clinical trials studying the use of Ramoplanin for CDAD, but due to their financial difficulties before the Petition Date, had suspended clinical development and were exploring the potential out-licensing, co-development, or sale of Ramoplanin with a partner, licensee or buyer.

Pursuant to the Debtors' acquisition of worldwide rights to Ramoplanin from Pfizer (formerly Vicuron), the Debtors were responsible for the manufacture of both the active pharmaceutical ingredient and finished dosage form of Ramoplanin.  The Debtors planned to seek a partner for Ramoplanin who would be required to produce both the active pharmaceutical ingredient and the final dosage form to support related manufacturing activities.

## D.   Corporate Headquarters and Other Facilities

The Debtors leased their executive offices located at 1000 Winter Street, Suite 2200, Waltham, Massachusetts (the "Winter Street Facility").  As of the Petition Date, the Debtors leased approximately 36,000 square feet of space at the Winter Street Facility, and the term of the existing lease was until March 31, 2012.  On October 30, 2009, the Debtors, with the consent of the landlord, moved to reject the existing lease for the Winter Street Facility effective November 30, 2009.  In connection with rejection of the existing lease, the Debtors and landlord agreed on the terms of a new lease pursuant to which the Debtors now occupy a significantly reduced amount of space at the Winter Street Facility for an initial three-month term and thereafter on a month-to-month basis terminable by either party on 30 days written notice at a monthly rent of approximately $8,000.  The purpose of the new lease was to provide the Debtors

BOS-1348582 v18